FILED

2007 Oct-18  PM 12:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MICHAEL JEFFREY LAND, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 04-BE-2866-S |
| | ) |
| DONAL CAMPBELL, Commissioner, | ) |
| Alabama Department of Corrections, | ) |
| | ) |
| Respondent. | ) |

MEMORANDUM OF OPINION

Procedural Background

Michael Jeffrey Land, petitioner herein, filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Land is represented by counsel.[1] His claims for relief include – allegations of prosecutorial misconduct, ineffective assistance of counsel, and other claims. For the reasons stated below, the petition is due to be denied.

On August 13, 1993, Land was convicted in the Circuit Court of Jefferson County of two counts of capital murder for the death of Candace Brown – one count of murder during a burglary in violation of § 13A-5-40(a)(1), *Ala. Code* (1975), and one count of murder during a kidnapping in violation of § 13A-5-40(a)(4), *Ala. Code* (1975). The jury recommended that Land be sentenced to death by a vote of 11 to 1.

At a sentencing hearing held on December 2, 1993, the trial court found two aggravating circumstances and no statutory mitigating factors. The trial court sentenced Land to death.

---

[1] Land is represented here by Robert M. Illman, Federal Defenders in the Middle District of Alabama. He was represented at trial by Hiram Dodd, Jr., and Erskine Mathis. He was represented on direct appeal by Joe W. Morgan, Jr. He was represented on petition for writ of certiorari to the Alabama Court of Criminal Appeals by Joseph T. Flood. He was represented on petition for writ of certiorari to the Supreme Court of Alabama by Ursula Bentele. He was represented throughout the Rule 32 collateral review process by J. Drew Colfax, Randall S. Suskind, and Gerald W. King, Equal Justice Initiative of Alabama.

On January 13, 1995, the Alabama Court of Criminal Appeals affirmed Land's conviction and sentence.  *Land v. State*, 678 So.2d 201 (Ala. Crim. App. 1995).  The Alabama Supreme Court granted certiorari and on March 1, 1996, affirmed Land's conviction and sentence.  *Ex parte Land*, 678 So. 2d 224 (Ala. 1996).  The United States Supreme Court denied Land's petition for writ of certiorari on October 15, 1996. *Land v. Alabama*, 519 U.S. 993, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996).

On October 2, 1997, Land filed a post-conviction petition in state court pursuant to Rule 32, *Alabama Rules of Criminal Procedure* (referred to hereinafter as a Rule 32 petition).  He amended his Rule 32 petition on November 6, 1998 and again on January 8, 2001.  The state court conducted an evidentiary hearing on July 2, 2001.  On April 23, 2003, the trial court denied Land's Rule 32 petition, adopting the proposed order submitted by the state.  On May 21, 2004, the Alabama Court of Criminal Appeals affirmed the denial of Land's Rule 32 appeal.  *Land v. State*, CR-02-1563, Memorandum Opinion, (Ala.Crim.App. May 21, 2004).  On June 25, 2004, the Alabama Court of Criminal Appeals denied Land's application for rehearing.  On September 24, 2004, the Alabama Supreme Court denied Land's petition for writ of certiorari.  On September 29, 2004, Land filed his federal petition for writ of habeas corpus in this court and subsequently filed his amended petition on February 16, 2005.  In his petition, Land asserts what he contends are instances of prosecutorial misconduct, ineffective assistance of counsel, trial court error, juror misconduct, and insufficiency of the evidence.

Factual Background

The Alabama Supreme Court summarized the facts as follows:

> On the evening of May 18, 1992, Candace Brown drove to her
> mother's home to pick up her two-year-old son. Because Ms.

2

Brown's residence had been burglarized five days earlier, her mother and brother followed her home to make sure the house was safe. Ms. Brown's mother and brother left the house at approximately 9:00 p.m.

The following morning, May 19, Ms. Brown's landlord went to her residence to supervise the installation of a fence. The landlord observed that a window located near the rear entry to the house had been broken into, that the telephone wires to the house had been cut, and that the window on the driver's side of Ms. Brown's car had been shattered. After knocking on the front door and receiving no response, the landlord asked a neighbor to call the police and then returned to his own home in order to get a spare set of keys to Ms. Brown's house. When officers from the Birmingham Police Department arrived at Ms. Brown's residence, they established that all doors to the house were locked, that a storm window located near a rear entry to the house had been removed, and that several panes of the interior window behind that storm window had been cut and removed. They saw on one of the removed panes of glass, which was lying on the ground, a shoe imprint with a distinctive tread design bearing the lettering "USA."

The landlord opened the house for the police officers, who found Ms. Brown's infant son alone and unharmed. The officers also found on a bulletin board a note with the name and telephone numbers of Michael Jeffrey Land and his mother, Gail M. Land.

After telephoning Ms. Land and learning from her where her son Jeffrey was working, Detectives Steve Corvin and Larry Fowler went to Riverchase Galleria, a shopping mall in Hoover, where Jeffrey Land was repairing the roof of the mall. The detectives informed Land that they were investigating the disappearance of Ms. Brown, and he agreed to accompany them to the police station to answer some questions. He was taken to an interrogation room and informed of his rights, pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He signed a waiver of rights form and agreed to have his statement tape-recorded.

Land acknowledged in the tape-recorded statement that he knew Ms. Brown, but said that he had not seen her in about a week, that he had no idea where she was, and that he had no knowledge about the most recent break-in at her residence. However, Land later confessed that he had burglarized Ms. Brown's residence six days earlier and that during the course of that burglary he had cut the exterior telephone lines.

3

When the detectives inquired as to where he had been the night before, i.e., May 18, Land claimed that he had been visiting a girlfriend at her parents' apartment until approximately 11:30 p.m. Land said that after he left the apartment he fell asleep in his car in the parking lot at the apartments and that he awoke at approximately 4:15 a.m., May 19, and drove to his grandfather's house; he said he lived there with his grandfather. Land claimed that he reported to work at the Galleria before 6:00 a.m. that morning, that he had eaten lunch earlier that day with a second girlfriend, and that his car was parked at that second girlfriend's house.

During the interrogation, Detective Fowler noticed that the tread design on the bottom of Land's tennis shoes appeared to match the print the officers had seen on the window glass at Ms. Brown's house. At the completion of Land's interview, Detective Fowler asked to see Land's shoes and, upon closer observation, noticed what appeared to be bloodstains. The detectives asked Land to removes [sic] his shoes and clothes, and they gave him a jail uniform to wear.[2/] Meanwhile, Birmingham Police Lieutenant Carl Quinn telephoned Land's second girlfriend, who denied having eaten lunch with him that day and also stated that Land's car was not parked at her home.

After Lt. Quinn relayed that information to Detectives Fowler and Corvin, Corvin informed Land that his second girlfriend had denied eating lunch with him and had denied having his car. Detective Corvin then told Land that he needed to tell the truth about the disappearance of Ms. Brown. Confronted with this discrepancy in his statement, Land then agreed to make a second statement, but refused to allow it to be tape-recorded.

Once again, Land was informed of, and waived, his *Miranda* rights. In his second statement, Land stated that he had met two men, whom he named "Tony" and "Edward," at a gas station late the previous night and that these men had asked him if he knew an "easy mark" for a burglary. Land stated that he suggested Ms. Brown's house and that Tony and Edward had paid him $20 to cut and remove the glass to a window in Ms. Brown's house. Land said that the three of them entered the kitchen through this window.

Land said that after they entered the house Ms. Brown walked into

---

[2/]     The parties agree that Land was arrested at this point.

4

the kitchen, where the three men were, and that either Tony or Edward slapped her, knocking her to the floor and causing her nose and mouth to bleed. According to Land, as Ms. Brown fell, she grabbed his hand and, he said, in doing so she may have gotten some blood on his gloves. When Detective Corvin told Land that no trace of blood was found in Ms. Brown's house, Land said that either Tony or Edward had cleaned the blood up with paper towels and then had placed the towels in his pants pocket. Land said that after Ms. Brown was injured he became frightened and left the house and that he did not know what happened to her after that.

In this second interview, Land admitted that his car was not parked at a girlfriend's house, but was instead parked in the parking deck at the mall where he had been working. When told by Detective Corvin that the police would need to look in his car, Land asked what would happen if they found something in his car that he was not supposed to have. Detective Corvin told Land that they were looking for evidence concerning Ms. Brown's disappearance and asked Land if he was referring to drugs. Land answered that he had a .45 caliber automatic handgun in his car and would consent to a search of the car only if the police agreed not to charge him with carrying a gun. Without agreeing to Land's conditions, Detective Corvin asked Land for his car keys. Land handed the keys to the detective.

Detective Fowler located Land's car, opened the trunk, and made a visual inventory of the trunk, without moving or touching the contents. He saw a .45 caliber semi-automatic handgun in the trunk, but did not seize it. Instead, the police had the car towed to a secure lot; it was searched two days later pursuant to a valid search warrant.

On the evening of May 19, after completing his second statement, Land was informed that he was under arrest. The next day, May 20, Ms. Brown's body was discovered by hikers in a rock quarry on Ruffner Mountain in Jefferson County. She had been shot once in the back of her head. Land was charged with capital murder.

At trial, the State's expert testimony showed that a pair of wire cutters found during the search of Land's car had made the cuts on the telephone wire leading into Ms. Brown's residence; that two types of glass fragments found on a pair of gloves seized from Land's car were consistent with the glass in the shattered window of Ms. Brown's car and with the glass in the broken window near the rear entry of Ms. Brown's house; that Land's tennis shoe sole had the same distinctive design as the shoe print found on a removed pane of glass at Ms. Brown's house; that the bullet

recovered from Ms. Brown's head had been fired from a .45 caliber handgun and that it matched a bullet test-fired from the .45 caliber handgun found in Land's car; and that a DNA profile of a semen stain found on Ms. Brown's blouse matched Land's known blood sample, and that only one in 20,620,000 white males would have those same DNA characteristics (Land is white).

Land was convicted of two counts of capital murder for the death of Ms. Brown. The jury found him guilty of murder during a burglary, Ala.Code 1975, § 13A-5-40(a)(4), and guilty of murder during a kidnapping, Ala.Code 1975, § 13A-5-40(a)(1). By a vote of 11-1, the jury recommended that he be sentenced to death. The trial court followed the jury's recommendation and sentenced Land to die in the electric chair.

*Ex parte Land*, 678 So.2d at 228-30.

LEGAL FRAMEWORK

Land's federal habeas petition was filed after April 24, 1996, the effective date of the

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  The AEDPA establishes the

analytical framework of review.  *Lindh v. Murphy*, 521 U.S. 320, 326-327, 117 S.Ct. 2059, 2063,

138 L.Ed.2d 481 (1997); *Williams v. Taylor*, 529 U.S. 420, 429, 120 S.Ct. 1479, 1486, 146

L.Ed.2d 435 (2000).

Title 28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Title 28 U.S.C. § 2254(e)(1) provides:

> In a proceeding instituted by an application for a writ of habeas
> corpus by a person in custody pursuant to the judgment of a State
> court, a determination of a factual issue made by a State court shall
> be presumed to be correct.  The applicant shall have the burden of
> rebutting the presumption of correctness by clear and convincing
> evidence.

"This presumption of correctness applies both to findings of fact made by the state trial court as well as the state appellate court."  *Dill v. Allen*, 488 F.3d 1344, 1354, (11th Cir. 2007), *citing*, *Bui v. Haley,* 321 F.3d 1304, 1312 (11th Cir. 2003).

In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the United States Supreme Court discussed the "contrary to" and "unreasonable application" phrases of § 2254(d):

> A state-court decision will . . . be contrary to our clearly
> established precedent if the state court applies a rule that
> contradicts the governing law set forth in our cases. . . . A state-
> court decision will also be contrary to this Court's clearly
> established precedent if the state court confronts a set of facts that
> are materially indistinguishable from a decision of this Court and
> nevertheless arrives at a result different from our precedent.
>
>                    . . . .
>
> [A] state-court decision involves an unreasonable application of
> this Court's precedent if the state court identifies the correct
> governing legal rule from this Court's cases but unreasonably
> applies it to the facts of the particular state prisoner's case. Second,
> a state-court decision also involves an unreasonable application of
> this Court's precedent if the state court either unreasonably extends
> a legal principle from our precedent to a new context where it
> should not apply or unreasonably refuses to extend that principle to
> a new context where it should apply. . . .
>
> A state-court decision that correctly identifies the governing legal
> rule but applies it unreasonably to the facts of a  particular
> prisoner's case certainly would qualify as a decision "involv[ing]
> an unreasonable application of . . . clearly established Federal law."

> A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case . . . would qualify as a decision "involv[ing] an unreasonable application of . . . clearly established Federal law."
>
> . . . .
>
> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.
>
> . . . .
>
> [U]nder § 2254(d)(1)'s "unreasonable application" clause, then a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.
>
> . . . .
>
> [T]he phrase "clearly established Federal law"] refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision.

529 U.S. at 405-12, 120 S.Ct. at 1519-23

"[W]hether a state court's decision was unreasonable must be assessed in light of the record the court had before it."  *Holland v. Jackson*, 542 U.S. 649, 652, 124 S.Ct. 2736, 2737-38, 159 L.Ed.2d 683 (2004).

A state court's decision is not contrary to clearly established law simply because it did not cite United States Supreme Court opinions "so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Mitchell v. Esparza*, 540 U.S. 12, 16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003), quoting *Early v. Packer*, 537 U.S. 3, 7-8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002).

8

The state court does not have to explain its decision to be entitled to deferential review under 28 U.S.C. § 2254. *Herring v. Secretary, Dept. of Corrections*, 397 F.3d 1338, 1347 (11th Cir. 2005), *cert. denied*, ___ U.S. ___, 126 S.Ct. 171, 163 L.Ed.2d 277 (2005). As the Eleventh Circuit Court of Appeals explained:

> A judicial decision and a judicial opinion are not the same thing. The chief responsibility of judges is to decide the case before them. They may, or may not, attempt to explain the decision in an opinion. The text of § 2254(d)(1) accepts this orthodox view. . . . The statutory language focuses on the result, not on the reasoning that led to the result, and nothing in that language requires the state court adjudication that has resulted in a decision to be accompanied by an opinion that explains the state court's rationale. . . . [A]ll that is required is a rejection of the claim on the merits, not an explanation.
>
> To conclude otherwise on this issue would be writing into § 2254(d)(1) an additional requirement that Congress did not put there–a requirement that the state courts explain the rationale of their decisions. Some might view such an addition as an improvement, others would not. Regardless, it would be an addition, and courts ought not add to what the legislature has said is the law.

*Wright v. Secretary for Dept. of Corrections*, 278 F.3d 1245, 1255 (11th Cir. 2002), *cert. denied*, 538 U.S. 906, 123 S.Ct. 1511, 155 L.Ed.2d 225 (2003).

Even if there were no legal explanation of the rationale for the decisions of the state courts set out in an opinion, a federal court may assume that the state court was aware of relevant Supreme Court case law and review the state court decision accordingly. *Wright*, 278 F.3d at 1255-56; *Peoples v. Campbell*, 377 F.3d 1208, 1227-28 (11th Cir. 2004), *cert. denied*, 545 U.S. 1142, 125 S.Ct. 2963, 162 L.Ed.2d 892 (2005).

Respondents assert procedural defaults as bars to the remedy sought by Land. A state procedural rule will bar federal habeas review of a claim only if that rule is "firmly established and regularly followed." *Ford v. Georgia,* 498 U.S. 411, 423-24, 111 S.Ct. 850, 857, 112 L.Ed.2d

935 (1991) (*quoting James v. Kentucky,* 466 U.S. 341, 348, 104 S.Ct. 1830, 1835, 80 L.Ed.2d 346

(1984)); *Cochran v. Herring,* 43 F.3d 1404, 1408 (11th Cir.1995), *cert. denied,* 516 U.S. 1073,

116 S.Ct. 776, 133 L.Ed.2d 728 (1996).

In *Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989), the

Supreme Court held that a "procedural default does not bar consideration of a federal claim on . . .

habeas review unless the last state court rendering a judgment in the case 'clearly and expressly'

states that its judgment rests on a state procedural bar."

Where a state court has ruled in the alternative, addressing both the independent state

procedural ground and the merits of the federal claim, the federal court should apply the state

procedural bar and generally decline to reach the merits of the defaulted claim. *Harris*, 489 U.S. at

264,  n. 10, 109 S.Ct. at 1044 n. 10; *Marek v. Singletary*, 62 F.3d 1295, 1301 -1302 (11th Cir.

1995), *cert. denied*, 519 U.S. 838, 117 S.Ct. 113, 136 L.Ed.2d 65 (1996); *Alderman v. Zant,*  22

F.3d 1541, 1549 (11th Cir. 1994), *cert. denied*, 513 U.S. 1061, 115 S.Ct. 673, 130 L.Ed.2d 606

(1994).  In *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), the Supreme

Court held that the procedural default rule applies to a claim which was never properly presented

to the state court.

A habeas petitioner may overcome a procedural bar by showing "cause" for the default

and "prejudice attributable thereto," *Murray v. Carrier*, 477 U.S. 478, 485, 106 S.Ct. 2639, 2644,

91 L.Ed.2d 397 (1986), or by demonstrating that failure to consider the federal claim will result in

a "'fundamental miscarriage of justice.'" 477 U.S. at 495, 106 S.Ct. at 2649, *quoting Engle v.*

*Isaac*, 456 U.S. 107, 135, 102 S.Ct. 1558, 1576, 71 L.Ed.2d 783 (1982). *See also,Coleman v.*

*Thompson*, 501 U.S. 722, 749, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991).  Because the

"cause and prejudice" exception is in the conjunctive, a petitioner must prove *both* cause *and*

prejudice to excuse his procedural default.  Cause requires a showing of some objective factor

external to the defense, *Murray v. Carrier*, 477 U.S. at 488, 106 S.Ct. at 2645, which prevented

counsel from constructing or raising the claim. *McCleskey v. Zant*, 499 U.S. 467,  497, 111 S.Ct.

1454, 1472, 113 L.Ed.2d 517 (1991).  "[A] showing that the factual or legal basis for a claim was

not reasonably available to counsel or that there was 'some interference by officials' would

constitute cause under this standard." *Amadeo v. Zant*, 486 U.S. 214, 222, 108 S.Ct. 1771, 1776,

100 L.Ed.2d 249(1988), *quoting Murray v. Carrier*, 477 U.S. at, 488, 106 S.Ct. 2645.

To demonstrate prejudice, a habeas petitioner must show "not merely that the errors at trial

created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage,

infecting his entire trial with error of constitutional dimensions."  *United States v. Frady*, 456 U.S.

152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (emphasis in original)).

Alternatively,  a habeas petitioner may overcome a procedural default by  establishing the

existence of a "fundamental miscarriage of justice."  In Calderon v. Thompson,, the Supreme

Court explained:

> [T]he precise scope of the miscarriage of justice exception depends
> on the nature of the challenge brought by the habeas petitioner. If
> the petitioner asserts his actual innocence of the underlying crime,
> he must show "it is more likely than not that no reasonable juror
> would have convicted him in light of the new evidence" presented
> in his habeas petition. If, on the other hand, a capital petitioner
> challenges his death sentence in particular, he must show "by clear
> and convincing evidence" that no reasonable juror would have
> found him eligible for the death penalty in light of the new
> evidence.

 523 U.S. 538, 559-60, 118 S.Ct. 1489, 1502-03, 140 L.Ed.2d 728 (1998) (citations omitted;

however, the Court quoted in part from  *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 867,

130 L.Ed.2d 808 (1995) and *Sawyer v. Whitley*, 505 U.S. 333, 348, 112 S.Ct. 2514, 2523, 120 L.Ed.2d 269 (1992).)

The independent and adequate state ground doctrine bars federal habeas review "when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests on independent and adequate state procedural grounds." *Coleman v. Thompson,* 501 U.S. 722, 729-730, 111 S.Ct. 2546, 2554, 115 L.Ed.2d 640 (1991). Whether a state procedural rule is "adequate and independent" so as to have a preclusive effect on federal review of a claim is a federal question. *Lee v. Kemna*, 534 U.S. 362, 375, 122 S.Ct. 877, 885,  151 L.Ed.2d 820 (2002).  To be considered "adequate," by a federal court, the state procedural rule must be "'firmly established and regularly followed.'" *Id.* (quoting *James v. Kentucky*, 466 U.S. 341, 348, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984)).  In other words, the rule must be "clear [and] closely hewn to" by the state for a federal court to find it to be adequate. *James v. Kentucky*, 466 U.S. at 345.

The applicable state procedural rules at issue in this case are found in Rule 32.2, *Alabama Rules of Criminal Procedure*:

> (a)    **Preclusion of Grounds.**  A petitioner will not be given relief under this rule based upon any ground:
>
>           . . . .
>
> (2)    Which was raised or addressed at trial; or
> (3)    Which could have been but was not raised at trial, unless the ground for relief arises under Rule 32.1(b); or
> (4)    Which was raised or addressed on appeal . . . .; or
> (5)    Which could have been but was not raised on appeal . . .
>
>           . . . .
>
> **(c)**    **Limitations Period.** . . . [T]he court shall not entertain any petition for relief from a conviction or sentence . . . unless

> the petition is filed: (1) In the case of a conviction appealed
> to the Court of Criminal Appeals, within one (1) year after
> the issuance of the certificate of judgment by the Court of
> Criminal Appeals under Rule 41, Ala.R.App.P. . . .

In *Waldrop v. Jones,* 77 F.3d 1308, 1314 (11th Cir. 1996), *cert denied*, 519 U.S. 898, 117

S.Ct. 247, 136 L.Ed.2d 175 (1996), the Eleventh Circuit Court of Appeals recognized:

> Alabama law precludes post-conviction relief for claims which
> could have been but were not raised on direct appeal. Ala.R.Crim.P.
> 32.2(a)(5). Under Rule 32, this . . .claim should have been raised on
> direct appeal. Because it was not, it has been defaulted. *Thompson
> v. State*, 581 So.2d 1216, 1218 (Ala. Crim. App.1991), *cert. denied*,
> 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992); *Weeks v.
> State*, 568 So.2d 864, 871 (Ala. Crim. App.1989), *cert. denied*, 498
> U.S. 882, 111 S.Ct. 230, 112 L.Ed.2d 184 (1990).

Rule 32.2(a)(5) is firmly established as a matter of Alabama law and regularly followed.

This court should not review claims deemed procedurally barred by the state court because of an

application of Rule 32.2(a)(5) in the absence of a showing of cause and prejudice or a

fundamental miscarriage of justice.

Claims which are procedurally defaulted are not set out here but will be addressed in

abbreviated form in the order in which these claims were asserted in Land's amended petition.

With the exception of a claim of trial court error related to the admission of DNA allegedly

improperly collected, analyzed and admitted, Land elected to expend no effort to establish the

cause and prejudice necessary as a matter of law to overcome procedural default.  Land has not

argued either actual or legal innocence in an attempt to overcome the  procedural defaults. In light

of this discussion, where this court concludes a procedural default has occurred, the court will

simply state that Land has failed to make a showing of cause and prejudice and will not address

actual or legal innocence as a separate concept.

I.    Claims of prosecutorial misconduct

On habeas review of claims of prosecutorial misconduct, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), *quoting*, *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

The Eleventh Circuit Court of Appeals has stated:

> Improper prosecutorial arguments, especially misstatements of law, must be considered carefully because "while wrapped in the cloak of state authority [they] have a heightened impact on the jury." *Drake v. Kemp*, 762 F.2d 1449, 1459 (11th  Cir.1985). When assessing this type of claim, this Court examines the entire context of the judicial proceeding to determine if it was fundamentally unfair. See *Brooks v. Kemp*, 762 F.2d 1383, 1400 (11th Cir.1985) (en banc), *vacated*, 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), *reinstated*, 809 F.2d 700 (1987). Not every improper prosecutorial remark, therefore, renders the trial unfair. See *id*. Improper arguments do, however, render the capital sentencing hearing fundamentally unfair and require reversal when there is a reasonable probability that they changed the outcome of the case. See id. at 1402. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " Id. at 1401 (quoting *Strickland v. Washington*, 466 U.S. 668, 669, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Proper arguments, regardless of their impact on the outcome of the case, do not render a trial unfair.

*Spivey v. Head,*  207 F.3d 1263, 1275-76 (11th Cir. 2000), *cert. denied*, 531 U.S. 1053, 121 S.Ct. 660, 148 L.Ed.2d 562 (2000).

Reviewing the challenged comments at issue in the context of the entire trial, for the reasons discussed below, the record establishes that the comments did not so infect the trial with an unfairness that would have denied Land constitutional due process.  On more than one occasion the comments about which Land has complained were made in response to arguments of Land's counsel.  Further "improper statements during argument can be cured by clear and accurate

jury instructions." *Johnson v. Alabama*, 256 F.3d 1156, 1185 (11th Cir. 2001). When considered in light of the weight of the evidence and the trial court's instructions to the jury, the prosecutor's comments were unlikely to have influenced the jury's decision. *Darden*, 477 U.S. at 182, 106 S.Ct. at 2472, *citing*, *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

      I.(a).   <u>Prosecutor's alleged comments on Land's decision not to testify</u>

      Land argues that in closing arguments the prosecutor made two comments on Land's decision not to testify. First, the prosecutor stated: "Jeff, tell us the truth, tell us the truth." Second, the prosecutor stated: "Through his attorneys [Mr. Land] continues to say 'I don't know anything about the wire cutters or the phone lines or the glass fragments, I don't know anything about the gun or how the bullet got into her head." Land contends these statements violate the prohibition against comments on his silence at trial.

      "[T]he Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965).

      The Eleventh Circuit has described the proper manner in which to evaluate a claim under *Griffin*:

> The Fifth Amendment prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify. A prosecutor's statement violates the defendant's right to remain silent if either (1) the statement was manifestly intended to be a comment on the defendant's failure to testify; or (2) the statement was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify. **The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury necessarily would have done so.** The defendant bears the burden of establishing the existence of one of the two criteria. The comment must be

examined in context, in order to evaluate the prosecutor's motive
and to discern the impact of the statement. . . .

*United States v. Knowles*, 66 F.3d 1146 (11th Cir.1995) (citations,
quotations, and footnotes omitted). See also *United States v.
LeQuire*, 943 F.2d 1554, 1565 (11th Cir.1991) (same); *Solomon v.
Kemp*, 735 F.2d 395, 401 (11th Cir.1984).

In applying *Griffin*, we have strictly enforced the requirement that a
defendant show that the allegedly offensive comment was either
manifestly intended to be a comment on the defendant's silence or
that the comment naturally and necessarily related to the
defendant's silence. For example, in *Knowles*, the Court considered
whether a prosecutor violated *Griffin* when he pointed out problems
with the defendant's defense, and then asked, "Did you ever hear an
explanation for that?" 66 F.3d at 1162. The Court held that this
statement did not necessarily relate to the defendant's silence,
because the defendant could have presented other types of evidence
to explain the inconsistency. Id. at 1163. Therefore, the Court
concluded that:

> As such, the remark is not so much a comment on Wright's
> failure to testify, but rather on Wright's counsel's failure to
> counter or explain the [damaging evidence]. It is not error
> to comment on the failure of the defense as opposed to the
> defendant, to counter or explain the evidence.

*Id*. at 1163 (citations and quotations omitted).

Likewise, in *Solomon v. Kemp*, the prosecutor addressed the fact
that the State was not sure which one of two defendants possessed
which of two guns found at a crime scene, and stated: "We don't
know which defendant had which gun. The only person who can
tell us that is [the defendant]." 735 F.2d at 401. We held that this
statement was proper under *Griffin*, stating:

> We find the statement to be rather an
> attempt to explain why the state could not
> match each defendant with one specific gun
> and to stress that this fact was not crucial to
> the state's case. Although the statement was
> an indirect reference to petitioner's silence,
> taken in context it is an objective evaluation

16

> of the state of the evidence. As such, it is
> permissible under *Griffin*.

> *Id.*

*Isaacs v. Head*, 300 F.3d 1232, 1270-71 (11th Cir. 2002), *cert. denied*, 538 U.S. 988, 123 S.Ct.

1805, 155 L.Ed.2d 683 (2003) (Emphasis added.)

On certiorari review during the direct appeal proceedings, the Alabama Supreme Court

correctly identified the governing United States Supreme Court case law and addressed Land's

claim of prosecutorial misconduct based on the alleged references to Land's failure to testify in

the following manner:

> In *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d
> 106 (1965), the United States Supreme Court held that a state
> prosecutor's direct comment on an accused's failure to testify
> violates the accused's rights under the Fifth and Fourteenth
> Amendments to the United States Constitution. Under this
> standard, "a statement by a prosecutor is improper if it was
> manifestly intended to be, or was of such a character that the jury
> would naturally and necessarily take it to be, a comment on the
> failure of the accused to testify." *Marsden v. Moore*, 847 F.2d
> 1536, 1547 (11th Cir.), *cert. denied*, 488 U.S. 983, 109 S.Ct. 534,
> 102 L.Ed.2d 566 (1988). This Court has also ruled that "where
> there is the possibility that a prosecutor's comment could be
> understood by the jury as a reference to failure of defendant to
> testify, § 6 [Alabama Constitution of 1901] is violated." *Beecher v.
> State*, 294 Ala. 674, 682, 320 So.2d 727, 734 (1975).

> As noted by the State, Land failed to object to either of these
> comments and, thus, failed to preserve for appellate review the
> issues he now raises. However, because this is a case where the
> death penalty has been imposed, this Court will, pursuant to Rule
> 39(k), Ala.R.App.P., notice any "plain error," regardless of
> whether an objection was made before the trial court. Plain error is
> error that "has or probably has adversely affected the substantial
> rights of the petitioner." Rule 39(k). "In other words, the
> plain-error exception to the contemporaneous objection rule is to
> be 'used sparingly, solely in those circumstances in which a
> miscarriage of justice would otherwise result.' " *United States v.*

17

*Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985), *quoting United States v. Frady*, 456 U.S. 152, 163, n. 14, 102 S.Ct. 1584, 1592, n. 14, 71 L.Ed.2d 816 (1982).

We further note that "[w]hen an accused contends that a prosecutor has made improper comments during a closing argument, the statements at issue must be viewed in the context of the evidence presented in the case and the entire closing argument made to the jury-both defense counsel's and the prosecutor's." *Ex parte Musgrove*, 638 So. 2d 1360, 1368 (Ala.1993), *cert. denied, Rogers v. Alabama*, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994).

1. " Jeff tell us the truth, tell us the truth."

The Court of Criminal Appeals addressed the issue whether the prosecutor's use of these words violated Land's constitutional rights, and that court found no error, plain or otherwise. That court held there was no chance that the jury could have understood the comment to be a reference to Land's failure to testify. *Land*, 678 So. 2d at 218.

We agree. In the first part of the prosecutor's rebuttal closing, he simply quoted or paraphrased statements Land had made to the police and statements the police had made to Land while he was being interrogated. It is clear that the prosecutor's discourse was nothing more than a "story" of the evidence told to the jury by the prosecutor's switching back and forth, speaking as Land, as the police, as a witness, and as the prosecutor himself.

**The Court of Criminal Appeals correctly held that "the remark was not a comment on the appellant's failure to testify, but a comment on the appellant's failure to tell the truth in his statement to the police."** *Land*, 678 So. 2d at 217. In the context of the prosecutor's entire closing statement, the jury could not have construed the words "Jeff tell us the truth, tell us the truth," to be anything other than a narration of what the police had said to Land when his initial statement conflicted with known facts. There was no error in the prosecutor's use of those words.

2. " Through his attorneys he continues to say 'I don't know anything about the wire cutters or the phone lines or the glass fragments, I don't know anything about the gun or how that bullet got into her head.' "

18

These words, also part of the prosecutor's rebuttal closing argument, followed his discussion of various statements that Land's counsel had made during closing argument. Land's counsel had attacked the credibility of the evidence presented by the State's expert witnesses, including testimony regarding the tennis-shoe "footprint" similar to Land's found on a pane of glass, the procedure used to compare the cut made by Land's wire cutters to the cut made on the telephone wire, the procedures used to analyze evidence for a blood type and DNA match, the match of a bullet fired from Land's gun to the bullet retrieved from the victim's body, and the match of two types of glass found on Land's gloves with the window glass in the victim's car and house.

We disapprove of a statement by a prosecutor referring the jury to the fact that the defendant spoke through his attorneys, i.e., that he did not speak for himself. Thus, if Land's counsel had made a contemporaneous objection to this statement, and we were to apply the *Beecher* standard explained above, we might have held the comment to be reversible error. This is true even though it is clear to this Court that, **when viewed in the context of the confrontational nature of closing arguments, the prosecutor's comment was intended as a "reply in kind" to the argument made by Land's counsel.**

However, the comment was not objected to during trial. Thus, the statement may be considered only by the standard of the plain error rule. Under that standard, given the evidence presented in this case, we find no plain error in the prosecutor's statement.

*Ex parte Land*,  678 So. 2d at 232-33 (Emphasis added).

The Alabama Supreme Court noted "that the lack of a contemporaneous objection by experienced defense counsel leads this Court to believe that the prosecutor's comment was not stated with an inflection or tone that would have naturally led a listener to construe it as a reference to Land's failure to testify."  678 So. 2d at 233, n.2.  This view is consistent with federal case law.  *United States v. Dorsey,* 819 F.2d 1055, 1061-62 (11th Cir.1987) ("The defense counsel's failure to object highlights the innocuous nature of the remark."), *cert. denied*, 486 U.S. 1025, 108 S.Ct. 2002, 100 L.Ed.2d 233 (1988).

19

The portion of the closing argument relevant to the statement, "Jeff, tell us the truth, tell us the truth" is as follows:

> They arrested him ladies and gentlemen, for murder.  They arrested him following his statement to the Birmingham Police Department: I wasn't there, I didn't have anything to do with it.  I don't know what you're talking about.  I was over at my girlfriend's house, my car was out at Marie Fortis's.
>
> They take his shoes.  They call Marie, they come back and say, hey, Jeff, Marie ain't got your car.  And your shoes match the shoeprint out there on the scene.  What you got to say?  **Tell me the truth.**
>
> Well, I'll talk to you but not if that thing's running.  I'll talk to you, I don't want it recorded like that.  I'll tell you what happened.
>
> So then the defense wants you to believe that we have so intimidated this man he is going to confess to breaking in a house that we haven't even told him anything about.  He talks to you about how he went in the window.  That was known at 8:30 that morning.  How he broke the glass to go in that window.  It's broken, it's stacked up.
>
> How he was wearing the same clothes that he's got on right now.  That matches the footprint out on the scene.
>
> How he went inside, committed the burglary.  They wanted to commit a burglary, let's go commit a burglary.  What do you do during a burglary?  You steal.  You steal.
>
> He gets inside with these two, with these two fictional human beings, I guess, and he gets scared and leaves because he realizes he is in some deep trouble.  He has got to get out of this thing somehow.  He ain't about to admit to committing the killing, so he is going to lay it off on Tony and Edward.  Oh, I got scared and left.  And I had my car and I drove home and I went over – I went on to work.  That means he has got his car the entire time.  And where do we find the gun that fired the bullet into Candy Brown's head?  We find it in the trunk of his automobile at 4:00 o'clock that afternoon.  And he's got the keys until such time the Birmingham Police Department take them from him.  He's got the keys.

20

> There was a bullet found inside that house by the front door.  It is
> consistent with having been fired out of this gun.  Remember that.
>
> Of course, Mr. Land, even in the statement where he talks to the
> police, starts hedging his bets and covering his tail a little bit.
> Said, oh, I got scared after she got hit by Tony and Edward and
> there was blood everywhere and that's how it got on my hands – on
> my gloves and on my pants.
>
> Phyllis Rollan, did you go out there and luminol that place?  Yep,
> no blood.
>
> **Jeff, tell us the truth, tell us the truth.**
>
> Ladies and gentlemen, the Birmingham Police Department did not
> conspire against Jeffrey Land.  I don't care about this guy unless or
> until he breaks the law here in the state of Alabama.  And that's
> what he has done in this case.  He committed a burglary and during
> that burglary he fired in that house.  And then he marched Candy
> Brown up to Ruffner Mountain and he tried to blow her brains out.
> . . .

(TR. 2009-12) (Emphasis added).

Following his response to the arguments of defense counsel criticizing the testimony of the

prosecution's witnesses (TR. 2022-26), the prosecutor stated:

> But this man right here, ladies and gentlemen, he stands before you
> and says they lied, those people lied, I don't know anything about a
> footprint nor a statement saying I was there.  **Through his
> attorneys** he continues to say I don't know anything about the wire
> cutters or the phone lines or the glass fragments, I don't know
> anything about the gun or how that bullet got into her head.  It may
> not even be the right bullet.

(TR. 2026).

When the comments are viewed in context, Land has not established that either of the

prosecutor's comments was manifestly intended to comment on Land's failure to testify nor has

he established that either statement was of such a character that  the jury would necessarily have viewed the comments to be a comment on Land's failure to testify.[3]

The Alabama Supreme Court's decision with respect to the prosecutor's alleged comments on Land's failure to testify was not an objectively unreasonable application of *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965).

> I.(b).   Prosecutor's introduction of allegedly irrelevant, prejudicial and inflammatory photographs to secure a conviction based on passion and sensibilities in violation of Land's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution.

Land challenges the prosecutor's introduction of 42 eight-by-ten color photographs of the victim's body that were taken at the scene of the crime and during the autopsy and the prosecutor's  elicitation of testimony that investigators at the scene observed a fox near the victim's body.  Land argues:

> Photographs unrelated to the bullet wound to the back of [the victim's] head, especially those displaying the victim's face, and the insinuation that a fox had scavenged the corpse, were wholly irrelevant and highly inflammatory.  The impact of these redundant, gruesome, and irrelevant photographs overwhelmed the jury's sensibilities and caused them to return a verdict and recommend a sentence on the basis of passion and prejudice.

(Amended Petition, ¶ 29).

---

[3]   This court is aware that the Alabama Supreme Court stated that, had there been a contemporaneous objection to the comment that defendant spoke through his attorneys, it **might** have found reversible error under *Beecher v. State*, 294 Ala. 674, 682, 320 So.2d 727, 734 (1975).  Under the *Beecher* standard, the Alabama Constitution is violated "where there is the **possibility** that a prosecutor's comment could be understood by the jury as a reference to failure of defendant to testify." *Beecher*, 294 Ala. at 682, 320 So.2d at 734.  The question before this court in evaluating a *Griffin* claim, "is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury **necessarily** would have done so." *Isaacs*, 300 F.3d at 1270. When viewed in the context of the entirety of the prosecution's closing argument, the jury would not necessarily have viewed the remark "[t]hrough his attorneys he continues to say" as a comment on Land's failure to testify.

Respondent argues that this claim is procedurally barred because it was not raised at trial or on direct appeal.  On appeal from the denial of the Rule 32 petition, however, the Alabama Court of Criminal Appeals affirmed the trial court's preclusion of  the claim that "3) The State improperly introduced photographs of the victim, Rule 32.2(a)(2), (a)(4)."  *Land v. State*, CR-02-1563, memo. op. at  10.  Although respondent argued that this claim is defaulted because it was **not** raised at trial or on direct appeal, the trial court and appellate court held that the claim was defaulted pursuant to Rule 32.2(a)(2) and (a)(4), which provide that a claim is precluded if it **was** raised at trial or on appeal.

On direct appeal, Land argued that the trial court abused its discretion by allowing into evidence photographs that were repetitive (Vol. 14, Tab R-28, pp. 58-63), and that "the prosecution improperly elicited testimony [regarding the presence of the fox at the scene of the crime] that was calculated to be inflammatory, prejudicial, and impossible to cure."  (Vol. 14, Tab R-28, pp. 92-100). In the Rule 32 petition, first and second amended petition, and on appeal from the denial of the Rule 32 petition, Land presented the claims concerning the photographs and the fox testimony as instances of prosecutorial misconduct.  (See Tabs R-40, p. 49; R-41, pp. 65-66; R-42, p.67-68; R-61, pp. 95-98).  Because the state courts concluded that the claims were raised at trial and on direct appeal, these claims are not precluded from federal review.

On direct appeal, the Alabama Court of Criminal Appeals concluded that the trial court did not err by admitting the  photographs, but did not specifically address the claims of prosecutorial misconduct with regard to the introduction of the photographs.  The court stated: "The courts of this state have repeatedly held that photographs that accurately depict the crime

scene and the nature of the victim's wounds are admissible despite the fact that they may be gruesome or cumulative." *Land v. State*, 678 So.2d at 207-08 (citations omitted).

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991). Evidentiary errors in the admission of photographs, which are matters of state law, ordinarily will not support habeas relief. *See, Smith v. Newsome*, 876 F.2d 1461, 1468 n. 8 (11th Cir.1989). "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)(discussing victim impact evidence), *citing Darden*, 477 U.S. at 179-83, 106 S.Ct. 2470-72. "Erroneously admitted evidence deprives a defendant of fundamental fairness only if it was a crucial, critical, highly significant factor in the defendant's conviction. The introduction of graphic photographic evidence rarely renders a proceeding fundamentally unfair." *Jacobs v. Singletary*, 952 F.2d 1282, 1296 (11th Cir.1992) (internal citations and punctuation omitted). *See also, Baxter v. Thomas*, 45 F.3d 1501, 1509 (11th Cir. 1995), *cert. denied*, 516 U.S. 946, 116 S.Ct. 385, 133 L.Ed.2d 307 (1995).   The photographs were introduced to depict the crime scene and the injuries suffered by the victim.  Land has not demonstrated either that the admission of the photographs was a crucial, critical, highly significant factor in his conviction or that the photographs were so unduly prejudicial that it rendered the trial fundamentally unfair.

The Alabama Court of Criminal Appeals held that the mention of the fox was not a fundamental error requiring the granting of a mistrial:

> The appellant contends that "[t]he prosecution improperly elicited
> testimony that was calculated to be inflammatory, prejudicial, and

impossible to cure." (Appellant's brief at 92). This argument relates to testimony concerning a photograph of a fox taken at the rock quarry where the victim's body was found.

Detective Larry Fowler testified that, on the morning of May 20, he went to the rock quarry at Ruffner Mountain where the victim's body had been found. Fowler then identified 25 photographs taken at the scene.  The prosecutor presented these photographs to Fowler in groups of 3 to 5. When the last group of photographs was shown to Fowler, the following occurred:

"Q.    [By the prosecutor:] State's Exhibit 37, 38, 39, and 43, can you tell us what those items are, please, sir?

"A.    Yes, sir. 37 is a photograph of the rocks that the victim was lying on. 38 is another photograph of the rocks where the victim was lying. And 39 is also a photograph of the rocks where the victim was lying. 43 is a photograph of a fox.

"Q.    Can you tell us where the fox was seen?

"MR. DODD [defense counsel]:          Excuse me, Judge, objection. That has absolutely nothing to do with this case and that's why we wanted to object in advance. It has absolutely no evidentiary value. We object.

"THE COURT:          We'll discuss it over lunch. Don't want to argue in front of the jury.

"MR. MATHIS [defense counsel]:          We would move that any further discussion of that particular photograph be curtailed at this time.

"THE COURT:          Sure."

(R. 805-06).

Although the prosecutor immediately thereafter asked Detective Fowler if "State's Exhibit Number 37, 38, 39, and 43 truly and accurately depict[ed] the scene as it appeared out there on the 20th where the body of Candace Brown was found," R. 806-07, no further mention was made before the jury of the fox.

When the jury recessed for lunch, the attorneys and the trial judge discussed the admissibility of the photographs identified by Fowler. With regard to State's Exhibit 43, the following occurred:

| "MR. DODD: | State's 43 is depicting the fox. We objected at the time, Your Honor. We would object again, [it] absolutely has no value in this case and should not have been admitted. And furthermore- |
| --- | --- |
| "THE COURT: | It is not admitted. |
| "MR. DODD: | -we would move again for a mistrial for it being mentioned. |
| "THE COURT: | Overrule." |

(R. 830-31) (footnote omitted).

The prosecutor then argued that the photograph was relevant to show "that had this body been out there another half a day, the wild animals would have been working on this body," R. 834, and he elicited testimony from Fowler in an attempt to support his argument. However, the trial court adhered to its ruling that the photograph was not to be admitted. The defense then renewed its motion for a mistrial:

| "MR. DODD: | Judge, we would renew our motion for a mistrial. And I'm glad Mr. Anderton [the prosecutor] pointed out what he was attempting to show to the jury because that's just what the jury would have garnered from that. It's already before the jury, no reason for that picture to ever be presented before this jury or testimony about a fox or any other thing other than evoke emotion from that jury that that poor deceased girl out there might have been eaten by some wild animal, which has absolutely nothing to do with this case. And it has absolutely prejudiced this jury and we would move for a mistrial." |
| --- | --- |

(R. 835).

The trial court again denied the motion.

26

[A] mistrial 'specifies such fundamental error in a trial as to vitiate the result,' *Diamond v. State*, 363 So.2d 109, 112 (Ala. Cr. App.1978), and should be granted only when a 'high degree of "manifest necessity" ' is demonstrated, *Wadsworth v. State*, 439 So.2d 790, 792 (Ala. Cr. App.1983), *cert. denied*, 466 U.S. 930, 104 S.Ct. 1716, 80 L.Ed.2d 188 (1984)." *Garnett v. State*, 555 So.2d 1153, 1155 (Ala. Cr. App.1989). If any error occurred by the mere mention of the fox, it was clearly not the fundamental error that is required for the granting of a mistrial. The photograph was never admitted, and there were only two brief references to the fox made before the jury. The trial court granted defense counsel's request that "further discussion of that particular photograph be curtailed at this time," and the fox itself was never again mentioned in the jury's presence.

Although the pathologist testified that the victim's body bore marks that might have been the result of insect bites, there was absolutely no indication that the body had been despoiled in any way by wild animals. Moreover, the place where the body was found was clearly an undeveloped area and one might expect that wild animals could be seen there. In view of these facts and the fact that there were almost 1200 pages of trial testimony, it is doubtful that the two brief references to the fox made much of an impression upon the jurors. *See Rowell v. State*, 647 So.2d 67, 69-70 (Ala. Cr. App.1994).  Under the facts of this case, including the strong evidence presented by the State, any error occasioned by the references to the fox was clearly harmless. *See generally Ex parte Greathouse*, 624 So.2d 208, 210-11 (Ala.1993). *Cf. State v. Johnson*, 298 N.C. 355, 259 S.E.2d 752, 765 (1979) (introduction of photographs depicting body of child victim when found some two months after the murder, which had been dismembered by wild animals was "harmless error beyond a reasonable doubt in the guilt determination phase of the trial").

 *Land v. State*,  678 So.2d at 219-20.

The transcript makes clear that the jury never heard the prosecutor's argument that the fox

photograph was relevant to show that wild animals would have soon been feeding on the victim's

body.

The trial court's actions with regards to the photographs and fox do not warrant habeas relief, nor do the prosecutor's actions justify habeas relief in light of the evidence.  The decision of the Alabama Court of Criminal Appeals that the prosecutor's actions in introducing the photographs of the victim and the crime scene and in eliciting testimony that one of the photographs was that of a fox did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process" (*Darden*, 477 U.S. at 181, 106 S.Ct. at 2471), is not an unreasonable application of United States Supreme Court law.[4]

> I.(c).   Prosecutor's alleged improper use of  victim impact evidence at the guilt phase in violation of Land's due process rights under the Fifth, Sixth, <u>Eighth and Fourteenth Amendments to the United States Constitution.</u>

Land argues that the prosecutor improperly focused the jury's attention on the victim's young son who was found at home alone and the effect of the victim's death on her parents.  The Alabama Supreme Court addressed Land's victim impact claim in the following manner:

> Land argues that his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and similar rights guaranteed by Alabama law, were violated when, he says, the prosecutor used prejudicial victim impact evidence during the guilt phase of the trial. Before trial, Land's counsel asked the court  to prohibit the State from introducing evidence regarding the condition in which the police found Ms. Brown's two-year-old son following her disappearance. The grounds for this motion was the argument that that
> evidence would likely inflame the emotions of the jury. The trial court reserved its ruling on the motion until trial, but after the trial began it never ruled on the motion.
>
> According to Land, the prosecution learned during voir dire examination of prospective jurors that those prospective jurors who

---

[4]    As stated above, the analysis of this claim is controlled by *Wright v Secretary for Dept. of Corr.*, 278 F.3d 1245 (11th Cir. 2002), *cert. denied*, 538 U.S. 906, 123 S.Ct. 1511, 155 L.Ed. 2d 225 (2003).  That is, even if the state court does not specifically address a claim that has been raised, the court will treat it as though it has been addressed and will presume that the state court is aware of the applicable governing law as set forth by the United States Supreme Court.

had some memory of news media accounts of Ms. Brown's murder recalled that her infant son had been with her in the house. Land argues that during opening statements the prosecutor then focused on Ms. Brown's infant son by suggesting that he was the last person to see his mother alive and by informing the jury that he had been left alone in the house when his mother was abducted from the house. Land argues that during the guilt phase of the trial the prosecutor elicited references to the child from several witnesses, and that in closing statements he emphasized the suggestion that Ms. Brown had sacrificed her life to keep her son alive.

Land also contends that the prosecutor improperly introduced evidence regarding the impact Ms. Brown's death had upon her family and then, during closing arguments, commented several times on the family's loss. Land contends that this evidence should have been excluded because, he says, its prejudicial effect far outweighed any probative value it may have had.

In response, the State argues that there was no error in the prosecution's questioning of those prospective jurors that remembered the crime, and that any questioning regarding the presence of the victim's son was not for the purpose of gathering victim impact evidence, but was merely a part of the general questioning of the venirepersons to ascertain whether any of them had prior knowledge and fixed opinions about the case. The State argues that the prosecution's opening statement telling the jury about the fact that the child had been left alone in the house was not improper because that was a fact the prosecutor expected the evidence would show, or, the State says, was a crucial part of the *res gestae* or chain of events in Ms. Brown's death. Further, the State contends that any questioning of witnesses regarding the child was not improper or was at most merely harmless error. The State argues that any mention of the victim's child by the prosecution during closing arguments of the guilt phase was to state a legitimate inference derived from the evidence and was, therefore, proper. Again, the State argues that, at most, the comments about the child were harmless error. The State also says that Land did not object to any references to the child during opening arguments, questioning of witnesses, or closing arguments.

The State argues that any comment or questioning by the prosecution regarding the effect of Ms. Brown's death on her family did not have an impact on the fairness of Land's trial. It also says that Land did not object to the comments or questioning. The State contends that, at most, the prosecution's action was only harmless error.

Recently, this Court examined the issue of victim impact evidence in *Ex parte Rieber,* [Ms. 1940271, May 19, 1995] 663 So.2d 999 (Ala.1995). In

*Rieber,* we acknowledged that testimony regarding a murder victim's children was not relevant to the issue of the accused's guilt or innocence and was, thus, inadmissible during the guilt phase of trial; we noted, however, that "a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant." 663 So.2d at 1005. After thoroughly reviewing the record of this present case, we conclude that the limited testimony regarding Ms. Brown's infant son and the impact of Ms. Brown's death on her family, and the prosecution's limited references to such evidence, did not operate to deny Land a fair trial or to prejudice his substantial rights. Thus, we find no reversible error as to this issue.

*Ex parte Land*, 678 So. 2d at 235-36.

This court has reviewed the portions of the record that petitioner asserts were improper victim impact references during the guilt stage. These portions of the record are set out below.

During his opening statement, the prosecutor stated:

MR. ANDERTON:   A little over a year ago, ladies and gentlemen, on the 19th of May, 1992, Candace Brown was at her mother's house and decided to go home. Her mama and brother followed Candace home to make sure she got there okay. Went in the house with her, checked all the doors and windows and looked under the bed to make sure that everything was all right. Everything was fine.

She and her two-year-old son were there at the house alone and mama and brother said bye, not realizing that was going to be the last time they would ever see her.

. . . .

J.C. Leeth owns the house Ms. Brown is renting. He showed up on the morning of the 19th to put in a fence. As he went around the house he saw some glass broken out of the back kitchen window, it was stacked up. As he went further around the house he saw the phone lines had been cut, phone lines to the house had been cut.

. . . .

When Mr. Leeth saw the phone line cut on this occasion –
and he had previously seen the glass – he went around the
front of the house and knocked on the door and tried to get
somebody to the door.  Couldn't get anybody to the door.

He went home and got a key, notified the police and came
back.  And inside the house, ladies and gentlemen, was a
two-year-old child in the bed.  Candace Brown was
nowhere to be found.  Her child was in that house.

(TR. 677-80).

Brenda Brown, the victim's mother, testified:

Q:      And who is that a photograph of?

A:      That's my daughter.

Q:      Is that Candace?

A:      That's Candace.

Q:      Ms. Brown, let me take you back to the 18th of May, about a year ago,
1992.  Did you have a chance to see Candace on the 18th?

A:      Yes.  She had gone to school and we were watching Michael and she came
by to pick him up.

Q:      Who is Michael?

A:      Michael is her son.

Q:      How old was Michael at the time?

A:      Almost two.

Q:      Ms. Brown, do you recall what time Candace came to your house?

A:      It was about 8:30 at night, she was going to night school.

Q:      Once she showed up at your house, what happened next?

A:      She visited for a little bit and then she decided to go home and her brother
and I followed her home.

31

Q:      All right.  What about Michael?

A:      He went with her.

Q:      Went in her car?

A:      Went in her car.

. . . .

Q:      When y'all got to Candace's house what, if anything, did y'all do at that
point?

A:      We got out and we went in with her and went into all the rooms and
looked in all the closets and under the beds and checked all the windows
to make sure they were locked.

Q:      Did you find anything wrong with her house at that time?

A:      No.

Q:      Following you and your son doing that, what did y'all do?

A:      We left there and went home.

. . . .

Q:      Ms. Brown, how old was Candace at the time of her death?

A:      She had just turned thirty on May the 19th.

. . . .

Q:      Where is Michael now?

A:      At this time?

Q:      Well, where is he now living?

A:      He lives with us.

(TR. 709-13).

John Brown, the victim's father, testified:

32

BY MR. ANDERTON:

Q:      . . . let me direct your attention to the 18th of May, approximately a year ago, and do you recall seeing Candace on that occasion?

A:      I believe that's the day – the evening she came by my house and picked her son, my grandson up.

Q:      And did you accompany her over to her house when she left?

A:      No, sir, I did not.

Q:      So when she left your house was that the last time you saw her?

A:      Yes.

(TR. 716-17).

J. C. Leeth, the owner of the house that the victim rented, testified:

Q:      Mr. Leeth, when you went inside the house did you find anybody inside?

A:      Small child.

Q:      Where was that child located?

A:      It was in the bedroom sitting in the bed.

Q:      Was that child awake or was it asleep?

A:      It was awake, sitting up in the bed at the head of the bed.

(TR. 745).

Larry Fowler, a homicide detective with the Birmingham Police Department, testified:

Q:      Detective Fowler, let me direct your attention to the 19th of May, 1992, and ask you if you had an occasion to participate in the investigation involving the disappearance of Candace Brown?

A:      Yes, sir, I did.

Q:      And during the course of that investigation did you have an occasion to go to Ms. Brown's residence?

33

A:      Yes, sir, I did.

                              . . . .

Q:      When you arrived can you tell us what all you found?

A:      When we arrived on the scene at that time the father was there and the
        child had been removed and given to the mother and she had the child.

Q:       Now, you talk about a child and mother and father.  Who are you talking
        about?

A:       I am talking about Candace Brown's father was there at the time that I
        arrived.

Q:      And you mentioned the child.

A:       There was a child found inside the house.

Q:      Where was that child at that time when you arrived?

A:       It had already left the scene with the grandmother.

(TR.758-60).

        Sandy Triplett, senior fingerprint technician and  supervisor of identification section with

the City of Birmingham, testified:

Q:      Ms. Triplett, if an individual had a two-year-old child and that child were
        to leave latent fingerprints, would that be – would the latent fingerprints be
        consistent or inconsistent with the size that were submitted to you of those
        three prints that were readable.

        MR. DODD:           Objection.

        THE COURT:          Sustain.

                              . . . .

Q:      Ms. Triplett, during your twenty-four years of being assigned to the I.D.
        bureau of the Birmingham Police Department, have you had the occasion
        to look at the latent prints or known prints of small children?

34

A:      Yes, sir.

Q:      On few or many occasions?

A:      I would say probably many occasions, very many occasions.

. . . .

Q:      And based on your experience in the past twenty-four years, along with training, education and background, have you formed an opinion of whether or not those handprints would be consistent or inconsistent with having been left by a small child?

A:      I would say they would be consistent.

(TR. 1316, 1322-23).

The prosecutor argued in closing argument:

You saw Brenda Brown and John Brown come in here and say she was over at our house and picked up her child and she went home. Brenda said we followed her home and we checked the house out and everything was fine.  That was about 9:00.

Betty Matherson talked to her about 9:30, everything was fine. And I submit to you until about 1:30 the next morning everything was just like it had been a hundred other nights.  And then the whole world is turned upside down for the Browns.

. . . .

And you have to consider each and every fact in this case.  And Brenda and John Brown can't consider what's Candy going to do today anymore.  They don't get that option.  That option was taken away from them back on the 19th of May, 1992.  Taken away by the man who fired this gun, the man that killed Candy Brown.

. . . .

What is he guilty of?  That's why we're here right now, what is he guilty of?  Take a look at him.  After it's all said and done, after you look at everything, you will be convinced beyond a reasonable doubt that Michael Jeffrey Land is guilty of not only capital murder during the course of a burglary, but he is also guilty of capital

35

> murder during the course of a kidnapping.  That he abducted
> Candace Brown, he abducted her after he broke into her house with
> a gun.  He abducted her and took her to Ruffner Mountain, Ruffner
> Mountain nature area.  An area that you can see is very secluded,
> way out in the woods, at 3:00, 3:30 in the morning.  Not anybody
> around going to hear a gunshot.
>
> Why did he pick that spot?  I don't know, I have got no idea,
> except that it's secluded.  Maybe it meant something to him.  It
> certainly means something to the Browns now.

(TR. 1934-35, 1939, 1942-43).

In *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) and *South Carolina v. Gathers*, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), the United States Supreme Court held that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing.  These holdings were overruled in *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) when the Court held that there is no *per se* bar to the introduction of victim impact evidence and argument at sentencing.[5]  *See also*, *Jones v. United States*, 527 U.S. 373, 395, 119 S.Ct. 2090, 2105, 144 L.Ed.2d 370 (1990) ("The Eighth Amendment . . . permits capital sentencing juries to consider evidence relating to the victim's personal characteristics and the emotional impact of the murder on the victim's family in deciding whether an eligible defendant should receive a death sentence.").  The *Payne* Court recognized that only where such evidence or argument is unfairly prejudicial may a court prevent its use through the Due Process Clause of

---

[5]   The *Booth* prohibition against evidence of family members' opinions and characterizations of the crime, the defendant, and the appropriate sentence remains the law.  *Payne,* 501 U.S. at 830 n. 2, 111 S.Ct. 2597 ("Our holding today is limited to the holdings of *Booth* . . . and *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing.  *Booth* also held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment.  No evidence of the latter sort was presented at the trial in this case.")

the Fourteenth Amendment. *Id.* at 825, 111 S.Ct. at 2608 (citing *Darden v. Wainwright,* 477 U.S. 168, 179-183, 106 S.Ct. 2464, 2470-2472, 91 L.Ed.2d 144 (1986)).  The question then is whether the victim impact evidence introduced "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden,* 477 U.S. at 181, 106 S.Ct. at 2471 (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)).  Land, however, complains about victim impact testimony during the guilt phase of the trial.

*Payne, Booth,* and *Gathers* were all decided in the context of the **sentencing** phase of a capital trial.  While no decision of the Supreme Court or Eleventh Circuit Court of Appeals has explicitly decided whether victim impact evidence may be introduced in the guilt phase, the Court in *Payne* observed that "[i]n many cases the evidence relating to the victim is already before the jury at least in part because of its relevance at the guilt phase of the trial." 501 U.S.  at 823, 111 S.Ct. at 2607 (Rehnquist, C.J., for the majority) and 501 U.S. at 840, 111 S.Ct. at 2616-17 (Souter, J., concurring).  Justice Souter concluded that it would be anomalous to require strict exclusion of such evidence at the sentencing phase when  the jury would have already  heard that evidence at the guilt phase.  *Id.* at 840-41, 111 S.Ct. at 2616-17.  The testimony about which Land complains during the guilt phase were not victim impact statements[6] but rather evidence related to events surrounding the victim's deaths.  Assuming such testimony and closing argument to be  improper  victim impact evidence and argument, the evidence and closing argument did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181, 106 S.Ct. at 2471.

---

[6]    Specifically, no testimony or argument was offered concerning the victim's personal characteristics nor the specific emotional impact on her family.

The Alabama Supreme Court's decision finding that "the limited testimony regarding Ms. Brown's infant son and the impact of Ms. Brown's death on her family, and the prosecution's limited references to such evidence, did not operate to deny Land a fair trial or to prejudice his substantial rights" was not an unreasonable application of clearly established federal law as determined by the Supreme Court in *Payne*, *Booth*, and *Darden*.  This court concurs.

> I.(d).   The claim that the prosecutor improperly commented on Land's exercise of his constitutional rights to a jury trial, to confrontation, to counsel and to present a vigorous defense in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

> Alleged improper comment on Land's exercise of his constitutional right to a jury trial.

Land argues that "the prosecutor repeatedly commented on his exercise of his right to a jury trial, and openly encouraged the jury to count the exercise of that right against Mr. Land in rendering its penalty phase verdict" (Amended Petition, ¶ 38).  Land attacks the prosecutors arguments in closing at the end of the penalty phase:

> Ladies and gentlemen, this is a horrible, horrible situation.  This is not a time for celebrating on anyone's part.  I am certain [sic] not, I think Mr. Mathis and Mr. Dodd know that.  This is a bad situation.

> But ladies and gentlemen, Michael Jeffrey Land is the one that started this whole thing so long ago, so long ago.  And he is the one that put us all here when he killed Candace Brown during the course of a burglary and kidnapping.  I am going to ask you to return a verdict of death for Michael Jeffrey Land.  I submit to you that based on the circumstances, the fact that the killing was performed during the course of the burglary and the kidnapping, I submit to you that those aggravating circumstances outweigh any mitigating circumstances.  And that's the test.

> I ask that in consideration of everything that you have done this week and all of the evidence, I ask that you return a verdict of death.

(R. 2086-87) (emphasis added).

. . . .

I feel sorry for you people having to be put through this.

. . . .

But that man pronounced more than that single death sentence that day. A part of everyone in this courtroom died that day. Some part somewhere, all the friends of the Browns, the friends of the Lands, the police officers who were involved in this case, a piece of all of us died that day when we became involved in this case.

Michael Jeffrey Land pronounced multiple, multiple, multiple death sentences when he performed that single execution. He is to blame for all of his [sic] ladies and gentlemen. Gail Land is not to blame. Mr. Morrison is not to blame. The Browns are not to blame, you're not to blame, the judge is not, the police are not. That man right there is to blame. For whatever his motives were . . . [h]e decided to play like God and take life. He is the one that brought about this tragedy and it is a tragedy for everyone else.

(TR 2099-2101).

Land  argues that the comments improperly "invit[ed] the jurors to consider their own discomfort when deciding what sentence to recommend [and] amounted to the prosecutor asking the jury to consider Mr. Land's exercise of his constitutional right to a jury trial as a non-statutory aggravating factor." (Amended Petition, ¶ 39).

Land raised this claim on direct appeal. Neither the Alabama Court of Criminal Appeals nor the Alabama Supreme Court addressed the merits of the claim. The court will review these statements to see if the State Courts' implicit rejection of this claim was an unreasonable application of Supreme Court precedent.

The first comment by the prosecutor was of a general nature often made by counsel intended to ensure that counsel appreciated their service as jurors, especially in a case that is so distasteful.  Defense counsel, Mr. Mathis, made similar statements when he said:

> These trials are terrible.  But our statute, our capital murder statute, dictates that sometimes some of us have to go through this, it just happens to be your day, I'm sorry.

(TR. 2088).

The first set of comments did not amount to the prosecutor asking that the jury consider Land's exercise of his right to a jury trial as a non-statutory aggravating factor.  Rather, the comment to which the court added emphasis was made at the penalty phase after Land had already been convicted of killing the victim during a burglary and kidnapping.  The prosecutor correctly stated that the fact that the killing was performed during the burglary and kidnapping were aggravating circumstances and  argued that those aggravating circumstances outweighed any mitigating circumstances.  Such argument passes constitutional muster.

With respect to the second set of comments, the comments preceded the prosecutor's response to comments by defense counsel that Land was a "young boy" (TR. 2101) and were clearly intended to emphasize that Land was responsible for his actions in murdering the victim. Neither set of comments could be construed as a comment on Land's exercise of his right to a trial by jury.  Rather, the statements are a recognition that the jury was there because Land had murdered the victim. "[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo*, 416 U.S. at 647, 94 S.Ct. at 1873.

The implicit decisions by the state appellate courts that the prosecutor's comments to the jury did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process," *Darden*, 477 U.S. at 181, 106 S.Ct. at 2471, are not unreasonable applications of United States Supreme Court law.

       (ii)    <u>Alleged juxtaposition of Land's rights with victim's rights.</u>

Land alleges that the prosecutor improperly contrasted his exercise of his constitutional rights with the rights of the victim when he argued during the sentencing hearing:

> Candace Brown was shown absolutely no consideration by Mr. Land. None. Through the courts of this country, the courts of this land, through every opportunity the legal system has provided . . . Mr. Land [had] every opportunity to confront his accusers, to deal with them in a fair and just manner just like the Constitution provides. It has given him every opportunity to talk to the witnesses, to look at evidence against him, and to prepare for months, for months, for months for his day in court. Candy Brown was given none of that. None of that. She was taken up to Ruffner Mountain and executed.

(TR. 2160).

This claim was raised on direct appeal but was not addressed by either the Alabama Court of Criminal Appeals or the Alabama Supreme Court. Again, the court must decide whether the implicit rejection of the argument was an unreasonable application of Supreme Court law.

Land cites *Brooks v. Kemp*, 762 F.2d 1383, 1411 (11th Cir. 1985), *vacated on other grounds*, 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), for the proposition that "[I]t is wrong to imply that the system coddles criminals by providing them with more procedural protections than their victims. A capital sentencing jury's important deliberation should not be colored by such considerations." In *Brooks*, the prosecutor argued that Brooks himself believed in the death penalty, as evidenced by the killing of his victim and noted that the victim did not

have lawyers or a judge or any other procedural safeguards.  The *Brooks* court went beyond the

portion of the opinion quoted by Land, stating:

> Although the remarks, as interpreted in the manner urged by
> Brooks, clearly would be improper, the more obvious interpretation
> of the argument is not. Correctly anticipating a defense argument
> that the death penalty is bad,  Whisnant argued that Brooks himself
> believed in the death penalty. The thrust of the argument was that
> Brooks' execution of Galloway in a manner much more horrible
> than a procedurally proper, legal execution demonstrated Brooks'
> belief in the death penalty. Following the command of *Donnelly v.
> DeChristoforo,* 416 U.S. at 647, 94 S.Ct. at 1873, that "a court
> should not lightly infer that a prosecutor intended an ambiguous
> remark to have its most damaging meaning," we doubt that the jury
> understood the remark in the improper way suggested by Brooks.

*Brooks*, 762 F.2d at 1411.

The court notes that the argument made in  *Brooks* was made to the jury while the

argument complained of by Land was made to the **judge** during the second sentencing hearing

after the jury had returned an advisory verdict of death. The trial court clearly knew that Land

could not be penalized for exercising his right to a jury trial to confront his accusers, to be

represented by counsel, and to present a vigorous defense.  The implicit decisions by the state

appellate courts that the prosecutor's comments at the sentencing hearing before the judge did

not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due

process," *Darden*, 477 U.S. at 181, 106 S.Ct. at 2471, are not  unreasonable applications of

United States Supreme Court law.

(iii)    Alleged argument of facts not in evidence.

Land argues that the prosecutor argued facts at the guilt phase that were not introduced at

trial and which were calculated to distract and inflame the jury: Specifically Land cites the

following arguments:

42

> [Jeff Land] goes in and at some point Candy Brown wakes up and
> he says you're going with me.  She said I'm not going anywhere.
> Maybe she ran towards the front door, maybe she was trying to get
> out.  But at one point Michael Jeffrey Land fires the gun and said
> the next one's for the kid.  You're going with me.
>
> . . . I submit to you that at the point Candy Brown pulled her pants
> on and puts some shoes on and walks out of the house and on the
> way out Candy Brown did one last desperate attempt to protect her
> child, she locked the door.

(R. 2015-2016) (emphasis added).

> [Jeff Land] didn't think nobody was going to find her.  But Candy
> Brown knew, Candy Brown knew somebody would find Michael,
> the little boy.
>
> I, like Mr. Mathis, am no biblical scholar, but there is a phrase in
> there, no greater love have one man than to lay down his life for his
> friend.  And that, ladies and gentlemen, is what Candy Brown did
> for her little boy, she gave up everything that she had, not knowing
> if it would work.  And she gave up everything in the world to save
> that little boy.  That's exactly what happened.  And I think if you
> look at the evidence you can see that.

(R. 2025).

While Land raised this claim on direct appeal, neither the Alabama Court of Criminal

Appeals nor the Alabama Supreme Court addressed the merits.  Once again, the court applies the

stand of unreasonable application of Supreme Court authority to evaluate the state courts'

implicit rejection of this argument.

Courts have widely recognized that "a prosecutor may argue both facts in evidence and

reasonable inferences from those facts."  *Tucker v. Kemp*,  762 F.2d 1496, 1506 (11th Cir. 1985),

*cert. denied*, 478 U.S. 1022, 106 S.Ct. 3340, 92 L.Ed.2d 743 (1986),  citing, *Alvarez v. Estelle*,

531 F.2d 1319, 1323 (5th Cir.1976), *cert. denied*, 429 U.S. 1044, 97 S.Ct. 748, 50 L.Ed.2d 757

(1977) *citing* ABA Standards for Criminal Justice 3.5-8(a) (1980) ("The prosecutor may argue all

reasonable inferences from evidence in the record"), which was also cited by *United States v. Young*, 470 U.S. 1, 9-10, 105 S.Ct. 1038,1043, 84 L.Ed.2d 1 (1985). The evidence supported the inferences that Land threatened to shoot the victim's child and that Ms. Brown left to spare her small child. The evidence showed that Ms. Brown left her home and locked the door with her two-year-old child safely inside. (TR. 745). Although Land said in his statement that the victim had been dressed in a nightshirt when she confronted him after he broke into her house at 1:00 a.m., she was found in a rock quarry on Ruffner Mountain wearing clothes but no shoes. (TR. 798-801). Land mentioned the fact that the victim had a young child in his statement. A bullet was retrieved from an interior wall next to the front door. (TR. 1257).

The trial court instructed the jury that it was not to consider comments by counsel as evidence. (TR. 1900). The implicit decisions by the state appellate courts that the prosecutor's closing argument based on reasonable inferences from the evidence did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process," *Darden*, 477 U.S. at 181, 106 S.Ct. at 2471, are not unreasonable applications of United States Supreme Court law.

(iv) <u>Alleged vouching for the veracity of its case.</u>

Land alleges that the prosecutor vouched for the veracity of its case in arguments at both the guilt and penalty phases of the trial by implying that the state had charged Mr. Land with capital murder because he was guilty. During closing arguments at the guilt phase of trial the prosecutor stated, "[t]he State of Alabama has not charged Michael Jeffrey Land with a capital offense, either kidnapping or . . . burglary *because we're sitting here scratching our head"* (TR. 1936). Land further alleges that during the penalty phase argument the prosecutor implied that the state has already concluded that the case warrants the death penalty above even other capital

44

murder cases and thereby reduced the jury's sense of responsibility to reach a guilty and penalty

phase verdict in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 328-29, 105 S.Ct. 2633, 86

L.Ed.2d 231 (1985) and the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States

Constitution; specifically, he challenges the following argument:

> I feel sorry for you people having to be put through this. But I'll
> just tell you right now and maybe this is cold and maybe this is
> mean and maybe this is callous: *One person I have no sympathy at
> all for, Michael Jeffrey Land*. Michael Jeffrey Land physically
> killed Candace Brown in an execution styled killing, one shot to
> the back of the head with a large caliber pistol.
>
> . . . .
>
> But that man pronounced more than that single death sentence that
> day. A part of everyone in this courtroom died that day. Some part
> somewhere, all the friends of the Browns, the friends of the Lands,
> the police officers who were involved in this case, a piece of all of
> us died that day when we became involved in this case.
>
> Michael Jeffrey Land pronounced multiple, multiple, multiple
> death sentences when he performed that single execution. He is to
> blame for all of his [sic] ladies and gentlemen. Gail Land is not to
> blame. Mr. Morrison is not to blame. The Browns are not to
> blame, you're not to blame, the judge is not, the police are not.
> That man right there is to blame. For whatever his motives were
> . . . he decided to play like God and take life. He is the one that
> brought about this tragedy and it is a tragedy for everyone else.
> That man got what he wanted. That man got what he wanted.
>
> He knew what he was getting into. So, my heart goes out and I
> mean this sincerely to everyone, I had no question of Mr. Morrison
> or of Ms. Land, I feel for them. *But my heart does not, does not
> bleed a single drop for Michael Jeffrey Land.*

(TR. 2099-2101) (emphasis added).

      While Land raised this claim on direct appeal, neither the Alabama Court of Criminal

Appeals nor the Alabama Supreme Court addressed the merits of the claim. The court must

determine whether the implicit rejection of this claim was an unreasonable application of Supreme Court law.

Prior to making the comment that the prosecution was not "sitting here scratching our head" (TR. 1936), the prosecutor had gone through the evidence at trial which supported a finding of Land's guilt; he summed up his discussion by stating "Ladies and gentlemen, **everything that we have presented** shows you Michael Jeffrey Land killed Candace Brown after kidnapping her, after breaking into her house." (TR. 1936) (emphasis supplied). The first challenged comment was not a vouching by the State but a comment on the evidence. As previously stated, in his jury instructions at the guilt stage, the trial court told the jury that it was not to consider comments by counsel as evidence. (TR. 1900).

Further, the second set of comments did not constitute a vouching by the State. The argument was in substance that Land meant to kill the victim as evidenced by the fact that she was shot execution style in the back of her head.

In *Caldwell*, the Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. at 328-329, 105 S.Ct. at 2639. "To establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams,* 489 U.S. 401, 407, 109 S.Ct. 1211, 1215, 103 L.Ed.2d 435 (1989); see also *Sawyer v. Smith,* 497 U.S. 227, 233, 110 S.Ct. 2822, 2826-2827, 111 L.Ed.2d 193 (1990) and *Romano v. Oklahoma,* 512 U.S. 1, 9, 114 S.Ct. 2004, 2010, 129 L.Ed.2d 1 (1994). At the penalty phase that immediately followed the guilt phase, the judge instructed the jury:

> [I]t is left up to you people to determine what the facts are and what the sentence shall be.
>
> The law of Alabama provides that the punishment for the capital offenses for which you have convicted Michael Jeffrey Land would be either death by electrocution or life imprisonment without ever being eligible for parole consideration.

(TR. 2105).  The court further instructed the jury:

> [I]n reaching your findings concerning the aggravating and mitigating circumstances in the case and determining what the penalty should be, you must avoid any influence of passion, prejudice or other arbitrary factors. Your deliberations and verdict should be based on the evidence you have seen and heard and the law about which you have been instructed.  There is no room for the influence of passion, prejudice or any other arbitrary factors.

(TR. 2118).

The jury instructions at the penalty phase took up 21 pages of the trial transcript.  (TR. 2104-25).  Based on the substance as well as the length of the instructions, the jury was certainly NOT "led to believe that the responsibility for determining the appropriateness of the defendant's death rested elsewhere."  The jury instructions cured any improper argument.  The implicit decisions of the state appellate courts that the prosecutor's closing argument did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process" *Darden*, 477 U.S. at 181, 106 S.Ct. at 2471, are not unreasonable applications of United States Supreme Court law.

(v)     Alleged disparagement of trial counsel.

Land alleges that the prosecutor disparaged trial counsel throughout his guilt phase closing argument,  suggesting to the jury that trial counsel had attempted to mislead the jury and had  presented a ludicrous conspiracy theory by comparing defense counsel to Oliver Stone,

director of the movie "J.F.K."  (TR 2003-13, 2021-22).  He alleges that the prosecutor personally

attacked counsel when he stated

> [H]e is talking out of both sides of his mouth, ladies and gentlemen.  He's
> saying they're crooked, they're trying to just convict people and that's all
> they're trying to do.  . . .  They're grasping at straws.

(TR. 2023).

Land alleges that the prosecutor characterized his exercise of his right to remain silent

and the theory of defense as an effort by defense counsel to present lies to the jury, the court and

the people of the county when he stated:

> Through his attorneys he continues to say I don't know anything
> about the wire cutters or the phone lines or the glass fragments, I
> don't know anything about the gun or how that bullet got into her
> head.

(TR. 2026).

While Land raised this claim on direct appeal, neither the Alabama Court of Criminal

Appeals nor the Alabama Supreme Court addressed the merits of the claim.  The court again

examines the implicit decision of the state courts to determine whether those decisions were

unreasonable applications of Supreme Court law.

If the challenged statements are put in context, the comments clearly were not a

disparagement of trial counsel but a reply in kind to attacks by Land's counsel on the evidence

presented by the prosecutor:

> Mr. Dodd (defense counsel) says he understands the word protocol
> out of the Department of Forensic Sciences now, because what it
> means, according to Mr. Dodd, is let's convict him, let's certainly
> don't turn him loose.  I guess that's why Phyllis Rollan came in
> here and said I got to tell you this, though, the three could be
> missing, so that could be Mr. Land's blood.  And then Mr. Dodd
> turns around, turns right around and said . . . she's very honest

> when she said it.  <u>So he is talking out of both sides of his mouth,
> ladies and gentlemen.  He's saying they're crooked, they're trying
> to just convict people and that's all their trying to do. . . .  They're
> grasping at straws.</u>
>
> (R. 2023-23)
>
> But this man right here, ladies and gentlemen, he stands before you
> and says they lied, those people lied, I don't know anything about a
> footprint nor a statement saying I was there.  <u>Through his attorneys
> he continues to say I don't know anything about the wire cutters or
> the phone lines or the glass fragments.  I don't know anything
> about the gun or how that bullet got into her head.</u>

(TR. 2026) (emphasis added to portions of quote relied upon by petitioner).  The implicit

decisions by the state appellate courts that the prosecutor's allegedly disparaging comments in

closing argument did not "so infect[] the trial with unfairness as to make the resulting conviction

a denial of due process," *Darden*, 477 U.S. at 181, 106 S.Ct. at 2471, are not unreasonable

applications of United States Supreme Court law.

> I.(e).   The claim that the prosecutor misled the jury on the law in violation
> of Land's right to a fair trial under the Fifth, Sixth and Fourteenth
> <u>Amendments to the United States Constitution</u>.

Land argues that the prosecutor incorrectly stated the level of proof necessary for an

acquittal when he stated before the venire  that a "reasonable doubt" was "a doubt for which you

can give a good, sound, sensible reason."  (R. 436).

This claim was raised on direct appeal, but neither Alabama Court of Criminal Appeals

nor Alabama Supreme Court addressed the claim.  The court must therefore, determine whether

the implicit denial of this claim presents an unreasonable application of Supreme Court law.

During **voir dire of the venire**, the prosecutor stated:

MR. ANDERSON:     . . . Now, as a member of the jury it is going to be up to you to listen to all
                  of the evidence and listen to all of the testimony and whatever physical

exhibits will be presented to you and make a decision if the state has proven to you beyond a reasonable doubt as to the guilt of Michael Jeffrey Lane.  And beyond a reasonable doubt is the burden of proof that the State of Alabama carries, Mike Anderton carries in this case, that is the burden of proof that is set up by law.

How many of y'all have seen or watched any of the lawyer shows on TV, L.A. Law and there used to be Reasonable Doubt and Law and Order and that kind of stuff; Perry Mason, Matlock, for heaven's sake.  Okay.  During the course of those programs y'all hear the expression beyond a shadow of a doubt, beyond all doubt.  Mainly because the writers out there don't know what they are doing.  Okay?  The proof here in the state of Alabama is beyond a reasonable doubt.  **A reasonable doubt is a doubt for which you can give a good, sound, sensible reason.**  And towards the end of the case the judge will tell you that.

Is there anybody here that thinks that beyond a reasonable doubt is too heavy a burden for the State to carry? . . .

Is there anybody here who feels like beyond a reasonable doubt is too light a burden?  Feels like you have got to show me beyond any doubt, you're going to have to prove to me beyond any shadow of a doubt.  That's not what the law says.

Is there anyone here who feels like beyond a reasonable doubt is too light a burden on the State of Alabama when we are talking about something like this?

. . . .

(TR. 434-37).

The court then asked:

THE COURT:      Let me ask this question of – if the Court instructs the jury about these principles, the burden of proof, reasonable doubt and so forth, is there anyone whose feelings about the subject suggests to you that you might not follow the Court's instructions?

. . . .

(TR. 437).

When instructing the **jury immediately before deliberations began**, the court described

the burden of reasonable doubt:

THE COURT:          Michael Jeffrey Land, the defendant in the case, is presumed to be not
                    guilty.  . . . .

                    He is presumed to be not guilty.  No burden of proof rests on Michael
                    Jeffrey Land here in the litigation.  The burden of persuasion, the burden
                    of going forward with the evidence is on the State of Alabama, the
                    prosecuting governmental entity.

                    The fact that Mr. Land is here as the defendant, he enjoys the presumption
                    of innocence, that's evidence in his behalf.  That is evidence in his behalf
                    here in the case.

                    What does the State have to do in order to overcome or override the
                    presumption of innocence that Michael Jeffrey Land enjoys?  The State
                    has to bring you strong and cogent evidence that convinces you people
                    beyond a reasonable doubt of his guilt in order to overcome the
                    presumption of innocence.

                    So, let's spend a moment on the quantum of proof required here in the
                    criminal division.  . . .  In the criminal division the State has a higher or
                    more onerous burden, [it has] to prove one's guilt by evidence that
                    convinces you beyond a reasonable doubt.

                    The State doesn't have to prove guilt to a mathematical certainty, that
                    wouldn't be plausible when the evidence is derived from human beings.
                    Proof beyond a reasonable doubt is required.

                    Use your common sense here, folks, throughout the course of the week as
                    you have listened and when you deliberate and as you observe these
                    proceedings, please use your common sense.  Reasonable double is self-
                    defining, a doubt based on reason and common sense after a careful
                    consideration of all of the evidence in the case.  **Proof beyond a
                    reasonable doubt would be proof of such a convincing character that
                    you would be willing to rely and act upon it without hesitation in the
                    most important of your own affairs.**

                    . . .  If after a full and fair consideration of all of the evidence in the case, if
                    there should remain in your collective minds an abiding conviction that
                    Michael Jeffrey Land here is guilty of one of the offenses charged, then

you would be convinced beyond a reasonable doubt and you should convict him of the offense.

On the other hand, if after that same full and fair consideration of all of the evidence in the case, if there does not remain in your collective minds that abiding conviction that he is guilty, then you would not be convinced by that full measure of proof required in the law and he should be acquitted.

A reasonable doubt may spring from the evidence that was actually adduced in court. It may emanate from or spring from a lack of sufficient and satisfying evidence. And indeed a reasonable doubt may be based on any part of the evidence.

(TR. 1902-06).

In *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), the Supreme

Court reviewed the following jury instruction:

"If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilty, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused. This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. *It must be such doubt as would give rise to a grave uncertainty*, raised in your mind by reasons of the unsatisfactory character of the evidence or law thereof. A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt*. It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a *moral certainty*." 554 So.2d 39, 41 (La. 1989) (emphasis added).

498 U.S. at 40, 111 S.Ct. at 329.

The *Cage* Court held:

In construing the instruction, we consider how reasonable jurors could have understood the charge as a whole. *Francis v. Franklin*, 471 U.S. 307, 316, 105 S.Ct. 1965, 1972, 85 L.Ed.2d 344 (1985). The charge did at one point instruct that to convict, guilt must be found beyond a reasonable doubt; but it then equated a reasonable doubt with a "grave uncertainty" and an "actual substantial doubt," and stated that what was required was a "moral certainty" that the

52

> defendant was guilty.  It is plain to us that the words "substantial"
> and "grave," as they are commonly understood, suggest a higher
> degree of doubt than is required for acquittal under the reasonable-
> doubt standard.  When those statements are then considered with
> the reference to "moral certainty," rather than evidentiary certainty,
> it becomes clear that a reasonable juror could have interpreted the
> instruction to allow a finding of guilt based on a degree of proof
> below that required by the Due Process Clause.

498 U.S. at 41, 111 S.Ct. at 329-30.

In *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed. 2d 385 (1991), the Supreme

Court  explained how challenged jury instructions in general are to be reviewed:

> The only question for us is "whether the ailing instruction by itself
> so infected the entire trial that the resulting conviction violates due
> process." . . .  It is well established that the instruction "may not be
> judged in artificial isolation," but must be considered in the context
> of the instructions as a whole and the trial record.  (citations
> omitted).  In addition, in reviewing an ambiguous instruction such
> as the one at issue here, we inquire "whether there is a reasonable
> likelihood that the jury has applied the challenged instruction in a
> way" that violates the Constitution.

502 U.S. at 72, 112 S.Ct. at 482 (citations omitted).

In *Victor v. Nebraska*, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), the Supreme

Court concluded that no *Cage* violation arose based on references to "reasonable doubt" and

"moral certainty" in the following jury instruction:

> "'Reasonable doubt' is such a doubt as would cause a reasonable
> and prudent person, in one of the graver and more important
> transactions of life, to pause and hesitate before taking the
> represented facts as true and relying and acting thereon.  It is such a
> doubt as will not permit you, after full, fair, and impartial
> consideration of all the evidence, to have an abiding conviction, *to
> a moral certainty*, of the guilt of the accused.  At the same time,
> absolute or mathematical certainty is not required.  You may be
> convinced of the truth of a fact beyond a reasonable doubt and yet
> be fully aware that possibly you may be mistaken.

> You may find an accused guilty upon the *strong probabilities of the case*, provided such probabilities are strong enough to exclude any doubt of his guilt that is reasonable.  A reasonable doubt is an *actual and substantial doubt* reasonably arising from the evidence, from the facts or circumstances shown by the evidence, or from the lack of evidence on the part of the State, as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture."

511 U.S. at 18, 114 S.Ct. at 1249.

The Court explained:

> **[In *Cage*] we did not hold that the reference to substantial doubt alone was sufficient to render the instruction unconstitutional.**  . . .  Rather, we were concerned that the jury would interpret the term "substantial doubt" in parallel with the preceding reference to "grave uncertainty,"  leading to an overstatement of the doubt necessary to acquit.  In the instruction given in Victor's case, the context makes clear that "substantial" is used in the sense of existence rather than magnitude of the doubt, so the same concern is not present.
>
> **In any event, the instruction provided an alternative definition of reasonable doubt:  a doubt that would cause a reasonable person to hesitate to act. . . .  [T]o the extent the word "substantial" denotes the quantum of doubt necessary for acquittal, the hesitate to act standard gives a common sense benchmark for just how substantial such a doubt must be.  We therefore do not think it reasonably likely that the jury would have interpreted this instruction to indicate that the doubt must be anything other than a reasonable one.**

511 U.S. at 20-21, 114 S.Ct. at 1250 (emphasis added).

In Land's case, in the instructions to the jury prior to deliberation, the trial court

emphasized that the jurors should consider the evidence in determining whether they had a

reasonable doubt and stated:

> Proof beyond a reasonable doubt would be proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

. . . .

(TR.  1905.)   No reasonable likelihood existed that the jurors understood that a conviction could

be based on a standard other than reasonable doubt or factors other than the evidence presented at

trial.

Land also alleges that the prosecutor sought to prevent the jury from considering his

youth at the time of the crime as a mitigating circumstance.   This claim was raised on direct

appeal, but neither the Alabama Court of Criminal Appeals nor the Alabama Supreme Court

addressed the merits of the claim.  The same standard applies to this implicit ruling.  Land argues

that the prosecutor misled the jury on the law applicable to the penalty phase by suggesting that

the jury must consider Land's age at the time of trial rather than at the time of the crime.  The

prosecutor argued:

> He is not a young boy, as [defense counsel] called him, he is
> twenty-four years old, he is a grown, he is an adult.  He knew what
> was happening and he made an adult's decision.  He made an adult
> decision to break into that house, take Candace Brown and he took
> her up to Ruffner Mountain and shot her in the back of the head.
> And that was an adult decision.

(TR. 2101-02).

This statement was in response to defense counsel's plea based on Land's age that the

jurors sentence Land to life without parole instead of the death penalty:

> Anyone put under such a sentence will never get out of prison, they
> will be there until they die.  And that is an awful thing for me to
> ask you to do to this young boy.  Are you twenty-three or twenty-
> four?

MR. LAND:          Twenty-four.

55

MR. MATHIS:    Twenty-four years old.  But to sentence him to die – well, perhaps some argument can be made that that is the thing to do.  It is a terrible, terrible thing.

. . . I don't believe in it here and I don't believe killing this boy is going   to do one small iota of anything good for Candace Brown.

(TR. 2090-91).

The prosecutor did not argue that Land's age at the time of the crime could not be considered as a mitigating factor.  He argued that Land was an adult and made an adult decision when he killed the victim.  The jury heard numerous references to the date of the victim's disappearance (May 18-19, 1992).  The court instructed the jury:

Our state law provides a list of some of the mitigating circumstances which you may consider, but this list or that list is not a complete list of the mitigating circumstances you may consider.   I am going to tell you some of the mitigating circumstances you may consider.

**Mitigating circumstances would include the age of Mr. Land here at the time of the offense.  Michael Jeffrey Land's date of birth, May the 23rd, 1969.  So, he would have been twenty-two on May the 18th/19th, just short of his twenty-third birthday.**

(TR. 2113-14) (emphasis added).

In light of the proper jury instructions, the decisions by the state appellate courts that the prosecutor's alleged misstatements did not change the outcome of the case and did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process," *Darden*, 477 U.S. at 181, 106 S.Ct. at 2471, are not unreasonable applications of United States Supreme Court law.

I.(f).    The claim that the State failed to comply with its discovery obligations
under *Brady v. Maryland* in  violation the Fifth, Sixth, Eighth and
<u>Fourteenth Amendments to the United States Constitution.</u>

In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 215 (1963), the United States

Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused

upon request violates due process where the evidence is material either to guilt or to punishment,

irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87, 83 S.Ct. at 1196-

97.  "Impeachment evidence, [] as well as exculpatory evidence, falls within the *Brady* rule."

*United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985).

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to

the defense, the result of the proceeding would have been different."   473 U.S. at 682, 105 S.Ct.

at 3383.   In *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342

(1976), the Supreme Court stated that *Brady* applies in situations "involv[ing] the discovery,

after trial of information which had been known to the prosecution but unknown to the defense."

The Court extended *Brady* to apply to evidence "known to police investigators and not to the

prosecutor."  *Kyles v. Whitley*, 514 U.S. 419, 438, 115 S.Ct. 1555, 1568, 131 L.Ed.2d 490 (1995).

In *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286

(1999), the United States Supreme Court stated:  "There are three components of a true *Brady*

violation:  The evidence at issue must be favorable to the accused, either because it is

exculpatory, or because it is impeaching; that evidence must have been suppressed by the State,

either willfully or inadvertently; and prejudice must have ensued."  The prejudice component is

satisfied if the petitioner can show a reasonable probability that his conviction or sentence would

have been different had the evidence been disclosed.  527 U.S. at 296, 119 S.Ct. at 1955.

57

Land alleges that the state failed to provide "a wealth of exculpatory evidence to Mr. Land" including:

(1)     Fingerprint evidence indicating that someone else had handled the broken glass at Ms. Brown's home (Amended Petition, ¶ 51);

(2)     "Evidence about police officers and other state agents that would have impeached or otherwise impugned their testimony, such as various misconduct that eventually led to their dismissal from law enforcement" (Amended Petition, ¶ 51);

(3)     Grand jury transcripts (Amended Petition, ¶¶ 52, 62);

(4)     A Birmingham Police Department Inter-Office Communication dated July 28, 1992 and entitled "Crime Scene Preservation" (Amended Petition, ¶¶ 53, 54); and

(5)     Investigation results concerning various leads and persons he believes should have been considered as suspects (including the victim's boyfriend, the father of the victim's child, and the victim's ex-husbands.) (Amended Petition, ¶¶ 55-64).

The Alabama Court of Criminal Appeals affirmed the trial court's findings of preclusion with regard to two aspects of Land's *Brady* claim:

> Claim IX – The State Failed to Comply with Its Discovery Obligations Under *Brady v. Maryland*, Rule 32.2(a)(2), (a)(4) (To the extent that Land claims the State violated *Brady* by failing to disclose, prior to trial, that a child's handprints were found on the glass that had been removed from the rear window of the victim's home); Rule 32.2 (a)(2), (a)(5) (To the extent that Land claims the State violated *Brady* failing to provide a transcript of the grand jury proceedings.) . . . .
>
> An examination of the record reveals that the trial court was correct in summarily dismissing the aforementioned claims as procedurally precluded for the aforementioned reasons.

(CR-02-1563, memo. op. at 8, 11, 36.).[7]

Land could have presented testimony at the Rule 32 evidentiary hearing on all *Brady* claims but for the fingerprint evidence and the grand jury transcript. The only *Brady* claim for which he offered evidence was the inter-office communication claim.

(i)      Fingerprint evidence

The *Brady* claim pertaining to the child's handprint is not precluded from federal review based on the state court's determination that it was barred from state review as it had been addressed on appeal. On direct appeal, the Alabama Court of Criminal Appeals held:

> The appellant asserts that the prosecution violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose, prior to trial, that a child's handprints were found on the glass that had been removed from the rear window of the victim's home. The short answer to this argument is that these prints were not *Brady* material.
>
> A defendant seeking to establish a *Brady* violation must show: "1. that the prosecution suppressed the evidence; 2. that the evidence was of a character favorable to the defense; and 3. that the evidence was material." *Ex parte Dickerson*, 517 So.2d 628, 630 (Ala.1987) (emphasis added). *Accord Johnson v. State*, 612 So.2d 1288, 1293 (Ala. Cr. App.1992). While none of these requirements appears to have been met in this case, it is readily apparent that the complained of evidence was not favorable to the appellant. Evidence that is "favorable to the defense" is evidence that " 'if disclosed and used effectively, . . . may make the difference between conviction and acquittal.' " *Patton v. State*, 530 So.2d 886, 890 (Ala. Cr. App.1988) (*quoting United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985)).
>
> Sandy Triplett, a latent print examiner, testified that she obtained three readable prints from the panes of glass found on the back porch of the victim's residence. None of these prints matched the appellant's prints. However, Ms. Triplett stated that these prints

---

[7]      The trial court dismissed these claims prior to the Rule 32 evidentiary hearing due to the procedural default. (Tab #75, pp. 3-4).

were "[m]uch smaller, at least a fourth of [the] size" of an adult
print, (R. 1316), and that these prints were "consistent . . . with
having been left by a small child," (R. 1323).  It had previously
been established that the victim had a two-year-old son who lived
with her.

These prints obviously do not fall within the definition of evidence
favorable to the defense. Evidence that is not favorable to the
defense does not fall within *Brady*. *Carr v. State*, 640 So.2d 1064,
1073 (Ala. Cr. App.1994).

*Land v. State,* 678 So.2d at 220.

The finding of the Alabama Court of Criminal Appeals that the fingerprints found on the

glass that were consistent with those of a small child  were not "favorable"  is not an objectively

unreasonable application of *Brady* and its progeny.

Grand jury transcript

The *Brady* claim based on the State's failure to provide a transcript of the grand jury

proceedings is precluded from federal review because the Alabama Court of Criminal Appeals

held that the trial court was correct in finding this claim precluded from state review at the Rule

32 stage based on Land's failure to raise it on direct appeal after having raised it at trial.  (CR-02-

1563, memo. op. at 8, 11). Land does not specifically address the procedural default argument

made by respondent as to this alleged *Brady* violation; however, he does argue that  the  trial

court erroneously barred him access to the grand jury testimony, citing *Butterworth v. Smith*, 494

U.S. 624, 110 S.Ct. 1376, 108 L.Ed.2d 572 (1990).  While Land relies on *Butterworth* for the

proposition that he "was entitled to the grand jury transcripts in the same manner as he was

entitled to all other *Brady* materials," *Butterworth* does not support this proposition.  Rather,

*Butterworth* stands for the proposition that  a "Florida law prohibit[ing] a grand jury witness

from disclosing his own testimony after the term of the grand jury has ended [] violates the **First**

60

**Amendment** to the United States Constitution." *Butterworth*, 494 U.S. at 626, 110 S.Ct. at 378 (emphasis added).

Even assuming that the court's action constituted cause for the procedural default, Land cannot show prejudice because his argument that the State violated *Brady* by failing to provide him with the grand jury transcript is based purely on speculation that, because some witnesses who testified before the grand jury did not testify at trial, these witnesses must have offered testimony that was "either exculpatory or otherwise helpful" to Land.  (Amended Petition, ¶ 62).  The only witnesses identified by name are "Birmingham police officers Mike Crawford, E.G. Hull, and Robert Cornelius."  (Amended Petition, ¶ 62).  Because Land has failed to show prejudice based on the prosecutor's failure to provide him with the grand jury transcript, this claim is procedurally barred from federal review.

Alternatively, Land has not made any showing that the grand jury testimony of Officers Crawford, Hull and Cornelius was exculpatory but merely speculates that their grand jury testimony may have been exculpatory.  Mere speculation that their testimony would have been exculpatory will not suffice to prove materiality.  *United States v. Jordan*, 316 F.3d 1215, 1252, n. 81 (11th Cir. 2003), *cert. denied*, 540 U.S. 821, 124 S.Ct. 133, 157 L.Ed.2d 40 (2003); *United States v. Lindsey*, 482 F.3d 1285, 1293 -1294 (11th Cir. 2007) ("claim that the fingerprint card [discarded pursuant to a routine procedure] could have been exculpatory is both highly speculative and insufficient to rise to the level of *Brady* error [in light of defendant's admission] that he owned the gun and that he placed it inside the SUV.")   "Neither mere speculation that the prosecution might possess information helpful to the defense nor base assertions, without more, of the presence of exculpatory information in the

prosecution's files would be sufficient to warrant a *Brady* determination." 25 James Wm. Moore et al., *Moore's Federal Practice,* § 616.06[2] (3d ed.1997).

Land must show a reasonable probability that the evidence could affect the outcome of the trial. See *Baxter v. Thomas*, 45 F.3d 1501, 1507 (11th Cir.1995), *cert. denied*, 516 U.S. 946, 116 S.Ct. 385, 133 L.Ed.2d 307 (1995).  Because he failed to sufficiently allege a *Brady* violation, the state trial court's denial of his request for grand jury transcripts[8/] and the prosecution's failure to provide them raise questions of state law and, therefore, do not present a question for this court on habeas review.  *See White v. Singletary*, 70 F.3d 1198, 1201 (11th Cir. 1995), *cert. denied*, 516 U.S. 1018, 116 S.Ct. 592, 133 L.Ed.2d 505 (1995), *citing Beverly v. Jones*, 854 F.2d 412, 416 (11th Cir.1988) ("a state's interpretation of its own laws provides no basis for federal habeas relief since no question of a constitutional nature is involved."),[9/] *cert. denied*, 490 U.S. 1082, 109 S.Ct. 2104, 104 L.Ed.2d 665 (1989).

Birmingham Police Department Inter-Office Communication

---

[8/]     Land did not identify this claim specifically under the heading of a trial court error; however, in arguing that the state failed to provide this information, Land states:

> 52.     The trial court erroneously barred access to *Brady* material, by denying Mr. Land access to transcripts or notes of the grand jury proceedings.  Although the trial court initially offered to compare the testimony proffered at trial with that given at the grand jury proceedings, this comparison never occurred.

> Regardless of whether this alleged *Brady* violation is considered as trial court error or prosecutorial misconduct, the result is the same (no *Brady* violation) as petitioner has failed to carry his burden of showing that any of the grand jury testimony would have been exculpatory or favorable to him.

[9/]     Under Alabama law, a  defendant is not entitled to grand jury testimony until after a witness has testified at trial and, even then, must make some offer of proof (1) that the matters contained in the witness' grand jury testimony were relevant to the subject matter of the prosecution; and (2) that an inconsistency exists between grand jury testimony and trial testimony. *McKissack v. State*, 926 So.2d 367, 371 (Ala. 2005); *Millican v. State*, 423 So.2d 268, 270-71 (Ala.Crim.App. 1982). Because  the officers did not testify at trial, their trial testimony could not have been inconsistent with their grand jury testimony.

In affirming the trial court's denial of the Rule 32 petition, the Alabama Court of

Criminal Appeals stated:

> [T]he trial court rejected the petitioner's claim regarding the inter-
> officer [sic] memorandum as follows:
>
>> "Even assuming, for the purpose of analysis that this was
>> '*Brady*' material and that it was suppressed, Land presented
>> nothing to establish that it was material to the issue at trial.
>> He did not connect the document to this case and he never
>> established that, had it been disclosed, it would have led to
>> admissible exculpatory evidence.  The document itself was
>> plainly hearsay and would not have been admissible at trial.
>> Mr. Dodd testified that, had he been aware of the
>> document, he would have followed up on it.  Current
>> counsel, on the other hand, did have the document and the
>> opportunity to follow up on it, but produced nothing.  Land
>> has . . . failed to establish materiality and, therefore, this
>> claim is denied."
>
> "To prove a *Brady* violation, a defendant must show that "(1) the
> prosecution suppressed evidence; (2) the evidence was favorable to
> the defendant; and (3) the evidence was material to the issues at
> trial." *Johnson v. State*, 612 So.2d 1288, 1293 (Ala. Crim. App.
> 1992).  The evidence is material only if there is a reasonable
> probability that, had the evidence been disclosed to the defense, the
> result of the proceeding would have been different.  "A 'reasonable
> probability' is a probability sufficient to undermine confidence in
> the outcome." *Johnson*, 612 So.2d at 1293, *quoting United States
> v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L.Ed.2d
> 481 (1985).
>
> At the Rule 32 hearing, petitioner's trial counsel testified that had
> he been aware of the memorandum, he would have attempted to
> determine whether "the genesis of the memorandum was Jeff
> Land's case" and if so, then, he "would have tried to develop it."
> The record reveals, however, petitioner's Rule 32 counsel was
> aware of the memorandum and failed to plead and prove any
> evidence tending to show that the memorandum was material to
> the petitioner's case; i.e., that it had anything to do with the
> investigation of the victim's death.  Moreover, the petitioner failed
> to present any evidence that the memorandum would have been
> admissible at trial.  Because the petitioner failed to present any

> evidence establishing that he was entitled to relief, the trial court
> was correct in dismissing the petitioner's petition.  Rule 32.2,
> Ala.R.Crim.P.

(CR-02-1563, memo. op. at 36-37).

The inadmissibility of the inter-office communication  supports the state court's

conclusion that the report was not material.  *See Gilliam v. Secretary for Dept. of Corrections,*

480 F.3d 1027, 1032 -1033 (11th Cir.  2007), *citing Wood v. Bartholomew,* 516 U.S. 1, 5-6, 116

S.Ct. 7, 133 L.Ed.2d 1 (1995) (noting that inadmissible polygraph test was not "evidence" and

therefore was not material) and *Breedlove v. Moore,* 279 F.3d 952, 964 (11th Cir.2002)

("[i]nadmissible evidence could only rarely meet [*Brady*'s materiality] standard-indeed no

Supreme Court case . . . has found inadmissible evidence was material for *Brady* purposes"),

*cert. denied*, 537 U.S. 1204, 123 S.Ct. 1825, 155 L.Ed.2d 699 (2003).   This court cannot review

the determination of the Alabama Court of Criminal Appeals that the report was inadmissible

under Alabama evidentiary law "unless it amounts to an egregious, unsupportable application of

state law designed to frustrate [the petitioner's] *Brady* claim." *Gilliam*, 480 F.3d at 1033, n. 1,

*citing*, *Breedlove*, 279 F.3d at 964.   Land makes no such claim.

While Land argues that the inter-office communication would have provided him with

critical impeachment evidence, nothing other than the temporal proximity of the communication

to the crime connects the two.  Moreover, counsel thoroughly questioned witnesses concerning

the condition of the crime scene and the handling of evidence. Land argues:

> [O]ne of the most important pieces of physical evidence in this
> case was a pane of glass cut from the victim's door, which
> purportedly had a shoe print on it.  That piece of glass was dropped
> and broken by the Birmingham police department and the shoe
> print was no longer available for further testing.  Trial counsel
> could have used that memo to undermine the credibility of the

> police officers who were charged with collecting and keeping the
> evidence in Mr. Land's case.

(Petitioner's brief, at 67-68.)  The court notes that the pane of glass was available at trial.  While

it is true that the pane had been broken into two pieces while it was in storage, the shoe print was

still visible on the glass. (TR. 1716-17, 1756-58).

The decision of the Alabama Court of Criminal Appeals that the interoffice

communication was not *Brady* material because it was not material or admissible as evidence  is

not an objectively unreasonable application of *Brady* and its progeny.

Evidence about police officers and other state agents that would have impeached or otherwise
impugned their testimony and investigation results

Land alleges:  "The state also failed to provide evidence about police officers and other

state agents that would have impeached or otherwise impugned their testimony, such as various

misconduct that eventually led to their dismissal from law enforcement."  (Amended Petition, ¶

51).

He further alleges:

> Evidence introduced at trial and contained in the files and records
> that Mr. Land has received indicate that additional discoverable
> material exists.  For example, a police report detailing a nearly
> identical break-in at Ms. Brown's house a week before her death
> lists "Willie Toyer" as the sole suspect.  None of the police reports
> or records provided to Mr. Land indicate why the police suspected
> Mr. Toyer in the burglary of Ms. Brown's house, or whether any
> state or local law enforcement agencies investigated Mr. Toyer's
> involvement in Ms. Brown's death.  Similarly, a cryptic and
> otherwise unlabeled note in the district attorney's file lists someone
> named Karen Erwin-Brown as having information about Ms.
> Candace Brown.  Another note lists an otherwise unknown person
> named "Debra Atchison," along with the telephone numbers where
> she could apparently be contacted.  The state, however, never
> provided the defense with the follow-up investigation of any of
> these leads.

Further, information about an Edward and Tony was found in a note in the district attorney files that reads: Edward + Tony.  IAN 0678 1333 Prosch Av Tarrant."  While the police evidently investigated the involvement of "Edward and Tony" in the homicide, and discovered both their license plate number and address, the state did not disclose this information to the defense.

According to yet another memorandum in the district attorney's files, an individual telephoned the police station and told the Birmingham Police Department that two people named Rayford Higgenbotham and Eugene Brashet might be involved in the death of Ms. Brown because they had bragged of kidnapping and killing two other females.  Further corroboration of both this anonymous tip and Mr. Land's purported statement indicating that several people were involved in Ms. Brown's death comes from Ms. Brown's neighbor, who stated that she saw the victim talking to a six-foot-tall white male on the day before her death.  Mr. Land is 5'3".  The state did not provide the results of its investigation into these leads to Mr. Land or his trial counsel.

Another police memorandum lists the name, number, and employment of a work partner of Mr. Land: "Vince Yacko 733-8833 Southern Waterproofing."  The police records, however indicate nothing about the outcome of their meeting with Mr. Yacko, or his relevance to the homicide investigation.

The police apparently suspected one of Ms. Brown's former boyfriends, Aaron Adams, who was incarcerated with Mr. Land and purportedly introduced him to Ms. Brown.  Mr. Adams, who was incarcerated for a drug offense, had been released from the penitentiary just before Ms. Brown's death, and had moved to northern Alabama.  The police interviewed Mr. Adams and asked his whereabouts on the day of Ms. Brown's death, but the records give no indication of how or whether the police otherwise investigated his possible involvement in the offense nor did the state provide this information to Mr. Land.  Given Mr. Adams' criminal history, his recent release from prison, his tenuous relationship with Ms. Brown, his lack of a reasonable alibi, and his belief that Ms. Brown and Mr. Land had seen one another while he remained incarcerated, Mr. Adams would be a likely suspect in the death of Ms. Brown.

Similarly, Ms. Brown lived with her child, but nothing in any of the documents provided to Mr. Land indicates the identity of the

child's father, or whether the state investigated that father as a possible suspect in Ms. Brown's disappearance and death. Moreover, none of the records provided to Mr. Land establish whether Ms. Brown had sole custody of the child, received either alimony or child support payments, or had any contact – amicable or otherwise – with the child's father.

Further, a note provided to Mr. Land indicated that Ms. Brown was married twice. While the police undoubtably investigated the victim's ex-husbands, nothing in the file reveal their alibis or their relations with Ms. Brown. Based on the nature of the murder, an exhusband or boyfriend would be a likely suspect in Ms. Brown's death.

In addition, several witnesses testified at the Grand Jury proceedings who never testified at trial, and whose connections to Ms. Brown and Mr. Land were never established. These witnesses surely testified at the Grand Jury proceedings because the district attorney believed that they would contribute to the state's presentation. Nevertheless, none of the records made available to Mr. Land contain any indication of their involvement in the investigation of Ms. Brown's death. For example, the state called Birmingham police officers Mike Crawford, E.G. Hull, and Robert Cornelius to testify at the Grand Jury proceedings, but the disclosed records provide no documentation of their involvement in the investigation into Ms. Brown's death or Mr. Land's purported involvement. The fact that none of these people subsequently testified at trial suggests a strong likelihood that these individuals offered testimony that was either exculpatory or otherwise helpful to Mr. Land.

The prosecutor's files also contain a letter dated August 12, 1993, in which an otherwise unknown person named Davis Copeland claimed particular knowledge of the facts of the case and announced his certainty of Mr. Land's guilt. In his letter, Mr. Copeland states that he knew Ms. Brown and "is now convinced, based on the evidence, that Michael Jeffrey Land murdered Candace Brown. I hope he frys [sic] in the electric chair till [sic] his eye balls (sic) pop out!" How Mr. Copeland could form a conviction as to Mr. Land's guilt "based on the evidence" before any was offered at Mr. Land's trial is unclear. Given the inflammatory tone of his letter and his claim that he knew the evidence against Mr. Land, state law enforcement surely investigated Mr. Copeland. Yet nothing in any of the records

67

provided to Mr. Land's counsel indicates the results of this investigation.

A memorandum filed by Assistant District Attorney Michael Anderton relates that he received a telephone call on August 17, 1993, from a man named Chris Hudson who told Mr. Anderton where to locate Tony and Edward, the purported accomplices in the homicide.  Mr. Anderton noted that he told the caller that the police would investigate the information, and relayed the information to a Birmingham detective.  However, the records provided to Mr. Land's counsel do not indicate the results of the investigation of this tip by the Birmingham Police Department or any other law enforcement agency.

Mr. Land's defense at trial was largely premised on showing that the police investigation was full of mistakes.  Those mistakes included the mishandling of the crime scene, the physical evidence and the scene where the body was found.  Mr. Land was prejudiced by not having all of the exculpatory evidence the prosecution uncovered and investigated, which Mr. Land could have used to impeach witnesses or prove his innocence.  The state's investigation of or failure to investigate these potential witnesses was substantially likely to affect the outcome of Mr. Land's trial.  The prosecution's failure to comply with the discovery requirements of *Brady* denied Mr. Land his right to a fair trial under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  *Kyles v. Whitley*, 514 U.S. 419 (1995); *Butterworth v. Smith*, 494 U.S. 624 (1990); *Giglio v. United States*, 405 U.S. 150 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963).

(Amended Petition, ¶¶ 55-65).

The state maintains that these claims are procedurally defaulted because Land failed to

present evidence related to these claims at the Rule 32 evidentiary hearing.   The Alabama Court

of Criminal Appeals, in affirming the trial court's denial of the Rule 32 petition, held,

"[a]lthough there were a number of "*Brady*" claims included in the petition, this [failure to

disclose the Birmingham Police Department Inter-office Communication] was the only claim

upon which the petitioner presented any evidence during the hearing, and thus, the only claim

properly before this Court.  Rule 32.2 Ala. R.Crim.P." (CR-02-1563, memo. op. at 36).  In

Alabama, "a petitioner is deemed to have abandoned a claim if he fails to present any evidence to

support the claim at the evidentiary hearing." *Brooks v. State,*  929 So.2d 491, 497

(Ala.Crim.App.), *cert. denied*, (Ala. 2005), *citing Payne v. State*, 791 So.2d 383 (Ala. Crim.

App.1999), *cert. denied*, 791 So.2d 408 (Ala. 2000).[10/]  The Alabama Court of Criminal Appeals

has also held that where a petitioner failed to present evidence to support this claim at an

evidentiary hearing, he  failed to meet his burden of proof under Rule 32.3 and concluded that

the trial court was correct in finding that this claim lacked merit. *McNair v. State*, 706 So.2d 828,

854 (Ala.Crim.App.), *cert. denied* (Ala. 1997), *cert. denied*, 523 U.S. 1064, 118 S.Ct. 1396, 140

L.Ed.2d 654 (1998).  Land has not shown cause and prejudice for his failure to present evidence

in support of this vague, nebulous *Brady* claim at the Rule 32 hearing.  These claims are thus

procedurally barred from federal review. [11/]

     The court concludes that neither the individual nor cumulative claims of prosecutorial

misconduct entitle Land to habeas relief because the Alabama courts' decisions that prosecutor's

actions did not "so infect[] the trial with unfairness as to make the resulting conviction a denial

---

[10/]     The trial court in denying the Rule 32 petition stated "[a]lthough the petition contains several alleged [*Brady*]
violations, Land only presented evidence on one [failure to disclose the Birmingham Police Department Inter-
office Communication]." (R-75, p. 36).  The trial court concluded its order by stating "As to the remaining
claims before this Court [not otherwise addressed], Land has failed to meet his burden of proof.  See Rule 32.3,
A.R.Cr.P."  Rule 32.3, A.R.Cr.P. provides: "The petitioner shall have the burden of pleading and proving by
a preponderance of the evidence the facts necessary to entitle the petitioner to relief."

[11/]     Even in this court, Land does not identify by name any police officers or state agents nor does he specify what
acts of misconduct allegedly occurred that would have impugned the testimony of any of the officers or agents
who testified at trial.  Mere speculation that some officer or agent may have engaged in misconduct that would
have allowed him to impugn testimony is not exculpatory and will not suffice to prove materiality.  *United
States v. Jordan*, 316 F.3d 1215, 1252, n. 81 (11th Cir. 2003), *cert. denied*, 540 U.S. 821, 124 S.Ct. 222, 157
L.Ed.2d 40 (2003).  Moreover, with respect to the allegations concerning the prosecutor's failure to inform
Land of investigation results, Land never alleges that any investigation results were favorable to him.  There
is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense
of all police investigatory work on a case." *Moore v. Illinois,* 408 U.S. 786, 795, 92 S.Ct. 2562, 2568, 33
L.Ed.2d 706 (1972).

of due process," *Darden*, 477 U.S. at 181, 106 S.Ct. at 2471, were not unreasonable applications of Untied States Supreme Court law.

II.      Claims of ineffective assistance of counsel during trial

The principles in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), govern all ineffective assistance of counsel claims.  The state courts' decisions in this case were not "contrary to" clearly established federal law as determined by the United States Supreme Court  because both the trial court and the Alabama Court of Criminal Appeals recognized that *Strickland* was the controlling law with respect to ineffective assistance of counsel claims.

In *Strickland* the United States Supreme Court established a national standard for judging the effectiveness of criminal defense counsel.  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Id*. at 686. The Court elaborated:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S.Ct. at 2064.

In reviewing the performance prong of *Strickland*, the Court stated:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.  Prevailing norms of practice as

70

> reflected in American Bar Association standards and the like . . .
> are guides to determining what is reasonable, but  they are only
> guides.  No particular set of detailed rules for counsel's conduct
> can satisfactorily take account of the variety of circumstances faced
> by defense counsel or the range of legitimate decisions regarding
> how best to represent a criminal defendant. Any such set of rules
> would interfere with the constitutionally protected independence of
> counsel and restrict the wide latitude counsel must have in making
> tactical decisions.

466 U.S. at 688-89, 104 S.Ct. at 2065.

In *Crawford v. Head*,  311 F.3d 1288 (11th Cir. 2002), *cert. denied,* 540 U.S. 956 (2003),

the Eleventh Circuit Court of Appeals  elaborated on the *Strickland* performance prong:

> [W]e must bear in mind that the "touchstone of a lawyer's
> performance under the Constitution" is "reasonableness."
> *Chandler* [*v. United States*], 218 F.3d [1305] at 1319 [(11th Cir.
> 2000)].  As we have explained:
>
>> The test has nothing to do with what the best lawyers would
>> have done.  Nor is the test even what most good lawyers
>> would have done.  We ask only whether some reasonable
>> lawyer at the trial could have acted, in the circumstances, as
>> defense counsel acted at trial. . . . We are not interested in
>> grading lawyers' performances; we are interested in
>> whether the adversarial process at trial, in fact, worked
>> adequately.
>
> *Waters [v. Thomas*], 46 F.3d [1506] at 1512 [(11th Cir.
> 1995)](quoting *White v. Singletary*, 972 F.2d 1218, 1220-21 (11th
> Cir. 1992)).  Accordingly, "[t]he relevant question is not whether
> counsel's choices were strategic, but whether they are
> reasonable." *Putman [v. Head*], 268 F.3d [1223] at 1244 [(11th
> Cir. 2001)](quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 481, 120
> S.Ct. 1029, 1037, 145 L.Ed.2d 985 (2000).  This recognizes that
> "[t]o uphold a lawyer's strategy, a court 'need not attempt to divine
> the lawyer's mental processes underlying the strategy,'" but instead
> must simply determine whether the course actually taken by
> counsel might have been reasonable.  *Id.* (quoting *Chandler*, 218
> F.3d at 1315 n. 16).

*Crawford*, 311 F.3d at 1314.

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066.  "There is a strong presumption that trial counsel's conduct is the result of trial strategy and 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Sinclair v. Wainwright*, 814 F.2d 1516, 1519 (11th Cir. 1987), (quoting *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066).  "Counsel's competence . . . is presumed and the defendant must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305 (1986) (internal citation omitted).  The respondent is not required to assume the burden of demonstrating competence; rather, the petitioner must disprove a presumption of competence. *Chandler,* 218 F.3d at 1315. Whether conduct by counsel was a tactical decision is a question of fact. *Collier v. Turpin*, 177 F.3d 1184, 1199 (11th Cir. 1999).  "Whether the tactic was reasonable, however, is a question of law. . . . ." *Id.*  Counsel's challenged conduct is viewed from counsel's perspective at the time of the conduct. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2066; *Collier*, 177 F.3d at 1200.  It is critical to understand that the petitioner bears the burden of proof in the § 2254 action.  In the absence of evidence to the contrary, this court may assume that counsel's decision was strategic. *Birt v. Montgomery*, 725 F.2d 587, 600 (11th Cir. 1984), *cert. denied,* 469 U.S. 874, 105 S.Ct. 232, 83 L.Ed.2d 161 (1984).

Land was afforded an evidentiary hearing in the Rule 32 collateral proceedings.  He elected to call only one of his attorneys to testify.  The attorney witness was not questioned with

regard to many of the allegations now asserted in the § 2254 petition.  Land did not testify at the

Rule 32 hearing.

In *Dill v. Allen*, 488 F.3d 1344, 1354 (11th Cir. 2007),  the Eleventh Circuit explained the

difficulty faced by the federal courts when an evidentiary hearing is conducted in state court but

no testimony is elicited on the issue of ineffective assistance of counsel:

> In judging whether trial counsel acted reasonably, we typically rely
> on two sources: petitioner's own testimony as to conversations that
> took place between petitioner and counsel concerning the pretrial
> investigation of the case and trial strategy, and the counsel's own
> explanation as to what took place. See *Chandler*, 218 F.3d at
> 1318-19 (en banc) ("[An] inquiry into counsel's conversations with
> the [petitioner] may be critical."); see *Rompilla v. Beard*, 545 U.S.
> 374, 385, 125 S.Ct. 2456, 2464, 162 L.Ed.2d 360 (2005)
> (recounting the testimony of trial counsel during post-conviction
> proceedings); *Wiggins v. Smith*, 539 U.S. 510, 517, 123 S.Ct. 2527,
> 2533, 156 L.Ed.2d 471 (2003) (same). The challenge faced by the
> Alabama courts, and the challenge we confront in this appeal, is
> that neither petitioner nor his trial counsel testified during the Rule
> 32 hearing.

> Despite the lack of live testimony from either petitioner or his
> counsel, we are not without a basis on which to review the district
> court's disposition of his claims. Both the Rule 32 court and the
> court of criminal appeals made explicit findings of fact to which
> we accord deference under AEDPA. 28 U.S.C. § 2254(e)(1); *Bui
> [v. Haley],* 321 F.3d [1304], 1312 [(11th Cir.2003)].

In reviewing the prejudice prong, the United States Supreme Court in *Strickland* stated:

> It is not enough for the defendant to show that the errors had some
> conceivable effect on the outcome of the proceeding.  Virtually
> every act or omission of counsel would meet that test, and not
> every error that conceivably could have influenced the outcome
> undermines the reliability of the result of the proceeding. . . .

> The defendant must show that there is a reasonable probability
> that, but for counsel's unprofessional errors, the result of the

proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law.  An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like.  A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed.  The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.  It should not depend on the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency.  Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry.  Thus, evidence about the actual process of decision, if not part of the record of the proceeding under review, and evidence about, for example, a particular judge's sentencing practices, should not be considered in the prejudice determination.

The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors.  When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.  When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer–including an appellate court, to the extent it independently reweighs the evidence–would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

*Strickland*, 466 U.S. at 693-95, 104 S.Ct. at 2067-69.

Respondent asserts that the decision of the Court of Criminal Appeals concerning the aspects of the claim of ineffective assistance of counsel was not contrary to or involved an unreasonable application of clearly established federal law, nor was the decision based on an

unreasonable determination of the facts in light of the evidence presented in the State Court proceedings. Land argues only that "[t]he Alabama court's decision to deny Mr. Land state habeas relief [on the claim of ineffective assistance of counsel] was an unreasonable application of clearly established federal law."[12]   Specifically, Land maintains that the state courts ignored the Supreme Court's holdings in *Wiggins v. Smith*, 539 U.S. 510 (2003) and *Williams v. Taylor*, 529 U.S. 362, 396 (2000).   (Petitioner's reply brief, p.49).

In those cases, the United States Supreme Court held that defense counsel were ineffective in  preparation for and performance during the penalty phase of a death penalty case. *See Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).   The Supreme Court recognized, however, that the decision was also governed by the holding in *Strickland v. Washington*. Although Land argues that the state court ignored the holdings in *Wiggins* and *Williams*, this court's review "is limited to whether the state courts unreasonably applied *Strickland* to the facts of this case" as "the controlling Supreme Court precedent with regard to claims of ineffective assistance of counsel is *Strickland*."  *Williams v. Allen*, 458 F.3d 1233, 1244 (11th Cir. 2006), *cert. denied*, __ U.S.__, 127 S.Ct. 1874, 167 L.Ed.2d 365 (2007).

The Eleventh Circuit Court of Appeals has stated:

> "The reasonableness of a trial counsel's acts, including lack of investigation . . . , depends critically upon what information the client communicated to counsel." *Chandler [v. United States]*, 218 F.3d [1305] at 1324 [(11th Cir. 2000)] (internal quotation marks omitted), [*cert. denied*, 531 U.S. 1204, 121 S.Ct. 1217, 149 L.Ed.2d 129 (2001)]; *see also Van Poyck [v. Florida Dept. Of Corrections]*, 290 F.3d [1318] at 1325 [(11th Cir. 2002), *cert.*

---

[12]    This court reviews  the ineffective assistance of counsel claim only under the unreasonable application standard.

> *denied*, 537 U.S. 812, 123 S.Ct. 70 154 L.Ed.2d 13 (2002)]
> ("Information supplied by a petitioner is extremely important in
> determining whether a lawyer's performance is constitutionally
> adequate."). Because information about childhood abuse supplied
> by a defendant is "extremely important" in determining reasonable
> performance, "[w]hen a petitioner (or family members petitioner
> directs his lawyer to talk to) [does] not mention a history of
> physical abuse, a lawyer is not ineffective for failing to discover or
> to offer evidence of abuse as mitigation." *Van Poyck*, 290 F.3d at
> 1325; *see also Williams v. Head*, 185 F.3d [1223] at 1237 [(11th
> Cir. 1999), cert. denied, 530 U.S. 1246, 120 S.Ct. 2696, 147
> L.Ed.2d 967 (2000)]("An attorney does not render ineffective
> assistance by failing to discover and develop evidence of childhood
> abuse that his client does not mention to him.").

*Stewart v. Secretary, Dept. of Corrections*,  476 F.3d 1193, 1211 (11th Cir. 2007).

　　　　In *Wiggins*, the Supreme Court emphasized:

> *Strickland* does not require counsel to investigate every
> conceivable line of mitigating evidence no matter how unlikely the
> effort would be to assist the defendant at sentencing. Nor does
> *Strickland* require defense counsel to present mitigating evidence
> at sentencing in every case. Both conclusions would interfere with
> the "constitutionally protected independence of counsel" at the
> heart of *Strickland*, 466 U.S., at 689, 104 S.Ct. 2052. We base our
> conclusion on the much more limited principle that "strategic
> choices made after less than complete investigation are reasonable"
> only to the extent that "reasonable professional judgments support
> the limitations on investigation." *Id.*, at 690-691, 104 S.Ct. 2052. A
> decision not to investigate thus "must be directly assessed for
> reasonableness in all the circumstances." *Id.*, at 691, 104 S.Ct.
> 2052.

539 U.S. at 533, 123 S.Ct. at 2541.

　　　　In assessing the claim of ineffective assistance of counsel, this court has reviewed not

only the decisions of the state appellate courts on both direct appeal and collateral review but

also the transcripts of the trial and the Rule 32 evidentiary hearing.  The court finds no error in

the state courts' application of *Strickland*.

II. (a)   <u>Respondent's assertion that certain claims of ineffective assistance of counsel are</u>
<u>procedurally defaulted</u>

Respondent argues that aspects of Land's claim of ineffective assistance of counsel are

procedurally barred because the Rule 32 court and/or the Alabama Court of Criminal Appeals

found that Land failed to present evidence in support of the claims during the Rule 32 evidentiary

hearing.  (Respondent's brief, pp.11-15).  Land does not specifically respond to the assertion that

he failed to present evidence.  Instead he argues that because the Alabama Court of Criminal

Appeals made determinations of fact and relied on federal law in denying his claims, this court

should also reach the merits.  A fair reading of the trial court's decision in denying the Rule 32

petition and the Alabama Court of Criminal Appeals' decision relying on that decision does not

appear to rest on a state procedural rule but rather on Land's failure to satisfy his burden under

*Strickland v. Washington* to show a constitutionally deficient performance and resulting

prejudice.

Respondent further argues that allegations asserted in support of the ineffective assistance

of counsel claim were not raised in the state court proceedings and are procedurally defaulted.

Land responds that his "cumulative effect" claims (assertions that counsel failed to properly

litigate the state's investigation and presentation, failed to obtain expert assistance, failed to

present evidence from Land's family and friends which would have supported a sentence of life

without parole, and failed to present expert testimony in the penalty phase) were raised in a reply

brief to the Alabama Court of Criminal Appeals, at the conclusion to his initial brief to the

Alabama Court of Criminal Appeals after the denial of his Rule 32 petition and in the petition for

writ of certiorari to the Alabama Supreme Court.

Land argues that the claim that counsel was ineffective for failing to obtain an expert in crime scene investigation and evidence handling is identical to the Rule 32 claim that counsel was effective for failing to obtain an expert in police procedures and investigation.  Similarly, he argues that the claim that counsel was ineffective in failing to "properly" litigate the admission of improper physical evidence is identical to his Rule 32 claim that counsel failed to properly litigate all evidentiary motions before the trial court and his Rule 32 appeal argument that counsel was ineffective for not challenging the collection of physical evidence from Mr. Land and the subsequent forensic analysis of this physical evidence.  He contends that the claim that counsel was ineffective in the penalty stage in not obtaining a mitigation expert is the same issue as the Rule 32 assertion that the assistance of penalty phase experts would have been helpful to the jury in assessing mitigating circumstances.  Finally, he alleges that the claim that counsel was ineffective at the penalty stage for not obtaining a forensic psychiatrist and forensic psychologist was "implied" in the Rule 32 claim that counsel was ineffective in failing to obtain a sufficient mental health evaluation.  Because claims raised in a federal habeas petition are required to first have been presented in state court, phrasing the issues in the same manner in federal court as in state court is helpful to a subsequent review.  Based on Land's representation that what was raised here is what was raised in state court, the court will construe the claims set forth earlier in this paragraph to be the same as those  presented in state court and declines to find the claims to be procedurally defaulted.

Respondent argues that Land did not raise an ineffective assistance of counsel claim based on counsel's failure "to exclude irrelevant, prejudicial, and inflammatory photographs of

the victim and the crime scene" in the Rule 32 proceedings.  In reply, Land refers the court to

page 23 of the Second Amended Rule 32 petition in which he clearly stated:

> Counsel was ineffective for failing to fully litigate the admission of
> gruesome photographs.  (See Issue XIV).  The photographs were
> cumulative, gruesome, unnecessary, and served little purpose but to
> inflame the passion and prejudice of the jury.  Counsel failed to
> adequately object to the photographs and document why they were
> not properly admissible.  As a result, the jury viewed over forty
> (40) glossy, color photographs of Ms. Brown.

This instance of ineffective assistance of counsel is presented in conjunction with Claim

II(f)–trial counsel's failure to adequately present, argue and obtain favorable rulings on numerous

motions.  (Amended Petition, ¶ 108).  For the reasons stated in section II(f) below, the court

concludes that the Alabama Court of Criminal Appeals did not unreasonably apply *Strickland v.*

*Washington* to the facts of this case.

II.(b).   The claim that counsel were constitutionally ineffective in part because of grossly
inadequate compensation.

Land alleges that *Alabama Code*, § 15-12-21 (1975), limited the compensation for

appointed attorneys for out-of-court work to $1,000.00 for each phase of a capital trial and as a

result counsel could not devote the time necessary to prepare an adequate defense, investigate the

case, prepare for voir dire, interview the state's witnesses prior to trial and present  mitigating

evidence. He further alleges that lack of funds for expert assistance was debilitating in the face of

the genetic and forensic evidence relied upon by the prosecution.

On appeal from the denial of Land's Rule 32 petition, the Alabama Court of Criminal

Appeals concluded that the trial court's findings were correct and supported by the record:

> "The Claim that trial counsel was ineffective, in part, because of
> grossly inadequate compensation.

"As noted previously, to the extent Land intended to assert a
substantive claim regarding the amount trial counsel was
compensated, such a claim is barred from review because it could
have been, but was not, raised at trial and on appeal.  *See* Rule
32.2(a)(3), (a)(5), Ala.R.Crim.P.  The claim, as couched in terms of
ineffective assistance of counsel, is without merit.  Mr. Dodd
pointedly testified that the amount of compensation he received
had absolutely no effect on the representation he provided in this
case.  He additionally stated that, 'as far as a capital case is
concerned,' he and Mr. Mathis 'probably worked as hard on this
case as any case [they had] tried together' and they had 'tried
several cases together.'  The claim that counsel's representation
was ineffective because of the compensation received is, therefore,
denied.

*Land v. State*, CR-02-1563, memo. op. at 17-18.

The Alabama Court of Criminal Appeals did not unreasonably apply *Strickland v.*

*Washington* to the facts of this case when it concluded that counsel's representation was not

rendered ineffective because of the compensation received.  Consequently, Land is not entitled to

habeas relief in this claim.

II.(c).   The claim that trial counsel failed to investigate adequately and independently the State's
capital murder charge against Land.

Land argues that trial counsel did not meet nor interview any of the state's witnesses or

the officer charged with investigating the victim's disappearance and death; that counsel met

with Land and his family members only a few times before trial; that counsel made no attempt to

locate either of Land's alibi witnesses  or other suspects; that counsel should have met with "each

of the individuals involved in the facts of this case, any and all possible mitigation witnesses, and

Mr. Land's family members."[13] He alleges that counsel "would have discovered critical

---

[13]   While Land lists various persons who should have been interviewed by trial counsel as suspects, witnesses or
mitigation witnesses, he does not state what the substance of their individual testimonies would be.  See
Amended Petition, ¶ 33, n. 3.

exculpatory information had they met with and thoroughly investigated the appropriate

witnesses."  The only specific information Land identifies that counsel would have discovered is:

> Birmingham Police Officer Gregg Bearden had a troubled work
> history of incompetence and impropriety prior to Mr. Land's arrest
> and trial, apparently stemming from substance abuse problems.
> Mr. Bearden's difficulties ultimately led to his removal from the
> Birmingham Police Department.  Given Mr. Bearden's important
> role as the lead investigator in the case against Mr. Land and h[is]
> role in the collection and storage of evidence used to convict Mr.
> Land such serious problems were important to the finder of fact's
> determinations.

(Amended Petition, ¶ 76).

On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal

Appeals concluded that the trial court's findings were correct and supported by the record:

> "The Claim that trial counsel failed to adequately independently
> investigate the State's capital murder charge against Mr. Land.
>
> "Land failed to offer any evidence in support of this claim.  Trial
> counsel was not asked any questions regarding what type of
> investigation was conduc[t]ed before and after settling on a theory
> of defense.  Land contends that Mr. Dodd's statement that he and
> Mr. Mathis 'more or less took the defense that was given to [them]
> by the initial facts' demonstrates that trial counsel 'embrac[ed] the
> state's account of the events surrounding Brown's death' and,
> therefore, 'did not independently and adequately investigate Mr.
> Land and other defense witnesses.'  (Land's brief at p.8) Mr. Dodd,
> however, stated that 'we more or less took the defense that was
> given to us by the initial facts' when responding to the question
> 'what was your primary defense.'  He never testified that he and
> Mr. Mathis adopted the strategy without conducting any
> investigation.  To the contrary, he testified that 'we probably
> worked as hard on this case as any case that we've tried together.'
>
> "To meet his burden of proof and establish that counsel did not
> adequately investigate the case, Land needed to present something
> regarding what septs [sic] counsel did take to investigate the case.
> He did not do so and therefore, failed to overcome the presumption
> that counsel 'did what [they] could have done, and that [they]

exercised reasonable professional judgment.'  *Williams v. Head*,
185 F.3d 1223, 1236 (11th Cir. 1999).  In the absence of any
contrary information, a reviewing court must presume that counsel
acted reasonably and did what they should have done, including a
presumption that they adequately investigated the case.

"In addition, the record contradicts Land's claims regarding this
issue.  For example, Land asserts that counsel 'met with [him] on
only a few occasions prior to trial.'  Mr. Dodd testified, however,
that he 'met with Jeff often, and made numerous visits to the jail
and visited with him. [He] and Mr. Mathis, together, would visit
with him and then a lot of times [he] would visit with him [alone].'
Additionally, when directly asked about the extensiveness of the
investigation conducted, Mr. Dodd stated that he and Mr. Mathis
'worked as hard on this case as any case that we've tried together.'

"Land failed to offer any evidence indicating, that had the
investigation been conducted differently, there is a reasonable
probability that the outcome would have been different.  For
example while he lists more than twenty individuals he claims
'effective assistance' would have met with, Land did not even
establish that counsel did not meet with the individuals listed.
Indeed, it is indisputable that counsel did meet with several of the
people on Land's list, such as Shelly Wade, who was called as [a]
witness for the defense, and David Higgins, who Mr. Dodd
specifically testified that he met with.  Moreover, even assuming
that only an unreasonable counsel would not have met with all of
the individuals listed--and assuming that counsel did not do so--
Land has failed to demonstrate prejudice.  He did not produce a
single witness at the evidentiary hearing who offered any testimony
relevant to a guilt phase issue.

"Finally, Land asserts that, 'had trial counsel adequately
investigated Officer Bearden, they would have discovered that
Officer Bearden's work history as a Birmingham Police Office is
troubled.'  This claim is denied for several reasons.  First, it was
not asserted in Land's initial petition for relief, and, in fact, was not
raised until January 8, 2001.  It is, therefore, barred because it was
raised beyond the two-year statute of limitations.  See *Charest v.
State*, No. CR-99-1663, 2002 WL 734306, at 1-2 (Ala. Crim. App.
April 26, 2002) (stating that 'trial judge did not have the authority
to enlarge the two-year limitations period established by Rule
32.2(c)' and, therefore, 'should have addressed only those claims
raised in the first petition . . . and any subsequently filed legitimate

amendments to that amendment relate back to the original petition').

"Second, the claim, as pleaded, fails to comply with Rule 32.6(b), Ala.R.Crim.P.  Even assuming that it is not barred by the statute of limitations, therefore, it is dismissed for failure to comply with the pleading requirements of Rule 32.  Alternatively, the claim is denied because Lane offered absolutely no evidence to support it. He did not question trial counsel about Officer Bearden and therefore, the Court has no way of knowing that the premise of the claim–that counsel did not investigate Officer Bearden is factually accurate.  Moreover, Land  failed to present any evidence that such an investigation would have led to useful and admissible evidence.

*Land v. State*, CR-02-1563, memo. op. at 18-20.

The Alabama Court of Criminal Appeals did not unreasonably apply *Srickland v. Washington* to the facts of this case when it concluded that Land failed to establish deficient performance and prejudice based on counsel's investigation of the capital murder charge against Land.  Land's petition, therefore, should not be granted on this claim.

II.(d).   <u>The claim that trial counsel failed to properly litigate the State's investigation and presentation of the case.</u>

Land argues that counsel failed to properly present to the court and jury that Land was illegally arrested without probable cause; failed to litigate the warrantless search of  Land's automobile while in police custody; failed to object to the introduction of the improper collection and analysis of physical evidence from Land; failed to properly litigate the state's assertion that Land used the gun recovered from his vehicle to kill the victim; and did not properly litigate that the state's introduction of the bullets recovered from Land's vehicle did not match the gun nor bullets recovered from the victim and from the victim's house.

On appeal from the denial of Land's Rule 32 petition, the Alabama Court of Criminal Appeals concluded that the trial court's findings were correct and supported by the record:

83

"The claim that trial counsel failed to adequately challenge the State's investigation and presentation of the case.

"In support of this claim, Land asserts that counsel failed to 'adequately challenge' several aspects of the State's case.  Each of the allegations are without merit and dismissed.  First, Land claims that trial counsel 'failed to adequately challenge [his] arrest.'  Trial counsel was, however, asked nothing about this claim during the evidentiary hearing.  Land has, therefore, failed to meet his burden of proof.  Moreover, on direct appeal, the Alabama Supreme Court rejected a claim that the arrest was improper, 'concluding that Land's arrest was amply supported by probable cause.  *Ex parte Land*, 678 So.2d 224, 239 (Ala. 1996).  Land presented nothing during these proceedings that would bring into question the holding of the Supreme Court.'

"Land claims that trial counsel 'failed to adequately challenge the warrantless search of [his] automobile while he was held in police custody.'  Again, trial counsel was asked nothing about this during the hearing.  Not unlike the previous claim, moreover, the appellate courts have already determined that Land's 'vehicle was not the subject of a unlawful search.'  *Land v. State*, 678 So.2d 201, 215 (Ala. Crim. App. 1995).  No evidence relevant to this subject was presented during the evidentiary hearing.  The claims is, therefore, denied.

"Land next contends that counsel 'was ineffective in failing to challenge the admissibility of evidence introduced by the State's witness.'  This claim is dismissed for the same reasons as the previous two.  On direct appeal, the appellate courts rejected the arguments presented by Lane on this matter.  He offered no evidence to make them any more viable in these proceedings. *Land v. State*, 678 So.2d at 209-213.

"Land additionally, and more generally, claims that trial counsel failed to 'challenge the police investigation, attributing the alleged incompetence to their failure to procure an expert in police procedures and forensic examination.'  (Land's brief, p.12).  Once again, Land apparently felt that trial counsel's testimony regarding this matter would have no relevance.  He did not question Mr. Dodd about whether he or Mr. Mathis considered retaining an expert in police procedures.  To prove his claim, Land must demonstrate that only an attorney acting unreasonably would fail to utilize such an expert.  He failed to do so.  This is especially true

here because Mr. Mathis, who had served as a police officer for thirteen years was no doubt familiar with the subject matter. The claim, is, therefore, dismissed.

"Additionally, Mr. Dodd testified-and the record reveals-that attacking the State's investigation was a primary strategy adopted and pursued by the defense. Trial counsel was challenging the State's investigation at every turn. Moreover, through closing argument, trial counsel was able to effectively summarize the problems and possible mistakes made during the State's investigation. The fact that current counsel feels that there are additional aspects of the investigation which could have been questioned does not make trial counsel's performance deficient.

"Finally, Land presented no evidence to demonstrate that, had counsel 'challenged the State's investigation' in the manner he deems 'adequate,' there is a reasonable probability that the results would have been different. As noted previously, he presented no evidence related to any guilt phase issues during the evidentiary hearing. His contention that he was prevented from doing do [sic] because the court sustained the state's objection to the admission of the 'Birmingham Police Department's procedural manuals' is without merit. At the hearing Land simply offered the manuals in their entirety without pointing to any particular relevant or to any procedure that was allegedly violated. He offered no testimony regarding the manuals and apparently expected the Court to search the manual in the context of this case seeking out potential improprieties or inconsistencies. Such a tactic would not have been a viable option for trial counsel and, likewise, was not appropriate here. The claim is denied.

*Land v. State*, CR-02-1563, memo. op. at 20–22.

The Alabama Court of Criminal Appeals did not unreasonably apply *Strickland v. Washington* to the facts of this case when it concluded that Land failed to establish deficient performance and prejudice based on counsel's failure to challenge the State's investigation and presentation of the case. Accordingly, the court will not grant habeas relief on this claim.

II.(e).   <u>The claim that trial counsel failed to procure necessary expert assistance.</u>

Land argues that counsel should have filed an *ex parte* motion to procure funds for expert assistance.  He argues that counsel should have obtained experts in

(1)      crime scene investigation and evidence handling to document police errors;

(2)      firearm and projectiles to challenge the state's ballistics technician;

(3)      the field of forensic entomology or pathology to challenge the time of death;

(4)      the field of forensic pathology to challenge the state's medical evaluation of the victim including injuries to her anus;

(5)      shoe prints to rebut the state's testimony matching Land's shoe to a footprint found on a pane of glass at the crime scene;

(6)      toolmark identification to rebut the state's testimony matching a cut telephone wire at the victim's residence to a pair of shears found in Land's vehicle;

(7)      the field of genetic analysis and matching to independently analyze the state's samples and DNA evidence and assistance with cross-examination of the state's experts; and

(8)      mental health evaluation to establish Land's history of mental, behavioral, and emotional problems.[14]

On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal Appeals concluded that the trial court's findings were correct and supported by the record:

> "The claim that trial counsel failed to procure necessary expert assistance.

---

[14]      Land's counsel acknowledges Land was evaluated for competency but argues that the evaluation was insufficient to determine whether Land was capable of forming the requisite intent required for capital murder, capable of waiving his right to counsel and for giving the police permission to search his automobile, or susceptible to the coercive pressure applied by the police in this case.

"Land asserts that counsel were ineffective for not obtaining an 'expert' in eight separate fields.  During the hearing, however, Land failed to question trial counsel about any specific decision to seek, or not seek, expert assistance.  Rather, he merely inquired as to whether trial counsel sought 'funds for expert assistance in various areas.'  In no area, did Land establish deficient performance on the part of trial counsel.  As stated previously, in the absence of contrary evidence, counsel will be presumed to have done what they should have done.  Here, the Court will presume that the decisions they made regarding expert assistance were within the wide range of reasonably professional assistance.

"Land's failure to question counsel about his claims, necessarily results in his failure to meet the burden of proof placed squarely upon him by Strickland and the rules of procedure.  For example, he alleges that counsel's decision not to procure an expert in firearm and projectile examination constituted ineffective assistance.  The record reveals, however, that counsel did seek out assistance, but ultimately decided not to use it.  Specifically at one point in the original trial proceedings, Mr. Dodd informed the court of the following:

> "'While we are on the record, Judge, me and Mr. Anderton had a conversation abut [sic] this right prior to lunch and he told me this, but for the record I would ask that it be made part of the record, that Mr. Higgins is going to testify later on this afternoon about a ballistics examination and we have told Mr. Anderton we are not going to use Phillip Lane to testify in this case nor is he going to be up here.  And Mr. Anderton has advised us that he has no intention of bringing up the fact that Phillip Lane looked at this gun and so forth and so on.'

"Additionally, when asked by the State, during the evidentiary hearing, whether he 'considered having someone else make a [projectile] comparison, Mr. Dodd replied that "we considered it and I think we tried to find someone that was qualified, but we were unable.'"

"Apparently, whatever the result[s] were of his having 'looked at [the] gun,' counsel did not think Phillip Lane was sufficiently qualified and may have been concerned that he would not come off well in front of a jury.  The Court can only speculate.  The fact is

that what Mr. Lane did and why trial counsel decided not to call him is unknown because Land, apparently deeming the information unnecessary to his claim, did not ask the question. In the absence of contrary evidence, the Court must presume that counsel's strategic decision as to how to deal with the ballistic testimony was reasonable. This claim is denied.

"Land additionally contends that trial counsel were ineffective in failing to obtain expert assistance in the area of DNA. The record plainly reveals, however, that trial counsel did seek such assistance. That they were unsuccessful in obtaining assistance that would be beneficial to Land's defense-indeed, the expert they contacted 'would be more or less reaffirming what the State's opinion was going to be'–does not render their performance deficient. The claim is denied.

"As noted, Land claims that trial counsel were ineffective for failing to obtain expert assistance in a number of other areas. As also noted, however, he failed to question trial counsel about any of those areas. It may very well be that counsel considered additional expert assistance, but made a reasonable strategic decision not to pursue it. It may also be the case that counsel actually contacted individuals about the matters raised by Lane, but were unable to obtain information beneficial to their case. The Court is only aware of Phillip Lane's involvement because his name is included in the trial transcript. His involvement plainly demonstrates, however, that, as part of their investigation, trial counsel contacted and sought assistance from individuals whose names may not be evident from the existing record.

"Put simply, because Land never inquired, the record does not reveal the specifics or the extent of the investigation undertaken by trial counsel. The Court does know that Mr. Dodd and Mr. Mathis–two attorneys who regularly practice before the Court–worked as hard on this case as any case that [they]'ve tried together. Crediting that testimony and the presumption of competence mandated by the law, Land has failed to demonstrate that counsel's performance was deficient in terms of expert assistance. The Court will not hold that only an attorney acting unreasonably would fail to see[k] expert assistance in each of the areas Land raises.

"Finally, Land asserts that he was prevented from adequately developing these claims because the Court denied his ex parte

applications for funds.  This claim is without merit.  Land is not entitled to funds at this stage of the proceedings and is certainly not entitled to funds merely because he requests them.  Moreover, expert assistance would presumably be necessary to establish the prejudice prong of the Strickland test.  Because Land failed to establish deficient performance on the part of trial counsel, this Court need not evaluate the issue of prejudice.  Regarding each of the areas listed in the petition as mandating expert assistance, the Court finds that trial counsel effectively represented Land in a manner consistent with the chose[n] defense strategy.

*Land v. State*, CR-02-1563, memo. op. at 23-25.

The Alabama Court of Criminal Appeals did not unreasonably apply *Strickland v. Washington* to the facts of this case when it concluded that Land failed to establish deficient performance and prejudice based on counsel's failure to procure expert assistance.  Habeas relief on this claim, therefore, is denied.

II.(f).   The claim that trial counsel failed to adequately present, argue and obtain favorable rulings on numerous motions.

Land argues that trial counsel did not challenge the composition of the grand or petit juries, did not "adequately" challenge the indictment; failed to ensure that the jury selected was impartial; failed to object to the trial court giving part of the jury instructions before closing and part after; failed to object to the court's instruction that the trial court would "determine the voluntariness of the [defendant's] statement" (TR. 1915); failed to effectively challenge the sufficiency of the evidence to satisfy the burglary element; failed to effectively challenge the sufficiency of the evidence to satisfy the kidnapping or sexual assault  element; failed to litigate the admission of physical evidence  for which the state failed to establish a proper chain of custody; failed to exclude irrelevant, prejudicial, and inflammatory photographs of the crime

scene and victim's body; and failed to move to exclude irrelevant testimony about the condition

of the victim's body and injuries to her anus.

On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal

Appeals concluded that the trial court's findings were correct and supported by the record:

> "The claim that trial counsel failed to present, adequately argue,
> and obtain favorable rulings on numerous motions.
>
> "In support of this claim, Land lists a number of motions he claims
> counsel was ineffective for either not filing or, in the case where
> such a motion was filed, not 'adequately arguing.'  Land did not
> question trial counsel about any of the matters raised within the
> claim.  He did not, therefore, overcome the presumption that
> counsel's conduct was 'within the wide range of reasonable
> professional assistance.'  Similarly, he presented no evidence to
> demonstrate that, had trial counsel handled the matter differently,
> there is a reasonable probability that the outcome of the trial
> probably would have been different.  In short, he presented nothing
> in support of this claim.  It is, therefore, denied.

*Land v. State*, CR-02-1563, memo. op. at 26.

The Alabama Court of Criminal Appeals did not unreasonably apply *Stickland v.*

*Washington* to the facts of this case when it concluded that Land failed to establish deficient

performance and prejudice based on counsel's failure to present and obtain favorable rulings on

various motions.  Consequently, Land is not entitled to habeas relief on this claim.


II.(g).   The claim that trial counsel failed to object to or otherwise prevent prosecutorial
          misconduct.

Land argues that counsel failed to object to the prosecutor's comments of Land's failure

to testify; failed to object to the unconstitutional composition of the jury even though the

prosecution allegedly "discriminated on the basis of race and gender in the use of its peremptory

strikes;" and  failed to properly litigate the admission of 42 inflammatory photographs of the

victim's body.  He also argues that counsel failed to object to the prosecution's elicitation of

inadmissible testimony (that the victim's telephone lines had previously been cut, that a small

child was found in the victim's residence, and that a fox was seen near the victim's body).  He

argues that counsel failed to ensure the adequate preservation of the record for review, stating

that "throughout both pretrial and trial proceedings, numerous bench conferences were held but

not transcribed."

      On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal

Appeals concluded that the trial court's findings were correct and supported by the record:

> "The claim that trial counsel failed to object to or otherwise
> prevent prosecutorial misconduct.
>
> "Not unlike the previous claim, Land failed to present failed to
> present [sic] any evidence in support of this claim.  He did not
> question trial counsel about any of the matters asserted in support
> of the claim and, therefore, he failed to meet his burden of proof.
> For example, one of the issues raised by Land reads as follows:
>
>> "'Among the numerous instances of misconduct during the
>> prosecutor's opening and closing arguments, the district
>> attorney presented the following paraphrase of what he
>> claimed Mr. Land was saying, through his attorneys:
>> "Through his attorneys he continues to say 'I don't know
>> anything about the wire cutters or the [p]hone lines or the
>> glass fragments, I don't know anything about the gun or
>> how that bullet got into her head.  As discussed elsewhere, .
>> . . a timely defense objections would have prevented the
>> ongoing prejudicial arguments of the district attorney, and
>> preserved the reversible error for appellate review.  The
>> prejudice of trial counsel's error was confirmed by the
>> Alabama Supreme Court, which expressly disapproved of
>> the state's argument, noting that "if Land's counsel had
>> made a contemporaneous objection to this statement, . . .
>> we might have held the comment to be reversible error."
>> *Ex parte Land*, 678 So.2d 224, 233 (Ala. 1996).  Trial
>> counsel's failure is inexplicable, and can only be explained
>> by ineffectiveness.'

"'Contrary to Land's contention, however, counsel's decision not to object may have been a result of something other than ineffectiveness.'

"Counsel may have made a reasoned determination not to object.  Objections are a matter of trial strategy, and an appellant must overcome the presumption that 'conduct falls within the wide range of reasonable professional assistance,' that is, the presumption that the challenged action "might be considered sound trial strategy.'  Moore v. State, 659 So.2d 205, 209 (Ala. Crim. App. 1994).  Moreover, 'the lack of a contemporaneous objection by experienced defense counsel [led the Alabama Supreme] Court to believe that the prosecutor's comment was not stated with an inflection or tone that would have naturally led a listener to construe it as a reference to Land's failure to testify.' Ex parte Land, 678 So.2d 224, 233, n.2 (Ala. 1996).  In failing to raise this issue  with trial counsel, Land has failed to overcome the presumption of competency and, therefore, failed to meet his burden of proof.

"'Similarly, he failed to overcome the presumption with all of the matters he relied upon to support this claim.  Moreover, several of the underlying substantive claims were addressed and rejected on direct appeal thereby preventing Land from establishing prejudice.  The claim that counsel was ineffective for an alleged failure "to object or otherwise prevent prosecutorial misconduct" is, therefore, denied.'"

*Land v. State*, CR-02-1563, memo. op. at 26-28.

The Alabama Court of Criminal Appeals did not unreasonably apply *Strickland v. Washington* to the facts of this case when it conclude that Land failed to establish deficient performance and prejudice based on counsel's failure to prevent prosecutorial misconduct.  Thus the court denies Land's petition on this claim.

II.(h).   The claim that trial counsel were constitutionally ineffective during the penalty phase of Land's trial.

II.(h)(1).    <u>The claim that trial counsel were ineffective for failing to present evidence from Land's family and friends that would have supported a sentence of life without parole.</u>

Land argues:

> Trial counsel should have presented information of Mr. Land's family life, medical history, school records, institutional and incarceration records, and other mitigating aspects of his background. Mr. Land's records, coupled with testimony from available witnesses, would have established that Mr. Land had a history of mental, emotional, and substance abuse problems; that he grew up in an unstable home environment; that he grew up largely without a father figure; that he was subjected to physical and emotional abuse from his adoptive and biological parents and acquaintances; that he suffered from genotypic and phenotypic defects since birth; and that he had recently suffered from the trauma and recent loss of several people close to him.

(Amended Petition, ¶ 122.)

The Alabama Court of Criminal Appeals did not unreasonably apply *Strickland v. Washington* to the facts of this case when it concluded that Land failed to establish deficient performance and prejudice at the penalty stage based on counsel's failure to present information about his background from family and friends.

II.(h)(2).    <u>The claim that trial counsel were ineffective for failing to obtain expert assistance for the penalty phase of Land's trial.</u>

Land further argues that trial counsel should have obtained an expert in mitigation to conduct interviews to develop information to be assessed by other experts including a social worker, forensic psychiatrists and forensic psychologists to explain how Land's home environment affected his development and interactions with family members, friend, and peers; medical geneticists and genetic dysmorphologists to explain Land's atypical physical features, behavioral problems, and detached courtroom demeanor. (Amended Petition, ¶ 145.)

On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal

Appeals concluded that the trial court's findings were correct and supported by the record:

> "The claim that trial counsel was ineffective during the penalty
> phase of Land's trial.
>
> "Not unlike the numerous guilt phase issues set forth in the petition
> for relief, Land failed to question trial counsel about any of the
> shortcomings he alleges occurred during the penalty phase of his
> trial.  In fact, Land did not ask trial counsel a single question about
> the preparation undertaken for the penalty phase.  Pursuant to
> questioning by the State, Mr. Dodd testified that he and Mr. Mathis
> were aware that they 'were not limited to statutory mitigation' in
> terms of what could be presented and that they 'decided to present .
> . . what we felt like was the best for Jeff at the time.'  Applying the
> presumption that Mr. Dodd and Mr. Mathis were competent in
> preparing for the penalty phase, the Court finds that Land has failed
> to meet his burden of proof.  Again, the law plainly requires that a
> presumption of competence be applied and that the burden of proof
> be place[d] solely on Land.  See Chandler, 218 F.3d at 1315, n.15
> (11th Cir. 2000) (en banc) (stating that '[n]ever does the
> government acquire the burden to show competence, even when
> some evidence to the contrary might be offered by the petitioner').
> He had, therefore, failed to establish deficient performance on the
> part of trial counsel.
>
> "Moreover, counsel testified that any decision not to present
> evidence regarding Land's troubled home life was reasoned and
> strategic.  Specifically, Mr. Dodd stated the following:
>
>> "'I'm sure we discussed Jeff and the fact he came from a
>> single parent home, that his mother raised him. That his
>> mother and father were divorced.  But that is something, if I
>> discussed it, it was something that I probably would not
>> have used because of the fact that the truth of the mater is
>> 50 percent of all marriages end in divorce.  And if you are
>> using that as an excuse, you have people on the jury that
>> also probably come from single-parent homes.  It is not
>> something that we decided to use as far as mitigation.'
>
> "Regarding what witnesses counsel decided to present, Mr. Dodd
> relayed the following:

"'I could not tell you when or exactly when we decided what we were going to do.  I know we talk[ed] about it and Jeff's mother, to me, was a wonderful witness.  She made a very good impression.  In my dealing with Gail, she impressed me a great deal.  And his grandfather was a very, very stately gentleman who testified in this case in chief and made, to me a very compelling figure, sitting in this witness stand.'

"'And we decided that we would call Gail if it came to that and his grandfather.  My memory is they were very good witnesses and it was a very emotional appeal on their part to the jury.  In fact, I think I recall there was a number of the jurors who were teared up and were crying at the time.  In fact, it got to me.  It was very emotional and appealing, compelling testimony.  Unfortunately, it didn't work.'"

"'Land has failed to demonstrate deficient performance on the part of trial counsel regarding the penalty phase of his trial.  The majority of the evidence presented during the evidentiary hearing was related to Land's troubled home life-evidence Mr. Dodd specifically testified that he would not have presented for strategic reasons.  Moreover, his reasons for not presenting such evidence would likewise apply to other aspects of the testimony that was forthcoming during the evidentiary hearing.  For example, being picked on at school and losing family members to death are things most people have to deal with growing up.'

"'Mr. Dodd testified that it was important to keep the negative aspects of Land's life, such as his extensive criminal history, from the jury.  Trial counsel was successful in this regard.  If trial counsel, had, however, taken the approach adopted by current counsel during the evidentiary hearing, they would have opened the door to an extensive amount of negative and damaging information about Land.  In fact, the information presented by the current counsel was, to a large extent, very negative and hard to reconcile with the objective of obtaining a sentence less than death.

"'For example, the psychologist who testified at the evidentiary hearing reached a diagnosis of antisocial personality disorder based upon a number of extremely negative characteristics and attributes she identified with Land.  Specifically, regarding this issue, the record reveals the following.

""""Q: [Counsel for the State]: Would you read off the characteristics that you found in Mr. Land's background to diagnosis him with antisocial personality disorder? You don't have to give specific examples, just tell me the ones you found to exist in his background.'"

""""A: [Dr. Boyer]: Okay. Certainly, one includes failure to conform to social norms with respect to lawful behavior.'"

""""Q: That one, that would be indicated by his criminal history?'"

""""A: Yes. Deceitfulness, repeated lying, use of aliases or conning others for personal profit or pleasure, impulsiveity, or failure to plan ahead, the next one is irritability which I did not see as being a large feature, which doesn't mean he is never irritable, but it wasn't a prominent part of his personality. Reckless disregard for the safety of self or others, that would fit, consistent irresponsibility as indicated by repeated failure to sustain consistent work behavior or honor financial obligations, and seven would be lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another.'"

""""Q: You found he exhibits all of those except perhaps [irritability]?'"

""""A: Correct.'"

"Dr. Boyer additionally testified that Land's extensive criminal history was not only relevant to her evaluation, but that it was necessary to the diagnosis. Trial counsel felt that it was important to keep Land's criminal history from the jury. Such decision was reasonable, strategic, and provides a basis to determine that trial counsel was not ineffective in failing to present testimony similar to that of Dr. Boyer. While current counsel may feel that Dr. Boyer's testimony was mitigating, a reasonable attorney could certainly conclude to the contrary. Indeed, had trial counsel presented testimony informing the jury of Land's extensive criminal history, his lack of remorse, his reckless disregard for the safety of others, his deceitfulness, and his consistent irresponsibility, Land would no doubt be accusing them of

ineffective assistance for presenting such negative evidence.  Trial counsel's objective was, after all, to present the jurors with evidence that would hopefully convince them to recommend a sentence of life without parole.

"This same reasoning can be applied to the Hillcrest records, which are full of negative information about Land.  While the Court will not find that only an attorney acting unreasonably would have presented the information contained in those records to the jury, it certainly will not find that the opposite is true.  An attorney acting reasonably could have decided that allowing the jurors to be privy to all the negative and damaging aspect of Land's character and background would not be the best way of convincing them that he should not receive the death penalty.

"The claim of ineffective assistance as it relates to Dr. Boyer's testimony is additionally denied due to Land's failure to establish deficient performance on the part of trial counsel regarding the use of a mental health expert.  Land was evaluated prior to trial pursuant to an order of the Court.  The resulting report revealed "no significant matter . . . as far as any abnormality or deficiency." Moreover, Mr. Dodd specifically testified that, in his interaction with Land, he never said 'anything that would indicate . . . any kind of mental health problem.'  If he had seen such an indication, he would have followed up on it.  Based upon the results of the court-ordered examination and trial counsel's personal experience with Land, it is unclear what basis could have been proffered in support of a request for additional evaluations.  Land must show not only that counsel should have requested funds for a mental health expert, but also demonstrate that had they done so, the request would have succeeded.  Land "has failed to prove that he was prejudiced by the absence of a request for [mental health] assistance, because he had failed to show that he would have been entitled to [mental health] assistance at trial.  *Floyd v. State*, 571 So.2d 1221, 1229 (Ala. Crim. App. 1989), *rev'd on other grounds*, 571 So.2d 1234 (Ala. 1990).

"Finally, Land's claims of ineffective assistance at the penalty phase are denied based upon his failure to prove prejudice.  He did not establish a reasonable probability that anything he presented during the evidentiary hearing would have altered the outcome.  As noted, much of the information brought was extremely negative and unlikely to be considered mitigating by either a judge or jury. Those aspects that might be considered mitigating, moreover, were

97

considered by this Court and the appellate courts following the
original trial.  Specifically, the Alabama Supreme Court noted that
the Hillcrest records contained the following information regarding
Land: '(1) that he suffered from a conduct disorder, (2) that he had
an unstable home environment, (3) that he had significant impulse
control problems, (4) that he had not had a father figure, and (5)
that he had no contact with his natural father.'  *Ex parte Land*, 678
So.2d 224, 241 (Ala. Crim. App. 1996).  Even considering this
information, this Court determined that death was the appropriate
sentence and the appellate courts agreed.  Land has presented
nothing in these proceedings to bring that determination into
question.  His claim that trial counsel were ineffective during the
penalty phase of his trial is, therefore, denied.

*Land v. State*, CR-02-1563, memo. op. at 29-35.

As previously observed, Land did not testify at the Rule 32 evidentiary hearing and Hiram

Dodd, Jr., one of his two trial lawyers, testified only briefly.  (Vol. 38, Tab-45, pp. 17-42).  Land

did not call Erskine Mathis to testify.    While Land sought to present evidence of additional

mitigation evidence or testimony, he did not question counsel about his investigation into Land's

background.  Land's mother could not recall if Land's attorneys explained mitigating

circumstances to her nor did she recall if trial counsel asked about Land's background or medical

records.  Land's brother was not questioned as to whether he spoke to Land's trial attorneys.

Upon questioning by the state's attorney, Mr. Dodd testified that Land was mentally evaluated

and he did not see anything that led him to believe that he could use that as a defense.

The Alabama Court of Criminal Appeals did not unreasonably apply *Strickland v.*

*Washington* to the facts of this case when it concluded that Land failed to establish deficient

performance and prejudice at the penalty stage based on counsel's failure to obtain expert

assistance.

II.(h)(3).    <u>The claim that trial counsel were ineffective for failing to object to the submission of the penalty phase case late Friday evening.</u>

Land contends that he was prejudiced by the failure of counsel to object to the late afternoon submission of the penalty phase because the jury hurriedly considered his sentence rather than remain sequestered until the next day or through the weekend.[15/]  Land relies upon *Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957 (1965) in support of his argument that such pressure at a capital sentencing phase rises to an impermissible level of coercion.  *Jenkins* is distinguishable because it was not a capital case nor did it involve the timing of the submission of a case to the jury. In *Jenkins*, the Supreme Court held that the trial judge's instruction to a deadlocked jury that "You have got to reach a decision in this case" had the coercive effect of forcing jurors to surrender their conscientiously held views.  There was no such instruction in Land's case.

Respondent argues that Land has failed to offer any evidence to support his claim that trial counsel was ineffective for failing to object or that the timing of the deliberations forced the jury to reach a hurried decision.  At the Rule 32 evidentiary hearing, counsel was not questioned concerning his decision not to object to the submission of the penalty phase case on Friday evening.  Counsel did testify that after Land's mother and grandfather testified at the penalty phase a number of jurors were crying.  (Rule 32 EH, pp. 38-39.)  Counsel may well have wanted the jury go into deliberations with the testimony of Land's mother and grandfather fresh in their minds – particularly as the testimony had an emotional effect on some of the jurors.

---

[15/]    The penalty phase of the case was submitted to the jury at 5:04 p.m., and the jury returned at 6:10 p.m. with an 11 to 1 sentence in favor of death.  TR. 2129-30.  The speed with which the jury acted at the penalty phase was comparable to the speed with which the jury acted at the guilt phase.  At the guilt phase, deliberations began at 2:25 p.m., and the jury returned at 3:27 p.m. with a guilty verdict. TR. 2072-73.

The Alabama Court of Criminal Appeals did not unreasonably apply *Strickland v. Washington* to the facts of this case when it implicitly found  that Land failed to establish deficient performance and prejudice based on counsel's failure to object to the submission of the penalty phase case late Friday evening.

Having reviewed the entire trial record and the Rule 32 evidentiary hearing transcript as well as the state courts' decisions, the court concludes with regard to all of the ineffective assistance of counsel claims that the Alabama Court of Criminal Appeals did not unreasonably apply *Strickland v. Washington* to the facts of this case.  The court reiterates that during the Rule 32 evidentiary hearing counsel asked few questions of trial counsel and presented little evidence regarding most of the allegations of ineffective assistance of counsel presented  in the § 2254 petition.  Only one of Land's trial attorneys was called to testify and Land did not testify himself. Despite the lack of testimony on the issue of ineffective assistance of counsel, the findings of the Rule 32 court and the Court of Criminal Appeals are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1).  *Bui*, 321 F.3d at 1312.  Because Land has not carried his burden under *Strickland v. Washington* on any of the individual claims of ineffective assistance of counsel, a cumulative effect claim must necessarily fail.  Consequently, the court denies Land's habeas petition on these claims.

III.    Claims related to constitutional violations by the trial court.

III.(a).    The claim that the trial court's failure to determine Land's competency to stand trial resulted in a denial of his rights to a fair trial, due process and reliable sentencing under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Land alleges that the trial court failed to assess Land's competency "despite his demonstrated problems" and "then arbitrarily concluded during the penalty phase proceedings that [he] was *not* impaired and that no resultant mitigating circumstance existed, despite the lack of . . . medical basis for its conclusion," citing to the transcript at TR. 2181-82.  (Amended Petition, ¶157).

Although the court did not make a determination of competency prior to trial, Land was evaluated for competency.  (TR. 2181; Vol. 38, p.4002).  The court in sentencing Land clearly stated it was considering Dr. Rosecran's competency report:

> Number Six, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired does not apply.  No evidence of impairment was gleaned from any report or evidence in the case that I have seen.  I'm not unmindful of the defendant's diagnosis in 1986, that of conduct disorder, socialized aggression.  In my view these findings, nor Dr. Rosecran's findings more recently support the existence of this factor.

> . . . .

> Returning to the eighth mitigating circumstance, inclusion of defendant's character, record, et cetera. . . .

> As I mentioned earlier, ladies and gentlemen, I have carefully read every scrap of paper submitted to me, including . . . Dr. Rosecran's findings, . . . .

(TR. 2181-83).

None the less, this claim is procedurally barred from federal review because the Alabama Court of Criminal Appeals found it precluded from Rule 32  review because it could have been but was not raised at trial or on direct appeal.  *Land v. State*, CR-02-1563, memo. op. at 6-7, 11.

III.(b). <u>The claim that the trial court's failure to exclude unlawfully obtained evidence deprived Land of his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.</u>

Land alleges:

> The police arrested Mr. Land when they took away his shoes and clothing. A reasonable person would not believe that after he was stripped naked, he would be free to leave. Therefore, once he was stripped of his clothing, he was under arrest. See *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (suspect must remain free to disregard the questions and walk away).

> At the time of Mr. Land's arrest, the totality of the circumstances did not create a "fair probability" that he had committed a crime. *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (employing a fair probability standard given all circumstances). As a result, the trial court should have found his arrest illegal for lack of probable cause and suppressed the evidence arising from this illegal arrest, including Mr. Land's statement and the items taken from his car. *See e.g., Vale v. Louisiana*, 399 U.S. 30 35 (1970); *Mapp v. Ohio*, 367 U.S. 643 (1961).

> The interrogation and arrest of Mr. Land occurred on May 19, 1992. Officers Steve Corvin and Larry Fowler of the Birmingham Police Department went to the rooftop of the Galleria Mall to talk to Mr. Land. (R. 5, 772, 944). The police suspected Mr. Land simply because they found his name and phone number, along with his mother's name and phone number, on a note on Ms. Brown's refrigerator. After a brief discussion, the officers transported Mr. Land back to the police department for further questioning. (R. 6, 773, 945). At the police department, Officer Corvin took Mr. Land to an interrogation room and read him his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Mr. Land signed a waiver of rights form and agreed to make a statement. (R. 7, 949). In his statement to the police, the taping of which began at 2:42 p.m., Mr. Land stated that he knew Ms. Brown through a mutual friend, but he emphatically denied involvement in her disappearance. (R. 11, 956-65, 1027). When the officers asked his whereabouts the previous evening, Mr. Land said that he was at his girlfriend's house until approximately 11:30 p.m., then fell asleep in his car outside her home until 4:00 a.m., after which he went home to get ready for work. (R. 967). In response to an officer's question, Mr. Land stated that a different girlfriend, Marie Fortis,

borrowed his car after lunch that day.  (R. 11, 789, 977).  At this time, the police had no reason to believe that Mr. Smith had committed a crime.  In *Illinois v. Gates*, 462 U.S. 213 (1983) the Supreme Court reaffirmed the "totality of the circumstances" analysis to determine probable cause.  *Id.* at 238-39.  Since at this point, there was no evidence linking Mr. Land to Mrs. Brown's disappearance, there was no probable cause for the police to make an arrest.

After Mr. Land completed his statement, without explanation, Detective Fowler immediately took Mr. Land's shoes and clothing, including his underwear, and forced him to sit naked in the interrogation room until a prison uniform was provided to him.  (R. 112, 778, 780, 788, 875, 988, 1032, 1047, 1115).  Despite Mr. Land's repeated requests, the police continued to hold Mr. Land without allowing him access to counsel.  Lieutenant Butch Quinn then called Mr. Land's girlfriend Marie Fortis, who denied having Mr. Land's car.  (R. 1100).  When Officer Corvin confronted Mr. Land with this fact, Mr. Land admitted that his car was in the Galleria parking lot.  (R. 16, 165, 997).

Because a reasonable person would not believe that he was free to leave the police department building after the police took his shoes and clothing, Mr. Land was under arrest.  *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).  The police lacked probable cause to arrest Mr. Land, because under the totality of the circumstances, no fair probability existed that Mr. Land had committed any crime.  The police purportedly seized his clothing because the interrogating officer claimed to see blood spatters on Mr. Land's clothing and shoes.  Subsequent forensic testing, however, yielded no information establishing such "spots."  (R. 1537-1539, 1681).

Even after the police obtained Mr. Land's tape-recorded statement, the police still had no sufficient probable cause to continue to hold Mr. Land.  The police's subsequent discovery of incriminating evidence in his car does not validate an illegal arrest.

The trial court should have suppressed the evidence arising from this illegal arrest, including Mr. Land's statement and the items taken from his car.  The trial court erred in admitting the statements, in violating of existing United States Supreme Court precedent and the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  *See, e.g., Cale v.*

*Louisiana*, 399 U.S. 30, 35 (1970); *Mapp v. Ohio*, 367 U.S. 643 (1961).

(Amended Petition, ¶¶ 158-64).

In addressing these claims, the Alabama Supreme Court stated:

> Land argues that the "fruits" of his arrest, including his first statement and the evidence obtained from his car, were improperly admitted into evidence. He contends that when the police arrested him, without an arrest warrant, they did not have probable cause to do so. Thus, he argues, the statement and other evidence were "fruit of the poison tree" and admission of the evidence violated his rights guaranteed under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and rights guaranteed under the Alabama Constitution. Land claims that he was "under arrest" when the police took his shoes and clothes and gave him a jail uniform to wear because at that time, he says, he was no longer free to leave the police station.
>
> He asserts that his arrest was made without probable cause because, he says, under the totality of the circumstances there was not a fair probability that he had committed a crime. He contends that all the police knew about the crime at that time was that there had been a burglary at Ms. Brown's house, that she had disappeared, that his name and telephone number had been found on a bulletin board in the house, and that he appeared to have blood spatters on his shoes. Land points out that the police also knew at that time that he had been cooperative with their investigation of Ms. Brown's disappearance, had given a voluntary statement, and had accounted for his whereabouts at the time she had disappeared. Land argues that although the police later obtained additional incriminating evidence against him, that fact does not validate what he says was an illegal arrest. As noted above, Land argues that the fruits of his arrest were not admissible and that his conviction, based on that evidence, should be reversed.
>
> The State agrees that Land was under arrest, though not formally, when the police took his clothes and shoes. However, the State argues that Land's arrest was supported by probable cause, pointing to such evidence as the fact that Land's telephone number was found in Ms. Brown's house, that Land had admitted to cutting the telephone line and breaking into Ms. Brown's house a week before her murder, that his story about having lunch that day with his

second girlfriend and leaving his car at her house was not true, that Land was wearing tennis shoes with a "USA" tread design that appeared similar to a shoe print on a piece of glass that had been removed from Ms. Brown's house, and that he appeared to have blood spatters on his shoes.

*Ala.Code* 1975, § 15-10-3(a)(3), states that a police officer may arrest a person without a warrant "[w]hen a felony has been committed and the officer has reasonable cause to believe that the person arrested committed the felony." An officer has reasonable, or probable, cause to make an arrest "when, at the time the arrest is made, the facts and circumstances within his knowledge, and of which he has reasonably trustworthy information, are sufficient to lead a prudent person to believe that the suspect is committing or has committed an offense." *Gord v. State,* 475 So.2d 900, 902-03 (Ala. Cr. App.1985). See *Manning v. State,* 568 So.2d 327 (Ala. Cr. App.1990), and *Brannon v. State,* 549 So.2d 532 (Ala. Cr. App.1989). Thus, a warrantless arrest is not legal if it is supported only by a suspicion in the officer's mind that the person has committed an offense. *Brannon, supra.* Evidence seized pursuant to a warrantless arrest not supported by probable cause is inadmissible, and a conviction based on that evidence must be reversed. *Id.*

Land and the State disagree as to whether the police were aware, when they arrested Land, that the tread design on his tennis shoe was similar to the print on the pane of glass that had been removed from Ms. Brown's house.  However, even if the police were unaware of that particular connection of Land to the crime, we conclude that Land's arrest was amply supported by probable cause. The trial court did not err in admitting the evidence seized pursuant to Land's warrantless arrest.

*Ex parte Land,* 678 So.2d 224, 238-239 (Ala. 1996).

Land does not dispute that the arrest occurred when his clothing was taken.  He argues, however, that the police did not have probable cause to arrest him when they took his clothing.  Specifically, he states that his clothing was taken before (1) he allegedly admitted to cutting the telephone line and breaking into the victim's house a week earlier, and (2) the police determined that his story about having lunch and leaving his car with his second girlfriend was not true.

When "the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at his trial." *Stone v. Powell,* 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976).  The *Stone v. Powell* doctrine is applicable where the defendant "argued that evidence used in his trial was the product of an illegal arrest." *Cardwell v. Taylor*, 461 U.S. 571, 572, 103 S.Ct. 2015, 2016, 76 L.Ed.2d 333 (1983).  Because Land had a suppression hearing in the trial court as well as  state appellate review on the facts that form the basis of his illegal arrest issue, he has had a full and fair review. *See Tukes v. Dugger*, 911 F.2d 508, 513-14 (11th Cir. 1990), *cert. denied,* 502 U.S. 898, 112 S.Ct. 273, 116 L.Ed.2d 225 (1991).

Before this court may review the merits of his Fourth Amendment claim, Land must demonstrate that the state courts deprived him of a full and fair opportunity to litigate the claim. See, *Peoples v. Campbell*, 377 F.3d 1208, 1224 (11th Cir. 2004), *cert. denied,* 545 U.S. 1142, 125 S.Ct. 2963, 162 L.Ed.2d 892 (2005).  Land has not demonstrated that the state courts deprived him of a full and fair opportunity to litigate this claim.  Rather, he argues that this claim cannot be barred because his illegal arrest claim is based on the violation of his *Miranda* rights and, thus, the *Stone* exclusionary rule is inapplicable, *citing Withrow v. Williams*, 507 U.S. 680, 688, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993)(declining to extend the *Stone* holding to include *Miranda* based claims).  *Withrow* and *Miranda* are inapplicable to Land's illegal arrest claim

because probable cause existed to take  Land's clothing which resulted in an arrest.[16/]   The

*Miranda* claim will be addressed in the next section in the manner in which it was raised.

III.(c).   <u>The claim that the trial court's failure to exclude Land's involuntary statement violated
the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.</u>

Land alleges that both of his statements were inadmissible because they were obtained

pursuant to an illegal arrest.  He further alleges that the second statement was also obtained after

Land requested to speak with a lawyer.  In addition, he alleges that the police used coercion and

intimidation to extract the alleged second statement.

The Alabama Court of Criminal Appeals addressed the *Miranda* claim in the following

manner:

---

[16/]   If not precluded by *Stone*, any challenge to the appellate court's finding of probable cause necessarily rests on a challenge to the court's factual determination about when Land's clothing was taken.  The appellate court found that prior to the arrest/taking of clothing the police were aware of  the fact that Land's telephone number was found in Ms. Brown's house, that Land had admitted to cutting the telephone line and breaking into Ms. Brown's house a week before her murder, that his story about having lunch that day with his second girlfriend and leaving his car at her house was not true, and that he appeared to have blood spatters on his shoes.  Land has failed to rebut the presumption of correctness of the appellate court's factual determination by clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1).

The testimony at trial and in the suppression hearing indicates that before Land's clothing was taken the police were aware that the girlfriend story was not true and that Land had admitted to the circumstances behind the burglary at the victim's home the week before.  After the recorded statement at which Land said he had lunch with his girlfriend and she kept his car, Officer Quinn called the "girlfriend." (TR. 162-63).  Thereafter, during an unrecorded interview, Land was told that the woman denied having the vehicle, Corvin told Land they needed to see the car, Land told Corvin that the car was located on the third floor of the parking deck and gave the keys to Corvin. (TR. 40-47, 90-91, 93-94, 119, 121, 1058-59). Land still had on his clothes when Land gave him the keys to the car.  (TR. 1029-30).  During the course of the unrecorded interview with Corvin,  Land told him the account of his involvement in both the first burglary and the involvement in the burglary that had occurred the night before.  (TR. 14-15, 22-23).   Land still had his clothing on when he told about his involvement in the burglary with the two white men.   (TR. 55). Land's clothing was not taken until Land had been at the station an hour or two (TR. 1071-72) [which would have been at the earliest around 3:40 p.m. since the *Miranda* waiver signed when Land arrived at the police station indicated it was signed at 2:42 p.m. (TR. 34).] Corvin had Quinn go back into the interview room with Corvin and Land so that Land could repeat the story at 4:00 p.m. (TR. 60, 160) by which time Land was dressed in a jail uniform.  (TR. 1043-47, 1115).  At this time Land repeated what he had told Corvin to both Corvin and Quinn.  (TR. 59-61, 1098).  The appellate court's finding was neither an unreasonable determination of the facts based on the evidence nor an unreasonable application of Supreme Court law as set forth in *Illinois v. Gates*, 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (reaffirming that "only the probability, and not a *prima facie* showing, of criminal activity is the standard of probable cause").

The appellant argues that his second statement to the police was involuntary.

"The oft-stated rule is that a confession is *prima facie* involuntary and inadmissible and the state must show voluntariness and a *Miranda* predicate in order for it to be admitted. Whether there was a waiver of the right to remain silent and the right to counsel and whether it was knowingly, voluntarily, and intelligently made must be decided from the particular facts and circumstances of each case, including the background, experience, and conduct of accused – the totality of the circumstances. The question of whether a confession was voluntary is initially to be determined by the trial court. Thereafter, the voluntariness as affecting the credibility and weight to be given any statement that an accused has made is a determination for the jury. The finding of the trial court will not be disturbed on appeal unless it appears contrary to the great weight of the evidence or is manifestly wrong. Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty. The trial court need only be convinced from a preponderance of the evidence to find a confession to have been voluntarily made. The fundamental requirements for voluntariness are that the court must conclude, in order to find a defendant's confession voluntary, that he made an independent and informed choice of his own free will, that he possessed the capability to do so, and that his will was not overborne by pressures and circumstances swirling around him."

*Lewis v. State*, 535 So.2d 228, 234-35 (Ala. Cr. App.1988) (citations omitted).

Through the testimony of Detectives Corvin and Fowler, the prosecution completely established the *Miranda* predicate. The appellant does not dispute the fact that he was given the *Miranda* warnings and that he waived his rights before making his second statement. He challenges the admission of the statement solely on the ground that it was coerced and that his will was overborne when, he alleges, during interrogation, he was "[s]tripped of his clothing, shouted at, called the classic Southern 'boy,' manhandled, and frightened into assuming the fetal position." Appellant's Brief at 74.

The appellant did not testify in connection with the motion to suppress his statement. The testimony of Lt. Carl M. Quinn, Detective Steven B. Corvin, and Detective Larry Fowler concerning what occurred during their interview with the appellant was unrefuted. See *Jackson v. State*, 549 So.2d 616, 620 (Ala. Cr. App.1989); *Grayson v. State*, 479 So.2d 69, 75 (Ala. Cr. App.1984), *affirmed*, 479 So.2d 76 (Ala.), *cert. denied*, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985). All three officers stated that the appellant was not threatened in any way in order to make him confess. All testified that during interrogation the appellant's clothes were taken and that he was given an orange jail uniform to wear. However, there is nothing in the record to indicate that the change of clothes was accompanied by any force or was in any way humiliating to the appellant. There is also nothing in the record to substantiate the appellant's allegation that he was "shouted at."

Lt. Quinn testified that during the interview the appellant changed positions, often curling up "almost into a fetal position," with his head in his hands and his feet pulled up into his chair. R. 167. Lt. Quinn interpreted the appellant's posture to mean that he was "avoiding [Quinn's] questions." R. 169. At one point, Quinn took the appellant's wrist, moved his hand away from his head, R. 21, and said "something to the effect, 'Boy, look up at me when I talk to you.' " R. 168. According to Detective Corvin, Quinn did not bend or twist the appellant's arm or "do anything inappropriate in talking with [the appellant]." R. 21-22.

The appellant is a 24-year-old white male. Lt. Quinn's addressing him as "boy" obviously was not a racial epithet, and given the appellant's relative youth, did not have the demeaning overtones it might in another situation. Quinn's touching the appellant by moving the appellant's hand away from his head so that the appellant would face Quinn during the interview was not brutal and did not amount to physical coercion. See *State v. Joyner*, 382 S.W.2d 683, 687 (Mo.1964) (accused's confession not coerced when officer "touch[ed] defendant's jaw to cause defendant to turn his head so that he would be looking at the questioning officer").

The record indicates that the appellant assumed a "fetal position" before he was questioned or touched by Lt. Quinn and that he constantly shifted positions during the interrogation. The trial court was justified in concluding, as Lt. Quinn did, that the appellant's

> body language indicated an aversion to the questions rather than a fear of the questioner.
>
> The trial court had substantial evidence upon which to conclude that, under the totality of the circumstances, the appellant's will was not overborne and his statement was not coerced. The court's finding that the statement was voluntary was not "manifestly contrary to the great weight of the evidence" and will be upheld on appeal. *Ex parte Matthews*, 601 So.2d 52, 53 (Ala.), *cert. denied*, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992).

*Land v. State,* 678 So.2d at 208-209.

(i).    <u>First Statement</u>

Although neither of the appellate courts specifically addressed the voluntariness of the first statement, the Alabama Supreme Court in its presentation of the facts stated that Land "agreed to accompany them [the police] to the police station to answer some questions.  He was taken to an interrogation room and informed of his rights, pursuant to *Miranda v. Arizona*. He signed a waiver of rights form and agreed to have his statement tape-recorded."  As noted in section III(b) above, Land did not dispute that the arrest occurred when his clothing was taken. He also does not dispute that he had on his clothing at the time of the first statement, the recorded statement.  The first statement clearly was not the product of the allegedly illegal arrest.  Further, as previously discussed, Land's challenge to the allegedly illegal arrest is precluded by the *Stone v. Powell* doctrine.  In a footnote in section III(b) above, the court also concluded that the Alabama Supreme Court's decision that the police had probable cause was not based upon an unreasonable determination of the facts based on the evidence.  This court will not, therefore, grant Land habeas relief on this claim.

(ii).    <u>Second Statement and Resulting Evidence</u>

110

This leaves only Land's allegations that the second statement was made after Land had invoked his right to counsel, citing C. 253-57, and that the second statement was based on coercion and manhandling.

To the extent that Land argues that his second statement was inadmissible because he had requested to speak with an attorney, this claim is procedurally barred from federal review; the Alabama Court of Criminal Appeals found it precluded from Rule 32 review because it could have been but was not raised at trial or on direct appeal.  *Land v. State*, CR-02-1563, memo. op. at 7, 11.[17/]  Land has not established cause and prejudice.

With regard to the alleged coercive tactics used to obtain the second statement,[18/] Land challenges only the Alabama Court of Criminal Appeals finding of no coercion as an unreasonable determination of the facts based upon the evidence.  He has failed, however, to rebut the presumption of correctness by clear and convincing evidence.

Corvin testified:  "At one point of the interview I think Mr. Land had dropped his head and was holding his head down with his hands and Lieutenant Quinn took his wrist and pulled his hand away from his head and asked him to look at him when he talked to him."  (TR. 21).

---

[17/]    Further, Land's citation to the record does not support his position that the police continued to interrogate Land after he invoked his right to counsel.  According to the handwritten account of the unrecorded  statement, after Land described his involvement with two other men in a burglary of the victim's home, Corvin asked him to repeat his statement on tape:

  "At this time he stated he might better talk to an attorney since he was confessing
  to burglary.  At this time I ceased the interview and told Land if he wanted to talk
  to me after contacting an attorney it probably would be in court."

(R. 257.)  This is consistent with Corvin's testimony at the suppression hearing that he stopped interviewing Land after he requested counsel  (TR. 39) and that Land said he wanted a lawyer after repeating his statement concerning his involvement in the  burglary of the victim's home the night of her disappearance to Quinn.  (TR. 61).

[18/]    *See Colorado v. Connelly*, 479 U.S. 157, 170, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986) ("The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion.")

Corvin testified that Quinn moved Land's hand "right at the closing of the interview" and that in response, Land said "something to Lieutenant Quinn about don't touch me."  (TR. 64-65).

> Q.     Was he upset?
>
> A.     I wouldn't say upset, no.
>
> Q.     At what point did that occur in this process?
>
> A.     That was probably right at the closing of the interview.

(TR. 65).

Quinn described the incident as follows:

> "Mr. Land was more than just with his head down at the time or during the conversation, he went almost into a fetal position.  At one time he had a leg here and here and would go down like this, and I tried to talk with him.  And at one point in time I did reach over and say something to the effect, "Boy, look up at me when I talk to you," or something.  Maybe not those specific words, but similar to that."

(TR. 167-68).

Quinn said that he "took [the fetal position] as avoiding my question."  (TR. 169).  The testimony of Corvin or Quinn contains no mention of Land "rocking back and forth." (Amended Petition, ¶ 166).  True, when asked if he felt Land was scared of Quinn, Quinn testified "I would say that Mr. Land was probably frightened of me." However, the characterization of Quinn's actions as exploitive of Land's fear, the "grabbing" his wrist, "yanking" Land's hand away from his face (Amended Petition, ¶ 166) is not supported by the record.  In any event, by the time, Quinn entered the room, the incriminating statement had already been made to Corvin alone and Land was simply repeating his statement to both Corvin and Quinn.  (TR. 57-64, 1098).

112

The Alabama Court of Criminal Appeals' determination that Land was not coerced was

not based on an unreasonable determination of the facts in light of the testimony presented at the

suppression hearing and at trial.  Further, the decision was not contrary to nor did it involve an

unreasonable application of clearly established federal law.  Accordingly, Land's habeas petition

on this claim fails.

III.(d).  The claim that the trial court's admission of items seized pursuant to a warrantless
search of Land's vehicle deprived Land of his rights under the Fourth, Fifth, Sixth,
Eighth, and Fourteenth Amendments to the United States Constitution.

Land alleges:

> Detective Corvin testified that he returned to the interrogation
> room at approximately 3:00 p.m., shortly after Mr. Land finished
> his first statement.  When Officer Corvin told Mr. Land that Marie
> Fortis did not have his car, Mr. Land said: "I'll only sign something
> saying you can look in my car if you won't charge me with
> carrying a gun." (C. 233, 254).  No such document was prepared.
> However, at Officer Corvin's instance, Mr. Land then relinquished
> his car keys, which Officer Corvin gave to Officer Fowler
> sometime between 3:00 p.m. and 4:00 p.m. (R. 42, 85, 93).
> Officer Corvin also informed Officer Fowler where the car was
> located. (R. 85).
>
> At approximately 4:45 p.m., Officer Fowler and assistant district
> attorney Mike Anderton went to the Galleria parking lot. (C. 239;
> R. 119, 123, 791).  After locating the vehicle, Officer Fowler
> opened the trunk and, at Mr. Anderton's direction, completed a
> thorough search of its contents. (C. 239; R. 791-92).  A .45 caliber
> pistol was taken from the trunk of Mr. Land's car. (R. 1284).
> Following his search of the car, Officer Fowler had the car
> impounded and towed to the police garage. (R. 1152-56).  Based
> partly upon the search of Mr. Land's trunk, Officer Fowler
> obtained a search warrant, which led to the discovery of additional
> evidence introduced at trial. (C. 222-24; 792, 1198-1200).
>
> Well-established federal law holds that a search within the
> meaning of the Fourth Amendment occurs whenever the
> government infringes upon a person's reasonable expectation of

113

privacy. *Oliver v. United States*, 466 U.S. 170, 177-78 (1984).
While the law attaches a lower expectation of privacy
to automobile searches, an owner's privacy right is not extinguished
and may be greater where, as in this case, the vehicle serves as a
depository for personal effects. *Arkansas v. Sanders*, 442 U.S. 753
(1979). In this case, the evidence showed that Officer Fowler
conducted a search of Mr. Land's car.

Moreover, Mr. Land not only refused to consent to this search, but
specifically stated that he would not consent to a search of the car.
When the state attempts to rely upon consent to justify the legality
of a search, it must demonstrate by clear and convincing evidence
that consent was voluntarily and intelligently given. *Schneckloth v.
Bustamonte*, 412 U.S. 218, 219 (1973).

In this case, the state failed to show that Mr. Land gave police
specific consent to search his car. After confronting Mr. Land with
an inconsistency in his statement, Detective Corvin asked him to
disclose the whereabouts of his car and car keys. Mr. Land, fearing
that he would be charged with possession of a weapon,
relinquished the keys but explicitly refused to consent to the
search.

Since Mr. Land specifically stated that he did not consent to a
search of his car, his conduct cannot be construed as an implied
consent to search. Even if his conduct could suggest consent, his
oral refusal renders the consent equivocal at best, and insufficient
to support a waiver of his fundamental Fourth Amendment rights.
Lacking unequivocal consent, the police required a warrant to
search the car, and their failure to obtain one violated the [sic] Mr.
Land's right to be free from search and seizure and his right to a
fair trial under the Fourth, Fifth, Six, Eighth and Fourteen
Amendments to the United States Constitution. *Oliver v. United
States*, 466 U.S. 170, 177-78 (1984); *Arkansas v. Sanders*, 442
U.S. 753 (1979); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219
(1973); *Mapp v. Ohio*, 367 U.S. 643 (1961).

(Amended Petition, ¶¶168-73)

On direct appeal, the Alabama Court of Criminal Appeals stated:

The appellant contends that evidence obtained during a warrantless
search of his automobile was inadmissible. Because the car was
searched pursuant to a warrant on May 21, we assume the

114

warrantless "search" to which the appellant is referring was
Detective Fowler's May 19 visual inspection of the trunk, during
which he saw the pistol.

Since the appellant had already told Detective Fowler that he had a
.45 caliber pistol in his car, we fail to see how the appellant's
privacy rights were violated by Fowler's looking in the car and
seeing the pistol there. "In *Burrell* [ *v. State*, 45 Ala. App. 664,
666, 235 So.2d 913 (1970),] this Court held that where the
defendant volunteered the whereabouts of a gun, there simply was
no search." *Hubbard v. State*, 382 So.2d 577, 592 (Ala. Cr.
App.1979), *affirmed*, 382 So.2d 597 (Ala.1980), set aside on other
grounds, 405 So.2d 695 (Ala.1981).

However, if Detective Fowler's opening the trunk and visually
inspecting the interior did constitute a "search" within the meaning
of the Fourth Amendment, that search was authorized under both
the consent and the probable cause plus exigent circumstances
exceptions to the warrant requirement.

"[C]onsent to search may be given on actions alone." *Morgan v.
State*, 518 So.2d 186, 189 (Ala. Cr. App.1987) (quoting *Hubbard
v. State*, 382 So.2d at 592). It was "reasonable to conclude that
when the defendant handed the keys to the police officer he
voluntarily relinquished all expectation of privacy." *Hubbard v.
State*, 382 So.2d at 592. In this case, "[t]here is not even any
evidence that the police demanded the keys but only that [the
officer] asked the defendant where the keys were." *Id*.

The appellant's statement that he would sign a consent-to-search
form if the officer agreed not to charge him "for carrying a gun," R.
1013, does not demonstrate that his consent was involuntarily
induced by the hope of a benefit. Detective Corvin testified that he
did not agree to the appellant's proviso. The proviso was simply a
unilaterally imposed condition which the appellant acknowledged
was not met when he refused to sign a consent to search form.
*Compare Siebert v. State*, 555 So.2d 772, 776-77 (Ala. Cr. App.)
(accused's confession not involuntarily induced by promise of
benefit when police officer acknowledged terms which accused
had unilaterally imposed on extent of his confession), *affirmed*,
555 So.2d 780, 782 (Ala.1989), *cert. denied*, 497 U.S. 1032, 110
S.Ct. 3297, 111 L.Ed.2d 806 (1990).

The very fact that the appellant imposed a condition on his giving written consent to search indicates that he thought he had the right to refuse consent. See *Daniels v. State*, 534 So.2d 628, 654 (Ala.Cr.App.) ("declaration [by accused's wife] to the officers that she would rather her husband sign the written release indicates that she knew she was being asked, rather than ordered, to permit the search and that she had a right to refuse permission"), *affirmed*, 534 So.2d 656 (Ala.1986), *cert. denied*, 479 U.S. 1040, 107 S.Ct. 898, 93 L.Ed.2d 850 (1987). The appellant's apparent ignorance of the fact that an oral consent to search is as valid as a written one does not make his oral consent involuntary. Compare *Connecticut v. Barrett*, 479 U.S. 523, 530, 107 S.Ct. 828, 832-33, 93 L.Ed.2d 920 (1987) (wherein the Court, holding that accused who agreed to give an oral, but not a written, statement without counsel had waived the right to counsel with regard to the oral statement, observed: "[W]e have never 'embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness' ") (quoting *Oregon v. Elstad*, 470 U.S. 298, 316, 105 S.Ct. 1285, 1297, 84 L.Ed.2d 222 (1985)).

Before the appellant gave his car keys to Detective Corvin, he was aware that he had been caught in two lies concerning his involvement in the May 18 burglary of Ms. Brown's house and the location of his car. He was specifically made aware that the police "were looking for evidence about the disappearance of Candace Brown." R. 1012. He stated that he would not sign a written consent to search unless he was promised he would not be charged in connection with the gun. Officer Corvin did not agree to the appellant's unilaterally imposed condition or solicitation of a benefit. Nevertheless, the appellant handed over his car keys to Detective Corvin. Based on the foregoing evidence, there is no reasonable basis for a claim that the appellant did not consent to the officers' looking in his car.

"A person may consent to a search without a warrant and thereby waive any protection afforded by the Fourth Amendment to his right of privacy. *Duncan v. State*, 278 Ala. 145, 176 So.2d 840 (1965). Consent to a search must be knowingly, intelligently, and freely given. *Id*. Based upon the evidence set out above, we conclude that the defendant did satisfy these criteria in his consent to the searches of his . . . automobile. Further, the record establishes that the defendant gave the consent with knowledge that he was a suspect in the [Candace Brown] murder case. The trial court's ruling on this issue is supported by substantial

evidence. See *Prince v. State*, 420 So.2d 856 (Ala. Crim. App.1982)."

*Ex parte Wilson*, 571 So.2d 1251, 1255 (Ala.1990).

If a search of the appellant's vehicle occurred on May 19, it was also authorized under the probable cause plus exigent circumstances exception to the warrant requirement. By the time Detective Fowler opened the appellant's trunk, the police had the following information: that the residence of Candace Brown had been burglarized on May 13, and Ms. Brown had named the appellant as a suspect in that burglary[19]; that the appellant had admitted his involvement in the May 13 burglary, including the fact that he had cut the telephone lines to Ms. Brown's house on that occasion; that the appellant had initially denied but later admitted his involvement in the May 18 burglary of Ms. Brown's house; that the appellant's description of what happened during the May 18 burglary, specifically the fact that Ms. Brown had bled on the kitchen floor, was inconsistent with the physical evidence, or the lack thereof, at the scene of the burglary; that the appellant had lied about the location of his vehicle; and that the tread design on the appellant's tennis shoes appeared to match a shoe imprint on a pane of glass at the scene of the burglary.

This "totality of circumstances" and information was sufficient to "warrant a man of reasonable caution in the belief," that an offense had been committed and that the appellant committed it. *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)). "[G]enerally, a vehicle may be searched on probable cause without a warrant and without a demonstration of any exigent circumstances other than its own inherent or ready mobility." *Stanfield v. State*, 529 So.2d 1053, 1060 (Ala. Cr. App.1988). See generally *Mewbourn v. State*, 570 So.2d 805, 810 (Ala. Cr. App.1990).

The appellant's vehicle was not the subject of an unlawful search.

*Land v. State*, 678 So.2d at 213 -215.

---

[19]/    That information was not presented to the jury.

This claim, like the illegal arrest claim discussed in Section III(b) is precluded by *Stone v. Powell* doctrine because th estate courts provided an opportunity for full and fair litigation of this claim.[20]

III.(e).    The claim that the trial court's admission of improperly seized evidence (samples of hair, blood, and fingernail clippings)  throughout trial deprived Land of a fair trial, due process and sentencing determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

This claim is procedurally barred from federal review because the Alabama Court of Criminal Appeals found it precluded from Rule 32  review because it could have been but was not raised at trial or on direct appeal.  *Land v. State*, CR-02-1563, memo. op. at 7, 11.  See, *Supra*, pp. 9-13, discussing procedural default.  Land has failed to establish cause and prejudice to overcome the procedural default.

III.(f).    The claim that the trial court's admission of DNA evidence that was improperly collected, analyzed and admitted at trial violated the  Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

This claim is procedurally barred from federal review because the Alabama Court of Criminal Appeals found it precluded from Rule 32  review because it could have been but was not raised at trial or on direct appeal.  *Land v. State*, CR-02-1563, memo. op. at 7-8, 11.

Land seeks to excuse his procedural default by alleging the ineffectiveness of trial counsel.  In the amended petition before this court, Land presented as an independent claim that

---

[20]    If not precluded, the appellate court's decision was not based on an unreasonable determination of the facts nor was it an unreasonable application of *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047-48, 36 L.Ed.2d 854 (1973) (the question of whether a consent search was voluntarily given is a question of fact to be determined from the totality of the circumstances).

"trial counsel failed to properly litigate the state's investigation and presentation of the case."

Under this claim, Land contended:

> In addition, counsel were ineffective for failing to object to the introduction of the improper collection and subsequent forensic analysis of physical evidence from Mr. Land.

(Amended Petition, ¶ 80)

On direct appeal, the Alabama Court of Criminal Appeals concluded that various DNA evidence was admissible over a chain of custody objection. *Land v. State*, 678 So.2d at 209-213.

On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal Appeals quoted with approval the following language found in the trial court's order denying the Rule 32 petition:

> "Land next contends that counsel 'was ineffective in failing to challenge the admissibility of evidence introduced by the State's witness.' This claim is dismissed for the same reasons as the previous two. On direct appeal, the appellate courts rejected the arguments presented by Land on this matter. He offered no evidence to make them any more viable in these proceedings. *Land v. State*, 678 So.2d at 209-13.

*Land v. State*, CR-02-1563, memo. op. at 21.

Land did not attempt to question counsel at the Rule 32 evidentiary hearing concerning introduction of this evidence. He has not sought an evidentiary hearing on the issue of ineffective assistance of counsel in this court. Land is not entitled to habeas relief on the ineffective assistance of counsel claim because he failed to present evidence in state court related to counsel's performance; therefore, the alleged ineffectiveness of trial counsel will not establish cause for his default. He has offered no evidence of prejudice in either court.

While Land argues that the state did not meet state law threshold requirements for the admission of DNA evidence under *Ex parte Perry*, 586 So.2d 242 (Ala. 1991), the trial court conducted an evidentiary hearing prior to trial on this very issue.  Subsequently, the trial court concluded:

> That certain DNA evidence referenced in 7/20/93 hearing by Ms. Scott from Mobile and Ms. Rollins of Birmingham shall be admissible in state's case in chief–
>
> State's evidence at *Frye* type hearing conducted on 7/20/93 best evidence that state's evidence from Ms. Scott and Ms. Rollins meets the test for admissability [sic] enunciated in *Ex Parte Perry*, 586, So.2d 242 (S. Ct. Ala.);
>
> *Daubert* case cited at 61 L.W. 4805 is inapplicable to case at bar – *Daubert* dealing with admission of 'expert' testimony in federal trials as being governed by the *Federal Rules of evidence* as opposed to *Frye*.

(R.6).

Because Land has failed to establish cause for his procedural default, this claim is precluded from federal review; consequently, Land's petition is denied on this claim.

III.(g).  <u>The claim that the trial court's failure to seek a change of venue in light of pretrial publicity deprived Land of his rights to due process, a fair trial and reliable sentencing in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.</u>

This claim is procedurally barred from federal review because the Alabama Court of Criminal Appeals found it precluded from Rule 32  review because it could have been but was not raised at trial or on direct appeal.  *Land v. State*, CR-02-1563 , memo. op. at 8, 11.

Again, Land does not address cause and prejudice.  Thus, Land has no right to habeas relief on this claim.

120

III.(h).  The claim that race and gender discrimination in the formation of the grand and petit juries deprived Land of due process, a fair trial, equal protection and reliable sentencing in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The Alabama Court of Criminal Appeals found the following issues to be precluded from Rule 32 review because they could have been but were not raised at trial or on direct appeal: Land's claim that race and/or gender discrimination occurred in the formation of his grand jury; Land's claim that the prosecutor used his peremptory strikes in a manner which discriminated against African Americans; and Land's claim that the prosecutor used his peremptory strikes in a manner which discriminated against women. *Land v. State*, CR-02-1563, memo. op. at 8, 11. These discriminatory claims are procedurally barred from federal review in light of the state court's ruling.

Land has not alleged cause and prejudice to excuse the procedural default of this claim. Again, therefore, these claims cannot provide a basis for habeas relief.

III.(i).  The claim that the evidence was insufficient to support Land's conviction and sentence as a matter of law in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

To the extent that Land alleges insufficient evidence to support a conviction for murder during a kidnapping in the first degree, this claim is procedurally barred from federal review; Alabama Court of Criminal Appeals found it precluded from Rule 32 review because it could have been but was not raised on direct appeal. *Land v. State*, CR-02-1563, memo. op. at 10-11. Land has made no attempt to establish cause and prejudice to overcome his procedural default.

To the extent that Land alleges insufficient evidence to support a conviction during a burglary in the first degree, the Alabama Supreme Court addressed the sufficiency of the evidence claim in the following manner:

> Land next argues that his conviction under count one of his indictment must be reversed because, he says, the State failed to introduce sufficient evidence by which a rational jury could conclude that he was guilty on that count. Count one charged Land, pursuant to *Ala.Code* 1975, § 13A-5-40(a)(4), with the intentional killing of Candace Brown in the course of a first or second degree burglary. Land contends that the State introduced no evidence that he intended to commit a theft when he entered Ms. Brown's home and, thus, he argues that the trial court erred in denying his motion for a judgment of acquittal on that count. Relying on *Coulter v. State,* 438 So.2d 336 (Ala. Cr. App.1982), *judgment affirmed, Ex parte Coulter,* 438 So.2d 352 (Ala.1983), *denial of habeas corpus affirmed, Coulter v. Herring,* 60 F.3d 1499 (11th Cir. 1995), he also argues that no proof of intent to commit a theft was put before the jury, so that the aggravating factor that the murder was committed while the defendant was engaged in a burglary, listed in Ala.Code 1975, § 13A-5-49(4), should not have been used in the determination of his sentence. Land contends that he should receive a new sentencing hearing.
>
> In response, the State argues that it presented evidence that, when Land broke into Ms. Brown's home, he clearly intended to commit a theft therein. The State notes that it presented in evidence Land's statement to the police in which he said that when he met Tony and Edward they discussed "doing a burglary" and in which Land said he told them "he knew an easy mark." In that statement Land said he drove to Ms. Brown's home, broke a window, and entered through that window, planning to commit a theft, but was interrupted by Ms. Brown. The State contends that that evidence was sufficient to support a jury's finding that, when Land broke into Ms. Brown's home, he intended to commit a theft.
>
> In *Ex parte G.G.,* 601 So.2d 890, 892 (Ala.1992), we stated: "In order to defeat a defendant's motion for judgment of acquittal, the State must prove, by substantial evidence, the elements of the charge and the defendant's guilt beyond a reasonable doubt." However, an appellate court will review the evidence in a light most favorable to the prosecution. *Breckenridge v. State,* 628 So.2d

1012 (Ala. Cr. App.1993). Moreover, a conviction will not be set aside because of an alleged insufficiency of the evidence unless the preponderance of the evidence against the verdict is so decisive as to clearly convince the appellate court that the verdict is unjust. *Id.*

In this case, given Land's statement to the police regarding his "break-in" into Ms. Brown's house, we conclude that the State presented substantial evidence that Land intended to commit a theft therein. Thus, the trial court did not err in denying Land's motion for a judgment of acquittal on the first count of his indictment. Given that ruling, we need not address Land's second contention, that he should receive a new sentencing hearing.

*Ex parte Land,* 678 So.2d at 237-238.

The Supreme Court explained the constitutional review process to be applied to challenge

on sufficiency of the evidence:

[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. . . . [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

*Jackson v. Virginia,* 443 U.S. 307, 318-319, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979).

Land's statement in which he admitted that he broke into the house the night of the crime

establishes that the decision of the Alabama Supreme Court was not based on an unreasonable

determination of the facts presented at trial nor was it an unreasonable application of *Jackson*.

Consequently, this court will deny Land's habeas petition on this claim.

III.(j).   The claim that the trial court's failure to correct the jury's misunderstandings about the presumption of innocence, and their ultimate accountability deprived Land of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The Alabama Supreme court squarely reviewed this issue.  The Alabama Supreme Court stated:

> Land argues that his rights guaranteed under the Fifth, Sixth, Eighth, and Fourteen Amendments to the United States Constitution, and similar rights guaranteed under Alabama law, were violated when, he says, the trial court failed to correct what he calls a juror's misunderstanding about the presumption of innocence and the juror's responsibility for recommending a punishment. At the close of the guilt phase of the trial, the judge informed both defense counsel and the prosecution that he had received an anonymous note from the jury during defense counsel's closing argument.

> The trial court informed the attorneys for both sides that it had decided that Juror C. had written the note. Defense counsel agreed to have Juror C. removed from the panel and replaced by alternate Juror S.

> "[JUDGE HARD]: Let me get this on the record about the alternates. Let me tell you what my proposal is. We had Walter, you don't know yet-we had, as the jury exited for a break before Erskine [Mathis] argued, Andy Willis, the bailiff, handed me a yellow paper that will become your property, I read this to the fellows before Erskine [Mathis] argued. We have divined that Ms. C. wrote this note, the lady that had been a victim and wanted to talk privately, isn't that Ms. C., the one with the hat? That's Ms. C. She wrote the note.

> "I have the law here, the rules of procedure that tell me, in blue highlight, if anybody wants to read it, the last person struck shall be the alternate and if it becomes necessary for an alternate to replace a principal juror, then the last person struck shall be so designated as such. So, I can say to you guys that your last strike was 289, [Juror S.] Is that the blonde on the left? Does anybody know?

> "[MR. MATHIS (defense counsel) ]: I would state for the record that the lady who wrote the note has glared at us ever since we found out about the

note, as though she would like to spit. I have been particularly cognizant of that. While I was standing up there within two feet of her trying to give my closing argument, I was really worried-

"[JUDGE HARD]: Well, do you want her to be struck?

"[MR. MATHIS]: I think that is our client's decision and, of course, mine and Hiram [Dodd's] as well.

"[MR. DODD (defense counsel) ]: I think the client needs to hear what she said.

[THE COURT]: Here's what she said: *'I object to Mr. Dodd's statement about them wanting us to kill him. I feel he did it to play on our guilt. Whatever the verdict may be we are not responsible for the punishment of the defendant if found guilty, the defendant is. If I may object.'* It is signed 'juror.'

"I show it to you. Give it to Walter when you are through with it.

"[MR. MATHIS]: I want to exercise my discretion-

"[MR. DODD]: You have observed her more than I have-

"[MR. MATHIS]: I have serious misgivings about leaving her on the jury, in light of the appearance of things.

"[MR. LAND (defendant) ]: Did y'all just get the note today?

"[MR. MATHIS]: Yeah.

"[MR. DODD]: Just now.

"[MR. LAND]: She's been glaring before today.

"[MR. DODD]: All right. Don't say anything else.

"[JUDGE HARD]: All right.

"[MR. MATHIS]: We would like to have her excluded, Judge.

"[MR. DODD]: And whoever is supposed to be put in there, put them in."

Land now points out that although the note was signed "juror," it included

125

the plural terms "us," "our," and "we," and he argues that this fact suggests that its contents actually represented the view of the jury as a whole. Land contends that the text of the note evidences a misunderstanding-that the jury is not responsible for recommending a punishment-and also suggests that the jury may have prematurely concluded that he was guilty. Land now asserts that, at a minimum, the trial court was obligated to poll the jury or to allow defense counsel an opportunity to ascertain whether there existed juror bias.

In response, the State argues that there was no error, because, it says, the trial court properly instructed the jury on the presumption of innocence, the reasonable doubt standard, and the jury's role in sentencing, and the State says the judge alleviated any possible prejudice to Land by replacing Juror C. with an alternate. The State contends that Land's argument based on the use of the plurals "we" and "us" is unfounded because the note was signed with the
singular noun "juror." It also argues that Land presented no proof that the note represented the feelings of more than the one juror that was replaced.

We find no error in the actions of the trial court. A trial court has considerable discretion in determining the scope of the inquiry required when there is an irregularity involving a juror or the jury. See *Johnson v. State,* 620 So.2d 679 (Ala. Cr. App.1992), *reversed on other grounds,* 620 So.2d 709 (Ala.1992), *cert. denied,* 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993), and *Sistrunk v. State,* 596 So.2d 644 (Ala. Cr. App.1992). The record reveals that there was no doubt in the minds of the trial judge, the prosecutors, defense counsel, or the defendant that Juror C. had written the note. Not only did Land's counsel not object to the trial court's actions, they specifically requested that the judge, to remedy the problem, only replace Juror C. Moreover, because Land did not object to the trial court's action, this issue is reviewable only under the plain error standard. Clearly, the trial court did not commit plain error.

*Ex parte Land*, 678 So.2d at 233-235.

The jurors were correctly instructed that Land was "presumed to be not guilty" (TR. 1902) and that he "enjoys the presumption of innocence" (TR.1903).   Immediately before the penalty phase and subsequent to the dismissal of the juror who wrote the note, the jury was clearly instructed of its responsibility in determining the appropriate penalty.  (TR. 2115-2125).

From the discussion on the record (TR. 2060-64), it appears that no question was in

anyone's mind as to which juror wrote the note nor was any request made for a hearing.  Defense

counsel sought only the removal of the juror.  The court did in fact replace her with an alternate

juror. (TR. 2062, 2064).  Prior to jury deliberations, the court excused both the author of the note

and one of the original alternate jurors, telling them "[y]ou ladies will have served as the

alternates on the jury."  (TR. 2071).

Land argues that the trial court should have inquired of each juror whether the juror was

aware of the note or shared similar beliefs.  Land argues that the Alabama Supreme Court

"ignored the impact that the note or feelings of that juror may have had on the rest of the jury."

(Petitioner's brief, p. 28).  Land cites *Remmer v. United States*,  347 U.S. 227, 229, 74 S.Ct. 450,

451, 98 L.Ed. 954  (1954), for the proposition that a trial court must conduct a hearing involving

interested parties to determine the circumstances, impact upon jurors, and prejudice resulting

from extraneous material reaching the jury.  In *Remmer*, the Court stated:

> In a criminal case, any private communication, contact, or
> tampering directly or indirectly, with a juror during a trial about the
> matter pending before the jury is, for obvious reasons, deemed
> presumptively prejudicial, if not made in pursuance of known rules
> of the court and the instructions and directions of the court made
> during the trial, with full knowledge of the parties. The
> presumption is not conclusive, but the burden rests heavily upon
> the Government to establish, after notice to and hearing of the
> defendant, that such contact with the juror was harmless to the
> defendant. *Mattox v. United States*, 146 U.S. 140, 148-150, 13
> S.Ct. 50, 52-53, 36 L.Ed. 917; *Wheaton v. United States*, 8 Cir.,
> 133 F.2d 522, 527.

347 U.S. at 229, 74 S.Ct. at 451.

The note challenged here was not extraneous contact or material.  It was written by a juror

who took offense at defense counsel's closing argument.  Because it was not extraneous material,

*Remmer* is inapplicable.  The Alabama Supreme Court's decision was not contrary to clearly

established federal law as determined by the United States Supreme Court, and, therefore, Land

has not established a basis for habeas relief on this claim.

III.(k).   <u>The claim that the trial court improperly considered the victim's family's haracterizations
and preferences thereby denying Land a reliable sentencing determination under the Fifth,
Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.</u>

      Land raised this issue before the Alabama Supreme Court:

> Relying on *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96
> L.Ed.2d 440 (1987), and *Payne v. Tennessee,* 501 U.S. 808, 111
> S.Ct. 2597, 115 L.Ed.2d 720 (1991), Land argued to this Court at
> oral argument that he should receive a new sentencing hearing
> because the trial judge stated that he had read and considered
> several letters written to him by the victim's family and friends.
> Land contends that the letters, which expressed the writers'
> opinions regarding Land, the crime, and the appropriate
> punishment, prejudiced the judge against
> him, prevented him from receiving a fair sentencing hearing, and
> violated his Eighth Amendment rights.
>
> In response, the State agrees that the law prohibits a trial court
> from considering victim impact evidence regarding
> characterizations of the defendant, the crime, or appropriate
> punishment. However, the State's position is that although the trial
> judge did read the letters that are now at issue, he did not
> improperly "consider" them during the process of determining
> Land's sentence. The State asserts that the trial judge was an
> experienced judge and was well aware of the law regarding what
> factors he could consider in determining Land's sentence and was
> capable of sorting out and using only the information he could
> properly consider under the law.

*Ex parte Land*, 678 So. 2d at 236.

      The Alabama Supreme Court continued:

> Because Land failed to make a contemporaneous objection during his
> sentencing hearing when the trial judge stated that he had read the
> letters from Ms. Brown's family and friends, we review this issue
> under the plain error standard.

The trial judge stated the following during the sentencing hearing:

"[JUDGE HARD]: I have also received, as you know, additional correspondence from family members, *both [members of the] Brown family and [members of the] Land family.* I would like to thank each person who has written me from both sides for the heartfelt sentiments that you have forwarded to me, many of you. I appreciate it. Many of the comments were very disturbing, *but I thought very carefully about everything that's been written to me by every person.* Of necessity, I copied everything and gave it to the lawyers and Mr. Land.

". . . .

"[JUDGE HARD]: All right. Proceeding to the determination of sentence, as we know, we lawyers know that *I am to determine sentence based squarely on whether or not prevailing [sic] circumstances found to exist outweigh mitigating circumstances found to exist. I am to consider the jury's recommendation contained in their advisory verdict,* though, as we all understand, we are in a jury-override state and the jury's recommendation is not binding on the Court.

". . . .

"[JUDGE HARD]: *To mitigation.* Number one. . . .

". . . .

"[JUDGE HARD]: As I mentioned earlier, ladies and gentlemen, *I have carefully read every scrap of paper submitted to me, including* the Hillcrest discharge papers, Dr. Rosecran's findings, the pre-sentence report by Mr. Bryant, *the letters submitted by the respective families.* I have listened, of course, to the trial, first and second stage and, as well in October, comments of counsel, and I have reviewed the entire case, recalling the arguments given at the first and second stage and third stage in October.

"To conclude, I find no mitigating circumstance by way of 13A-5-52."

In *Ex parte McWilliams,* 640 So.2d 1015 (Ala.1993), this Court directed a new sentencing hearing where the record did not reveal whether the trial judge, in imposing the death sentence on the defendant, had improperly considered certain portions of victim-impact statements that contained the type of information involved in this case. In contrast, the record in this case indicates to this Court that

the trial court determined Land's sentence in a manner consistent with the procedure established by §§ 13A-5-47 to -52. The record indicates that the trial court reviewed the letters at issue, both those written by the victim's family and those written by Land's family, out of a respect for the families and for the limited purpose of possibly establishing a mitigating factor under § 13A-5-51 to be weighed in Land's favor at trial. We find no plain error in the actions of the trial court.

*Ex parte Land,* 678 So.2d at 236-237.

In Section I(c) above, this court noted that *Payne* overruled *Booth* in part.  Post-*Payne,* that  portion of *Booth* prohibiting presentation to the **jury** family members' opinions and characterizations of the crime was retained.  *United States v. Brown,*  441 F.3d 1330, 1351 (11th Cir. 2006) *cert. denied,* _____ U.S. _____, 127 S.Ct. 1149 (2007).  The Supreme Court in *Booth* described the emotionally charged information presented to the jury and explained why this information should not be presented to the jury:

> The second type of information presented to the jury in the VIS [victim impact statement] was the family members' opinions and characterizations of the crimes. The Bronsteins' son, for example, stated that his parents were "butchered like animals," and that he "doesn't think anyone should be able to do something like that and get away with it." App. 61. The VIS also noted that the Bronsteins' daughter "could never forgive anyone for killing [her parents] that way. She can't believe that anybody could do that to someone. The victims' daughter states that animals wouldn't do this. [The perpetrators] didn't have to kill because there was no one to stop them from looting. . . . The murders show the viciousness of the killers' anger. She doesn't feel that the people who did this could ever be rehabilitated and she doesn't want them to be able to do this again or put another family through this." *Id.*, at 62.

> One can understand the grief and anger of the family caused by the brutal murders in this case, and there is no doubt that jurors generally are aware of these feelings. But the formal presentation of this information by the State can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant. As we have noted, any decision to impose the death sentence must "be, and

> appear to be, based on reason rather than caprice or emotion."
> *Gardner v. Florida, supra*, at 358, 97 S.Ct., at 1204 (opinion of
> STEVENS, J.). The admission of these emotionally charged
> opinions as to what conclusions the jury should draw from the
> evidence clearly is inconsistent with the reasoned decisionmaking
> we require in capital cases.

482 U.S. at 508-09, 107 S.Ct. at 2535-36.

Letters from both Land's and the victim's friends and families were provided to the

sentencing *judge*.  The letters at issue in this petition were not introduced by the State, were

never before the jury, and were not emotionally charged.  The Alabama Supreme Court's finding

that the letters were reviewed out of respect for the families and "for the limited purpose of

possibly establishing a mitigating factor under § 13A-5-51" is supported by the record.  The trial

court's imposition of the death penalty was clearly based on reason, not caprice or emotion as

evidenced by the court's discussion of his findings of aggravating and mitigating circumstances.

The Alabama Supreme Court's decision that the letters were considered for the limited purpose

of assessing the possibility of mitigation is not an unreasonable finding of the facts based upon

the evidence nor is its decision contrary to or an unreasonable application of *Booth* and *Payne*.

The court, therefore, concludes that Land is not entitled to habeas relief on this claim.


III.(l).   <u>The claim that the trial court's erroneous instruction on the voluntariness of Land's
statement violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments
to the United States Constitution.</u>

While raised on direct appeal, neither the Alabama Court of Criminal Appeals nor the

Alabama Supreme Court addressed the claim that the trial court improperly charged the jury with

regard to which factfinder was to decide the voluntariness of Land's statements.  The trial judge

instructed the jury:

> With regard to the alleged statements made by the defendant to the officers, whether we are talking about the recorded statement or the alleged unrecorded statement, you should know that you may consider all of the facts and circumstances surrounding the taking of the statement in determining the weight or credibility that you give to the statement.
>
> In exercising your exclusive prerogative of determining the credibility of the evidence or the weight to which the evidence is properly entitled, you people may consider the circumstances under which the statement or statements were obtained, including the situation and the mutual relation to the parties.
>
> I determine the voluntariness of the statement, you people determine the weight and credibility of one's statement and may disregard a defendant's statement which is unworthy of belief or in which you entertain a reasonable doubt of its truth.

(TR. 1914-15).

Habeas relief based on a jury instruction is warranted only if "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991).

In his brief, Land criticizes respondent's failure to address *Ex parte Singleton*, 465 So.2d 443, 446 (Ala. 1985) and two federal circuit court cases cited therein. Land does not contend the United States Supreme Court has ever considered the issue. In *Ex parte Singleton*, the Alabama Supreme Court held that even though the trial court makes an initial determination of voluntariness, "[i]t is improper for a trial judge to disclose to the jury that he made a preliminary determination that a confession was voluntary and, therefore, admissible." 465 So.2d at 446. The challenged comment in *Singleton* was:

> Do you know yesterday when you were-the jury was out of here for a long period of time? It is incumbent upon the Court first to hear all of the testimony and first the Court must decide that it is a voluntary statement and that it is admissible into evidence. The

132

> Court first makes this determination, which I did, and I allowed the
> confession to be introduced. But, again, I am not the trier of the
> facts, you are. So, then the burden is upon the State to show you
> that it was a quote, voluntary statement. . . .

In finding no prejudicial error, the state supreme court in *Singleton* reasoned that because

the comments of the trial judge "did not imply that the jury should accept and believe appellant's

confession based on the trial court's ruling that the statement was voluntary," the trial judge made

it clear to the jury that they were to ultimately determine whether the confession was voluntary.

*Id*.

In *Ex parte Gaddy,* 698 So.2d 1150 (Ala.1997), *cert. denied*, 522 U.S. 1032, 118 S.Ct.

634, 139 L.Ed.2d 613 (1997), the Alabama Supreme Court was faced with an instruction

extremely similar to the one here:

> While I determine the voluntariness of the statement and thus you
> were allowed to hear it, the jury determines the weight or
> credibility and may disregard the defendant's statements which you
> deem to be unworthy of belief or in which you entertain a
> reasonable doubt as to its truth.

698 So. 2d at 1156 (emphasis omitted).

The court decided that although the instruction was partially erroneous, any error was harmless

because the trial court made it clear in its instruction that the jury was "to ultimately determine

whether the confession was voluntary" as "[t]he jury was informed that it could disregard

Gaddy's confession entirely if it decided to give no weight to the confession or if it found the

State's witnesses to be unworthy of belief." *Ex parte Gaddy*, 698 So.2d at 1158.

The Alabama Supreme Court's implicit decision that the jury instruction did not result in

a violation of due process is not contrary to nor did it involve an unreasonable application of law

133

as established by the United States Supreme Court.  Consequently, Land's habeas petition fails

on this claim.

III.(m). <u>The claim that the trial court prevented Land from a full cross-examination of important
state witnesses, depriving him of his rights under the Fifth, Sixth, Eighth, and Fourteenth
Amendments to the United States Constitution.</u>

    Land raised this issue in oral argument before the Alabama Supreme Court:

> At oral argument, Land argued to this Court that his
> cross-examination of Detective Fowler was improperly curtailed
> when the trial court would not allow him to question Fowler about
> the contents of an internal police memorandum outlining an
> anonymous tip that two persons other than Land may have been
> involved in Ms. Brown's murder. Land contends that the police
> were overly zealous in their investigation of him and that they
> failed to conduct a thorough investigation of other potential
> suspects. He now argues that the memorandum was admissible
> under the "public records exception" to the hearsay rule, relying on
> *Grantham v. State*, 580 So.2d 53 (Ala. Cr. App.1991),FN3 and,
> thus, he asserts that he should have been allowed to further
> cross-examine Fowler on the question whether there were other
> possible suspects. Land asserts that the trial court committed
> reversible error in limiting the scope of his cross-examination of
> Fowler because, he says, it prevented him from fully developing
> his defense and infringed upon his right to confront witnesses
> testifying against him. He contends that the court's action violated
> his rights guaranteed by the Fifth, Sixth, and Fourteenth
> Amendments to the United States Constitution and rights
> guaranteed by Alabama law.
>
> > 1.FN3. In *Grantham*, the Court of Criminal Appeals stated: "Sections
> > 12-21-35 and 36-18-2 [Ala.Code 1975] essentially establish a public
> > record exception to the hearsay rule that is similar in nature to the
> > business record exception found in § 12-21-43." 580 So.2d at 55.
>
> Land also argues that the trial court infringed on his right to full
> cross-examination when, he says, it prohibited defense counsel
> from asking leading questions of Detective Corvin. He contends
> that the court's action limiting cross-examination of Corvin
> violated his rights guaranteed by the Fifth, Sixth, Eighth, and
> Fourteenth Amendments to the United States Constitution and
> rights guaranteed by Alabama law.

In response, the State points out that Land's counsel was allowed, without objection, to ask Fowler whether he had seen the memorandum at issue and that counsel obtained a response indicating that he had seen it. The State notes that Land's counsel then attempted to elicit from Fowler a statement of the contents of the memorandum. It argues that the memorandum was clearly hearsay evidence and inadmissible, and that the trial court therefore did not err in preventing Land from further questioning Fowler regarding the contents of the memorandum.

*Ex parte Land*, 678 So. 2d at 239.

The Alabama Supreme Court then rejected this argument:

The Court of Criminal Appeals held that the trial court correctly ruled the internal police memorandum inadmissible hearsay. It stated: "'The general rule in Alabama is that an accused is not entitled to introduce testimony that someone else was suspected of committing the crime for which he is being tried.' " *Land*, 678 So.2d at 207 (quoting *Johnson v. State*, 612 So.2d 1288, 1293 (Ala. Cr. App.1992)).

With regard to Land's argument relating to his cross-examination of Detectives Fowler and Corvin, we note that the latitude and extent of cross-examination of witnesses rests within the sound discretion of the trial court and that the trial court's ruling on these matters will not be reversed except for an abuse of discretion. *Ex parte Pope*, 562 So.2d 131 (Ala.1989), *cert. denied*, 498 U.S. 841, 111 S.Ct. 118, 112 L.Ed.2d 87 (1990); *Beavers v. State*, 565 So.2d 688 (Ala. Cr. App.1990). We find no abuse of discretion with regard to the trial court's limitation on Land's cross-examination of Fowler with regard to the police memorandum. The contents of the memorandum were clearly hearsay reduced to a writing. Although Land argues that the memorandum was admissible under a "public records exception" to the hearsay rule, which he says is similar to the business records exception, we conclude that such an exception would not make the document admissible, and admissibility was required in order for Land to be entitled to further question Fowler about the document. Exceptions to the hearsay rule will not make admissible into evidence documents that are inadmissible for reasons other than the fact of their hearsay nature. *Gullatt v. State*, 409 So.2d 466 (Ala. Cr. App.1981). In this case, the evidentiary rule relating to testimony about other suspects, which the Court of Criminal Appeals relied upon and which is quoted above, made the

135

> memorandum inadmissible. The trial court did not abuse its
> discretion in limiting Land's cross-examination of Detective
> Fowler.
>
> Similarly, we find no abuse of discretion by the trial court with
> regard to Land's cross-examination of Detective Corvin. The trial
> court did sustain a "leading question" objection by the prosecution
> to a question asked of Corvin by defense counsel. However, we
> conclude that the one ruling by the trial court now complained of
> by Land did not prevent his counsel from conducting a thorough
> and sifting cross-examination of Corvin. The record contains an
> additional 30 pages of questioning of Corvin by defense counsel
> following the trial court's ruling that Land now claims abridged his
> constitutional rights.

*Ex parte Land,* 678 So.2d at 239-240.

The Supreme Court has explained how cross-examination relates to the Confrontation

Clause:

> The Sixth Amendment's Confrontation Clause provides: "In all
> criminal prosecutions, the accused shall enjoy the right . . . to be
> confronted with the witnesses against him." This right is secured
> for defendants in state as well as in federal criminal proceedings.
> *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923
> (1965). The Court has emphasized that "a primary interest secured
> by [the Confrontation Clause] is the right of cross-examination."
> *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13
> L.Ed.2d 934 (1965). The opportunity for cross-examination,
> protected by the Confrontation Clause, is critical for ensuring the
> integrity of the fact-finding process. Cross-examination is "the
> principal means by which the believability of a witness and the
> truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308,
> 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). . . .
>
> "The primary object of the constitutional provision in question was
> to prevent depositions or *ex parte* affidavits . . . being used against
> the prisoner in lieu of a personal examination and
> cross-examination of the witness in which the accused has an
> opportunity, not only of testing the recollection and sifting the
> conscience of the witness, but of compelling him to stand face to
> face with the jury in order that they may look at him, and judge by

136

his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."

*Mattox v. United States*, 156 U.S. 237, 242-243, 15 S.Ct. 337, 839, 39 L.Ed. 409 (1895).  See also *Kirby v. United States*, 174 U.S. 47, 53, 19 S.Ct. 574, 576, 43 L.Ed. 890 (1899).

. . . .

[T]he Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S., at 20, 106 S.Ct., at 294 (emphasis in original). This limitation is consistent with the concept that the right to confrontation is a functional one for the purpose of promoting reliability in a criminal trial.

"A defendant's confrontation rights are satisfied when the cross-examination permitted exposes the jury to facts sufficient to evaluate the credibility of the witnesses and enables defense counsel to establish a record from which he can properly argue why the witness is less than reliable." *U.S. v. Baptista-Rodriguez,* 17 F.3d 1354, 1371 (11th Cir. 1994).  "Once a defendant has engaged in sufficient cross-examination to satisfy the Confrontation Clause, further questioning is within the trial court's discretion." *Mills v. Singletary*, 161 F.3d 1273, 1288 (11th Cir.  1998).

*Kentucky v. Stincer,*  482 U.S. 730, 736-739, 107 S.Ct. 2658, 2662-64, 96 L.Ed.2d 631 (1987).

At trial, the jury heard the following:

Q [by Mr. Dodd]:      Do you recognize that document?

A [by Detective Fowler]:      It's a inter-office memo from Lieutenant Dunn.

Q:      You have seen that before?

A:      Yes, sir.

Q:      Rayford Higgenbotham, did you ever talk to him?

A:      No, sir.

Q:      Eugene Brasher, did you ever talk to him?

A:      No, sir.

Q:      Was it your information based on this inter-office memo that Rayford
        Higgenbotham –

        MR. ANDERTON:      Objection, Your Honor.  I object to the hearsay testimony.

        THE COURT:         You're right.  Do you want to talk to me about that letter or
                           do you want to finish your question for the record?

        MR. DODD:          I think this is the last question I am going to ask, Judge, but
                           I don't –

        THE COURT:         Start over and ask your question.

Q:      Number one, did you ever talk to Rayford Higgenbotham?

A:      No, sir.

Q:      Did you ever talk to Eugene Brasher?

A:      No, sir.

Q:      Did you receive information about these two individuals as a result of an
        inter-office memo?

        MR. ANDERTON:      Objection.

        THE COURT:         Okay.  Did you receive information or not, yes or no?

        THE WITNESS:       Yeah, during the course of the investigation that memo was
                           sent up.

        MR. DODD:          Judge, I don't know of any way to do it –

        THE COURT:         Well, it's not admissible, Hiram.

        MR. DODD:          Judge, I beg to differ with you.

        THE COURT:         Let's do that out of the jury's presence.

        MR. DODD:          Yes, sir.  We would ask to do it right now.

THE COURT:          All right, we shall.  Would you retire to the jury room for just a moment?

. . . .

BY MR. DODD:

Q:      Mr. Fowler, as a result of your investigation as the chief investigating officer involved in the disappearance and death of Candace Brown, did you ever interview any other suspect other than Jeff Land --

A:      No, sir.

Q:      – in regard to this case?

A:      No, sir.

Q:      To your knowledge did any other police officer that was involved in this investigation interview any other suspects --

A:      No, sir.

Q:      – in this investigation?

A:      No, sir.

(TR. 906-15).

The jury heard that during the course of the investigation an interoffice memo containing information about Rayford Higgenbotham and Eugene Brasher was received but that the police did not talk to either man or to any suspect other than Land.

During cross-examination of Detective Corvin, defense counsel asked numerous questions concerning the facts surrounding the statements given by Land.  The court sustained the prosecutor's leading question objection to the following question: "The first statement that he made that was recorded, Mr. Corvin, that statement would not in any way support any search

139

of Jeff Land's car, would it?"  Land does not complain that he was prevented from asking any other questions.

The record makes clear that the defense had an opportunity for effective cross-examination.  The fact that the defense was not able to introduce the memo that was inadmissible as hearsay or ask a particular leading question does not establish a violation of Land's right to confrontation.  The evidentiary rulings did not affect the fundamental fairness of the trial.  The Alabama Supreme Court's decision was not based on an unreasonable application of United States Supreme Court law.  Therefore, Land has not established a right to habeas relief on this claim.

III.(n).  <u>The claim that the trial court's failure to grant a mistrial after the introduction by the prosecution of testimony of a wild animal observed near the victim's corpse deprived Land of his rights to a fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.</u>

As discussed in Section I(b) above, Land challenged the prosecutor's elicitation of testimony concerning a photograph of a fox taken at the crime scene where the victim's body was found.  He now argues that the trial court's refusal to order a mistrial after this testimony is grounds for habeas relief.  The Alabama Court of Criminal Appeals discussed the mistrial issue in the context of prosecutorial misconduct.

> The appellant contends that "[t]he prosecution improperly elicited testimony that was calculated to be inflammatory, prejudicial, and impossible to cure."
>
> (Appellant's brief at 92).
>
> This argument relates to testimony concerning a photograph of a fox taken at the rock quarry where the victim's body was found. Detective Larry Fowler testified that, on the morning of May 20, he went to the rock quarry at Ruffner Mountain where the victim's body had been found. Fowler then identified 25 photographs taken

140

at the scene. The prosecutor presented these photographs to
Fowler in groups of 3 to 5. When the last group of photographs
was shown to Fowler, the following occurred:

"Q.     [By the prosecutor:] State's Exhibit 37, 38, 39, and 43, can you tell
        us what those items are, please, sir?

"A.     Yes, sir. 37 is a photograph of the rocks that the victim was lying
        on. 38 is another photograph of the rocks where the victim was
        lying. And 39 is also a photograph of the rocks where the victim
        was lying. 43 is a photograph of a fox.

"Q.     Can you tell us where the fox was seen?

        "MR. DODD [defense counsel]: Excuse me, Judge, objection.
        That has absolutely nothing to do with this case and that's why we
        wanted to object in advance. It has absolutely no evidentiary value.
        We object.

        "THE COURT: We'll discuss it over lunch. Don't want to argue in
        front of the jury.

        "MR. MATHIS [defense counsel]: We would move that any
        further discussion of that particular photograph be curtailed at this
        time.

        "THE COURT: Sure."

(R. 805-06).

Although the prosecutor immediately thereafter asked Detective
Fowler if "State's Exhibit Number 37, 38, 39, and 43 truly and
accurately depict[ed] the scene as it appeared out there on the 20th
where the body of Candace Brown was found," (R. 806-07), no
further mention was made before the jury of the fox.

When the jury recessed for lunch, the attorneys and the trial judge
discussed the admissibility of the photographs identified by
Fowler. With regard to State's Exhibit 43, the following occurred:

        "MR. DODD: State's 43 is depicting the fox. We objected
        at the time, Your Honor. We would object again, [it]
        absolutely has no value in this case and should not have
        been admitted. And furthermore-

"THE COURT: It is not admitted.

"MR. DODD: -we would move again for a mistrial for it being mentioned. FN3

> FN3.    We note that this is the first request for a mistrial with regard to State's Exhibit 43.

"THE COURT:          Overrule."

(R. 830-31) (footnote added).

The prosecutor then argued that the photograph was relevant to show "that had this body been out there another half a day, the wild animals would have been working on this body," (R. 834), and he elicited testimony from Fowler in an attempt to support his argument. However, the trial court adhered to its ruling that the photograph was not to be admitted. The defense then renewed its motion for a mistrial:

> "MR. DODD: Judge, we would renew our motion for a mistrial. And I'm glad Mr. Anderton [the prosecutor] pointed out what he was attempting to show to the jury because that's just what the jury would have garnered from that. It's already before the jury, no reason for that picture to ever be presented before this jury or testimony about a fox or any other thing other than evoke emotion from that jury that that poor deceased girl out there might have been eaten by some wild animal, which has absolutely nothing to do with this case. And it has absolutely prejudiced this jury and we would move for a mistrial."

(R. 835).

The trial court again denied the motion.

 "[A] mistrial 'specifies such fundamental error in a trial as to vitiate the result,' *Diamond v. State*, 363 So.2d 109, 112 (Ala. Cr. App.1978), and should be granted only when a 'high degree of "manifest necessity" ' is demonstrated, *Wadsworth v. State*, 439 So.2d 790, 792 (Ala. Cr. App.1983), *cert. denied*, 466 U.S. 930, 104 S.Ct. 1716, 80 L.Ed.2d 188 (1984)." *Garnett v. State*, 555 So.2d 1153, 1155 (Ala. Cr. App.1989).  If any error occurred by the mere mention of the fox, it was clearly not the fundamental error that is required for the granting of a mistrial. The photograph

was never admitted, and there were only two brief references to the fox made before the jury. The trial court granted defense counsel's request that "further discussion of that particular photograph be curtailed at this time," and the fox itself was never again mentioned in the jury's presence.

Although the pathologist testified that the victim's body bore marks that might have been the result of insect bites, there was absolutely no indication that the body had been despoiled in any way by wild animals.  Moreover, the place where the body was found was clearly an undeveloped area and one might expect that wild animals could be seen there.  In view of these facts and the fact that there were almost 1200 pages of trial testimony, it is doubtful that the two brief references to the fox made much of an impression upon the jurors. See *Rowell v. State*, 647 So.2d 67, 69-70 (Ala. Cr. App.1994). Under the facts of this case, including the strong evidence presented by the State, any error occasioned by the references to the fox was clearly harmless. See generally *Ex parte Greathouse*, 624 So.2d 208, 210-11 (Ala.1993). *Cf. State v. Johnson*, 298 N.C. 355, 259 S.E.2d 752, 765 (1979) (introduction of photographs depicting body of child victim when found some two months after the murder, which had been dismembered by wild animals was "harmless error beyond a reasonable doubt in the guilt determination phase of the trial").

*Land v. State,* 678 So.2d at 219-20.

This claim is related to the prosecutorial misconduct claim addressed in section I(b)

above.  The Eleventh Circuit Court of Appeals has explained the habeas review standard for

claims based on evidentiary rulings:

Federal courts generally do not review a state court's admission of evidence in habeas corpus proceedings. *See McCoy v. Newsome,* 953 F.2d 1252, 1265 (11th Cir.), *cert. denied,* 504 U.S. 944, 112 S.Ct. 2283, 119 L.Ed.2d 208 (1992). We will not grant federal habeas corpus relief based on an evidentiary ruling unless the ruling affects the fundamental fairness of the trial. *See Baxter v. Thomas,* 45 F.3d 1501, 1509 (11th Cir.) (stating that we "inquire only to determine whether the error was of such magnitude as to deny fundamental fairness to the criminal trial.") (citations omitted), *cert. denied,* 516 U.S. 946, 116 S.Ct. 385, 133 L.Ed.2d 307 (1995); *McCoy,* 953 F.2d at 1265. "A denial of fundamental

> fairness occurs whenever the improper evidence 'is material in the
> sense of a crucial, critical, highly significant factor.' " *Snowden v.*
> *Singletary,* 135 F.3d 732, 737 (11th Cir.1998) (quoting *Osborne v.*
> *Wainwright,* 720 F.2d 1237, 1238 (11th Cir.1983)), *cert. denied,*
> 525 U.S. 963, 119 S.Ct. 405, 142 L.Ed.2d 329 (1998).

*Mills v. Singletary,* 161 F.3d 1273, 1289 (11th Cir. 1998), *cert. denied,* 528 U.S. 1082, 120 S.Ct. 804, 145 L.Ed.2d 677 (2000).

"The decision whether or not to grant a mistrial is within the sound discretion of the trial court." *Untied States v. Brooks*, 670 F.2d 148, 152 (11th Cir. 1982), *cert. denied*, 457 U.S. 1124, 102 S.Ct. 2943, 73 L.Ed.2d 1339(1982). As discussed in Section I(b) above, the court did not admit the photograph of the fox, and the Alabama Court of Criminal Appeals did not unreasonably apply Supreme Court law by deciding that the mere mention of the fox did not violate due process.

Although the court gave no curative instruction, none was requested, and the fox was not mentioned before the jury again. The decision of the Alabama Court of Criminal Appeals that the trial court's denial of a mistrial did not affect the fundamental fairness of the trial was not contrary to nor was it based on an unreasonable application of Supreme Court law. Land's petition for habeas relief on this claim, therefore, is denied.

III.(o).  The claim that the trial court failed to excuse jurors Hightower and Holloway as unfit to serve in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Land raised this issue before the Alabama Supreme Court, which addressed it in the following manner:

> Land argues that the trial court committed reversible error when it
> denied defense motions to excuse two prospective jurors for cause.
> Land argues that prospective Juror P.H. should have been
> dismissed for cause because, Land says, voir dire questioning
> revealed that he had significant knowledge about the case and that

he had a significant potential for bias against Land arising from a sympathy for Ms. Brown's son. Land argues that prospective Juror W.H. should have been dismissed for cause because, he says, during voir dire W.H. expressed an unequivocal belief that once a person is found guilty of capital murder that person should be put to death and that life without parole should not be considered. Land argues that any later "rehabilitation" of W.H. was a response learned by W.H. after observing other similarly opinionated prospective jurors being struck from the jury panel.

In response, the State argues that prospective Juror P.H. did not need to be struck for cause because he indicated only that he had read the newspaper every day and recalled sketchy facts of the case, but did not know any specifics of it. The State argues that prospective Juror W.H. did not need to be struck for cause during questioning by the trial court because he clearly expressed his opinion that the death sentence was not appropriate in every murder case and that each case should be judged on its own merits. In sum, the State contends that there was no statutory ground on which to strike either of these prospective jurors for cause and that they did not show an absolute bias against Land or a fixed opinion as to his guilt or as to the application of the death penalty.

Even though a prospective juror may initially admit to a potential for bias, the trial court's denial of a motion to strike that person for cause will not be considered error by an appellate court if, upon further questioning, it is ultimately determined that the person can set aside his or her opinions and try the case fairly and impartially, based on the evidence and the law. *Knop v. McCain,* 561 So.2d 229 (Ala.1989); *Siebert v. State,* 562 So.2d 586 (Ala. Cr. App.1989), *affirmed,* 562 So.2d 600 (Ala.), *cert. denied,* 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990); *Perryman v. State,* 558 So.2d 972 (Ala. Cr. App.1989). Only when a prospective juror's testimony indicates a bias or prejudice so fixed or deep-seated that that person cannot be impartial and objective must a challenge for cause be granted by the trial court. *Knop, supra;* *Siebert, supra; Perryman,* supra. Finally, a trial court's ruling on a motion to strike a juror for cause, based on an allegation of juror bias, is entitled to great weight and will not be disturbed on appeal unless it is shown that the court clearly abused its discretion. *Forehand v. State,* 624 So.2d 688 (Ala. Cr. App.1993); *Siebert, supra*.

After thoroughly reviewing the record, we conclude that the voir

145

> dire testimony of both P.H. and W.H. clearly indicates they could
> try the case fairly and impartially. Neither prospective juror
> expressed a deep-seated or fixed bias or prejudice that would have
> required a strike for cause. Accordingly, the trial court did not err
> in denying Land's motions.

*Ex parte Land,* 678 So.2d at 240-241.

In support of his claim, Land now cites *Morgan v. Illinois*, 504 U.S. 719, 729-30, 112

S.Ct. 2222, 119 L.Ed.2d 492  (1992).  In *Morgan*, the United States Supreme Court stated:

> [*Wainwright v.*] *Witt*, [469 U.S. 412, 423, 105 S.Ct. 844, 851-852,
> 83 L.Ed.2d 841 (1985)] *Witt* held that "the proper standard for
> determining when a prospective juror may be excluded for cause
> because of his or her views on capital punishment . . . is whether
> the juror's views would 'prevent or substantially impair the
> performance of his duties as a juror in accordance with his
> instructions and his oath.' " 469 U.S., at 424, 105 S.Ct., at 852
> (quoting *Adams v. Texas*, *supra*, 448 U.S., at 45, 100 S.Ct., at
> 2526). Under this standard, it is clear from *Witt* and *Adams*, the
> progeny of *Witherspoon* that a juror who in no case would vote for
> capital punishment, regardless of his or her instructions, is not an
> impartial juror and must be removed for cause.
>
> Thereafter, in *Ross v. Oklahoma*, [487 U.S. 81, 88-89 (1988)], a
> state trial court refused to remove for cause a juror who declared
> he would vote to impose death automatically if the jury found the
> defendant guilty. That juror, however, was removed by the
> defendant's use of a peremptory challenge, and for that reason the
> death sentence could be affirmed. But in the course of reaching
> this result, we announced our considered view that because the
> Constitution guarantees a defendant on trial for his life the right to
> an impartial jury, 487 U.S., at 85, 108 S.Ct., at 2276-2277, the trial
> court's failure to remove the juror for cause was constitutional
> error under the standard enunciated in *Witt*. We emphasized that
> "[h]ad [this juror] sat on the jury that ultimately sentenced
> petitioner to death, and had petitioner properly preserved his right
> to challenge the trial court's  failure to remove [the juror] for
> cause, the sentence would have to be overturned." 487 U.S., at 85,
> 108 S.Ct., at 2277 (citing *Adams, supra*).
>
> We reiterate this view today. A juror who will automatically vote
> for the death penalty in every case will fail in good faith to

> consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.

*Morgan,* 504 U.S. at 728-29, 112 S.Ct. at 2229-30.

A habeas petitioner may rightfully complain of a trial court's denial of his challenges for cause when those venire members actually sit on the jury. *Heath v. Jones*, 941 F.2d 1126, 1133 (11th Cir.1991) *cert. denied*, 502 U.S. 1077, 112 S.Ct. 981, 117 L.Ed.2d 144 (1992). Where, however, the defense elects to use a peremptory challenge to remove a potential juror, he cannot later claim a constitutional violation absent deliberate misapplication of the law. *United States v. Martinez-Salazar*, 528 U.S. 304, 316, 120 S.Ct. 774, 782, 145 L.Ed.2d 792 (2000) ("In choosing to remove [juror] rather than taking his chances on appeal, *Martinez-Salazar* did not lose a peremptory challenge. Rather, he used the challenge in line with a principal reason for peremptoriness: to help secure the constitutional guarantee of trial by an impartial jury.")

Neither of the challenged veniremen was on the jury because the defense struck both Hightower, prospective juror # 144, and Holloway, prospective juror #152. (R.197, 208, 664).[21] The Alabama Supreme Court's implicit decision that Land was not deprived of due process was not based on an unreasonable application of *Morgan, Ross* and *Martinez-Salazar.* The court denies Land's habeas petition on this claim.

---

[21]   When juror Cooper was removed after it was determined that she had written the note referred to in section III(j) she was replaced by juror Seal. (R. 2062, 2064, 2070-71).

III.(p).   <u>The claim that the trial court's instructions undermined the presumption of innocence and deprived Land of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.</u>

On direct appeal, the Alabama Court of Criminal Appeals held:

> The appellant complains that the trial court's instructions to the jury gave "more weight to a finding of guilty rather than one of not guilty." Appellant's brief at 107.
>
> With the explicit consent of defense counsel, the trial court delivered the jury instructions in two segments-one segment preceded the closing arguments of the attorneys and the other segment followed the closing arguments.FN4 The trial court began the first segment by instructing the jury that the statements of counsel were not evidence. He then stated:
>
>> FN4.   When the defense rested, the trial court asked the prosecutor if he had any rebuttal. The prosecutor responded, "No, sir." R. 1894. The following then occurred:
>>
>> "THE COURT: Do we understand that I'll go first, is that all right with you guys, in my comments to the jury?
>>
>> "MR. MATHIS [defense counsel]: Yes, sir.
>>
>> "THE COURT: I'll bring it up to the charges and I'll be the first to tell them about the lesser offenses and then I'll turn it over to you fellows and I'll conclude with the charges and a rehash of what I first gave them.
>>
>> "MR. DODD [defense counsel]: Yes, sir.
>>
>> ". . . .
>>
>> "THE COURT: Mike [Anderton, the prosecutor], is that all right with you?
>>
>> "MR. ANDERTON: Yes, sir."
>
> (R. 1894-95).
>
> "Michael Jeffrey Land, the defendant in the case, is presumed to be not guilty. The lawyers talked with you about that. I think a couple of jurors perhaps in the group were asked specific questions about it, I'm not sure.

148

"He is presumed to be not guilty. No burden of proof rests on Michael Jeffrey Land here in the litigation. The burden of persuasion, the burden of going forward with the evidence is on the State of Alabama, the prosecuting governmental entity.

"The fact that Mr. Land is here as the defendant, he enjoys the presumption of innocence, that's evidence in his behalf. That is evidence in his behalf here in the case.

"What does the State have to do in order to overcome or override the presumption of innocence that Michael Jeffrey Land enjoys? The State has to bring you strong and cogent evidence that convinces you people beyond a reasonable doubt of his guilt in order to overcome the presumption of innocence."

(R. 1902-03).

The court then explained the State's burden of proof, defined reasonable doubt, and instructed the jury that the indictment was not evidence or an indication of guilt. The trial judge informed the jury that it was the "sole and exclusive judge of the weight and sufficiency of the evidence," (R. 1909-10), and gave instructions regarding the credibility of witnesses.

At this point, the court again instructed the jury on the State's burden of proof and reasonable doubt, then stated:

> "The presumption of innocence that we have discussed at length here is to be regarded by you people as a matter of evidence, as I said, to the benefit of which Michael Jeffrey Land here is entitled. And as a matter of evidence, it attends Michael Jeffrey Land throughout the course of the litigation until his guilt is by the evidence placed beyond a reasonable doubt."

> (R. 1917).

The trial judge then instructed the jury on direct and circumstantial evidence. He concluded the first segment of instructions with brief descriptions of the charges contained in the indictment and of the lesser offenses included in those charges.

After the attorneys made their closing arguments, the trial court gave the second, and final, segment of the jury instructions. In this

segment, the trial court instructed the jury on the elements of the capital offenses charged in the indictment-intentional murder during the course of a burglary and intentional murder during the course of a kidnaping – and on the lesser offenses included within each charge – felony murder, intentional murder, and first and second degree burglary and felony murder and intentional murder, respectively. With regard to each of the charged offenses and the lesser offenses included within each charge, the trial court repeatedly stated that, in order to convict the appellant, the jury must be convinced of his guilt beyond a reasonable doubt.

The trial judge then instructed the jury that its verdict must be unanimous and that the jury would be polled when it returned the verdict. After mentioning the verdict forms and briefly explaining the role of the foreperson, the trial court stated:

> "Don't forget some of the preliminaries: Presumption of innocence that attends Mr. Land, he is presumed to be not guilty. The burden of proof is on the State, it does not shift to the defendant at any point in the litigation. The State having to prove guilt beyond a reasonable doubt, we talked at length about that."

> (R. 2050-51).

The trial judge reminded the jury that he had previously instructed it with regard to the credibility of witnesses and circumstantial evidence. The judge then concluded by reiterating:

> "[T]he State's burden is to always establish beyond a reasonable doubt each of the elements of the offenses charged, including the involvement of the defendant. The burden of proof does not shift to a defendant who asserts through his witnesses that he was elsewhere at the time and occasion of the events complained of."

> (R. 2053-54).

The appellant contends that he was prejudiced by the trial court's "order and manner of giving the charge" in that "the two parts [of the charge were] . . . divided so that the part of the charge that favor[ed] the defendant [wa]s given at the first part of the charge," while in the last part of the charge, which was given after the

150

closing arguments, "the phrase 'not guilty' [wa]s used [only] four times." (Appellant's brief at 107).  This claim is without merit.

Rule 21.1, A.R.Crim.P., provides, in pertinent part: "The court shall inform counsel of its proposed action upon [any written] requests [for jury instructions] prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed." (Emphasis added.)  By giving one segment of the jury instructions before the closing arguments, the trial judge in this case violated the letter of Rule 21.1. However, he did so with the express consent of defense counsel. More importantly, the appellant was not prejudiced by this action.

This Court must review the jury instructions given by a trial court as a whole. *Beard v. State*, 612 So.2d 1335, 1344 (Ala. Cr. App.1992); *Williams v. State*, 611 So.2d 1119, 1123 (Ala. Cr. App.1992). The instructions in this case, when considered as a whole, accurately stated the principles of law and the issues involved. In the first segment of these instructions, the trial court clearly and adequately covered the presumption of innocence. See, e.g., *Grace v. State*, 456 So.2d 862, 864 (Ala. Cr. App.1984); *Brooks v. State*, 380 So.2d 1012, 1014 (Ala. Cr. App.1980). Near the end of the second segment, the trial court again reminded the jury that the appellant was presumed innocent. Throughout both segments, the court stressed to the jury that the State had the burden of proof. The instructions as a whole were both fair and accurate.

*Land v. State*,  678 So.2d at 220-22.

The Eleventh Circuit Court of Appeals has set forth the habeas review standard when

jury instructions are challenged:

Federal habeas relief is unavailable "for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990)). A jury instruction that "was allegedly incorrect under state law is not a basis for habeas relief," *Id*. at 71-72, 112 S.Ct. at 482, because federal habeas review "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id*. at 68, 112 S.Ct. at 480. Unlike state appellate courts, federal courts on habeas review are constrained to determine only whether

> the challenged instruction, viewed in the context of both the entire
> charge and the trial record, " 'so infected the entire trial that the
> resulting conviction violate[d] due process.' " *Id*. at 72, 112 S.Ct.
> at 482 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct.
> 396, 400-01, 38 L.Ed.2d 368 (1973)).

*Jamerson v. Secretary for Dept. of Corrections*,  410 F.3d 682, 688 (11th Cir. 2005).

The mere splitting of the jury instructions did not so infect the trial such that the conviction

violated due process.  The decision of the Alabama Court of Criminal Appeals was not contrary

to nor did it involve an unreasonable application of clearly established federal law.  The charges

as a whole did not result in a violation of due process.  See *Jamerson*, 410 F.3d at 688.

Therefore NCP fails.


III.(q).  <u>The claim that the trial court deprived Land of an individualized sentencing when it
ignored unrebutted non-statutory mitigating circumstances in violation of his rights under
the Eighth and Fourteenth Amendments to the United States Constitution.</u>

Land alleges that the trial court failed to consider as non-statutory mitigating

circumstances the unrebutted factors contained in records from Hillcrest Mental Health Facility

regarding Land's treatment in 1986.  Those records reflected that Land (1) suffered from a

conduct disorder; (2) had an unstable home environment since at least age ten; (3) had

significant impulse control problems; (4) had no father figure; and (5) had not had contact with

his natural father since he was very young.

In reviewing this challenge, the Alabama Supreme Court stated:

> Land contends, for the first time, that he was deprived of his rights
> guaranteed by the Eighth and Fourteenth Amendments to the
> United States Constitution and rights guaranteed by Alabama law,
> to a reliable sentencing determination when, he says, the trial court
> ignored what he calls an unrebutted nonstatutory mitigating
> circumstance. Land argues that this unrebutted nonstatutory
> mitigating circumstance is shown by information contained in
> records from the Hillcrest mental facility regarding his treatment

there in June 1986. Land stresses five bits of information
contained in the reports: (1) that he suffered from a conduct
disorder, (2) that he had an unstable home environment, (3) that he
had significant impulse control problems, (4) that he had no father
figure, and (5) that he had no contact with his natural father. Land
argues that the trial court erred by simply holding that this
information did not rise to the level of indicating a statutory
mitigating circumstance, without considering it to indicate a
nonstatutory one.

In response, the State argues that although the law requires that a
sentencing authority must not be precluded from considering any
mitigating evidence, a trial court is not required to list the
evidence it considers in determining the existence or nonexistence
of nonstatutory mitigating factors. It notes that in this case the trial
court clearly stated in its sentencing order that it did consider
Land's records from Hillcrest and, thus, that it must have
considered the information Land now emphasizes. The State
contends that it was not error for the trial court to consider the
Hillcrest records without finding the existence of a nonstatutory
mitigating circumstance.

In *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57
L.Ed.2d 973 (1978), the Supreme Court stated that "the Eighth and
Fourteenth Amendments require that the sentencer, in all but the
rarest kind of capital case, not be precluded from considering, *as a
mitigating factor*, any aspect of a defendant's character or record
and any of the circumstances of the offense that the defendant
proffers as a basis for a sentence less than death." (Emphasis
original, footnote omitted.)

In *Haney v. State*, 603 So.2d 368, 389 (Ala. Cr. App.1991),
*affirmed*, 603 So.2d 412 (Ala.1992), *cert. denied*, 507 U.S. 925,
113 S.Ct. 1297, 122 L.Ed.2d 687 (1993), the Court of Criminal
Appeals stated the following with regard to nonstatutory
mitigating factors:

*"It is not required that the evidence submitted by the accused as a
nonstatutory mitigating circumstance be weighed as a mitigating
circumstance by the sentencer*, in this case, the trial court;
although consideration of all mitigating circumstances is required,
the decision of whether a particular mitigating circumstance is
proven and the weight to be given it rests with the sentencer."

(Emphasis added.)

> The trial court's sentencing order specifically stated that the court
> had reviewed the Hillcrest records Land now highlights. In fact, in
> his order the trial judge quoted a portion of those records
> summarizing Land's history and his condition on discharge.
> Although the trial court did not find that any of the circumstances
> described in the Hillcrest records qualified as statutory mitigating
> factors, it is clear to this Court that the trial court did consider that
> information when it determined Land's sentence. Thus, we find no
> plain error in the trial court's sentencing of Land.

*Ex parte Land*, 678 So.2d at 241.

In imposing the sentence, the trial court considered the seven statutory mitigating

circumstances.  (TR. 2175-82).  The court then stated:

> Returning to the eighth mitigating circumstances, inclusion of
> defendant's character, record, et cetera.  It's well known that the
> defendant is the eldest son of Gail Land, a Birmingham police
> officer, which to my knowledge has an unblemished record of
> service to the community through her years of service on the
> Force.  Gail and the defendant's biological father were divorced
> apparently when the subject was a young child.  Ms. Land
> divorcing the stepfather when Mr. Land was about 10.  According
> to the Hillcrest discharge information, the defendant began acting
> out during adolescence, stealing cars at 14 or so, arrested for
> kidnapping, numerous runaways from home, committed to DYS,
> obtaining his GED at Mt. Meggs [sic] on a juvenile commitment.
>
> As I mentioned earlier, ladies and gentlemen, I have carefully read
> every scrap of paper submitted to me, including the Hillcrest
> discharge papers, Dr. Rosecran's findings, . . . .
>
> To conclude, I find no mitigating circumstance by way of 13A-5-
> 52.

(TR. 2182-2184).

The Alabama Supreme Court recognized the governing holdings of the Supreme Court.

The Alabama Supreme Court also correctly recognized that the trial court considered the

Hillcrest records.  The trial court considered the factors identified in the Hillcrest report in its

analysis under 13A-5-52, which allows the court to consider any mitigating circumstances not specifically enumerated in 13A-5-51.

The Alabama Supreme Court's decision that the trial court considered the non-statutory mitigating circumstances was not based on an unreasonable determination of the facts in light of evidence presented at the sentencing.  The decision was not contrary to nor did it involve an unreasonable application of *Lockett* and its progeny.  Consequently, the court denies Land's habeas petition on this claim.


III.(r).  The claim that the trial court's refusal to allow the use of a jury questionnaire or individual voir dire deprived Land of his rights to a fair and impartial jury in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Land raised this issue before the Alabama Supreme Court which stated:

> Land also argues that the trial court's refusal to allow the use of a jury questionnaire form or individual voir dire prevented him from selecting a fair and impartial jury and, thus, violated his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and rights guaranteed by Alabama law. He contends that the use of a jury questionnaire, or individual voir dire examination of prospective jurors, was required in order for him to be able to conduct an effective voir dire designed to detect bias arising from pretrial publicity, without contaminating the entire venire. Land argues that the group voir dire, in which he says 33 of 56 members of the venire responded by indicating that they had been crime victims, left every prospective member of the jury with a greater sense of vulnerability to crime. Land contends that these discussions created an atmosphere of hostility toward him and destroyed any chance of a fair trial. Land also argues that group voir dire examination had the prejudicial effect of "training" members of the venire on how to answer questions relating to the use of the death penalty, in such a way as to avoid being struck for cause.

> In response, the State argues that although the trial court did not permit individual sequestered voir dire examination or the use of a

jury questionnaire the record shows that the trial court allowed extensive group voir dire examination on the questions of possible prejudice arising out of pre-trial publicity, as well as questions concerning the prospective jurors' views about the death penalty. The State contends that the trial court took adequate steps to ensure that Land would be judged by a fair and impartial jury and that the failure to use the voir dire examination procedure Land now argues was necessary was not reversible error.

A trial court is vested with great discretion in determining how voir dire examination will be conducted, and that court's decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion. *Fletcher v. State,* 291 Ala. 67, 277 So.2d 882 (1973); *Lane v. State,* 644 So.2d 1318 (Ala. Cr. App.1994); *Harris v. State,* 632 So.2d 503 (Ala. Cr. App.1992), *affirmed,* 632 So.2d 543 (Ala.1993), *affirmed,* 513 U.S. 504, 115 S.Ct.1031, 130 L.Ed.2d 1004 (1995). After reviewing the record, we conclude that the trial court did not abuse its discretion in this regard.

*Ex parte Land*, 678 So.2d at 241-242.

As the Supreme Court has noted, "the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639,1642 , 6 L.Ed. 2d 751 (1961). The court specifically addressed voir dire:

[V]oir dire "is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." The Constitution, . . . does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury. Even so, part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors.

[Citations omitted] *Morgan v. Illinois,* 504 U.S. 719, 729, 112 S.Ct. 2222, 2230, 119 L.Ed.2d 492 (1992).

Land argues that the Alabama Supreme Court's finding of no abuse of discretion in voir dire was based on an unreasonable determination of the facts presented at trial. The court, the prosecutor and defense counsel questioned the prospective jurors. Land has not alleged that he was denied an opportunity to question jurors concerning a particular subject matter. Land has not complained of the adequacy of the voir dire, only the form. Sequestered voir dire or questionnaire as proposed by Land is not constitutionally required. An independent review of the voir dire (TR. 374-653) makes clear that the voir dire protected Land's due process right to an impartial jury. The state supreme court's finding of no abuse of discretion was not based on an unreasonable determination of the facts presented in voir dire. Land's habeas petition on this claim, therefore, fails.

III.(s).   The claim that the trial court's erroneous calculation of Land's age at the time of the crime denied him an individualized sentencing determination in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Land argues that the trial court's one-year miscalculation of his age deprived him of "an applicable mitigating circumstance." The Alabama Supreme Court addressed his claim as follows:

> Land next argues that the trial court miscalculated what Land's age was at the time of Ms. Brown's murder, and that the miscalculation denied him an individualized sentence and thereby violated his rights guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and rights guaranteed by Alabama law. Land states that he was born on May 23, 1969, and was only 22 years old at the time of Ms. Brown's death, on May 18, 1992. He argues that the trial court erroneously concluded that he was only a few days short of his 24th birthday at that time. Land contends that, based on the error, the trial court concluded that Land's age at the time of the crime was not an applicable

157

mitigating circumstance. Relying on *Lockett, supra,* [438 U.S. 586 (1978)], and its progeny, Land argues that the trial court's reliance on the miscalculation deprived him of the right to that court's consideration of a possible mitigating factor that would have suggested a sentence less than death and, thus, requires reversal of his sentence.

In response, the State notes that Land did not raise this claim at his sentencing or on direct appeal and that, therefore, it is subject to review only under the plain error standard. In sum, the State argues that Land has not shown the degree of harm required for a reversal under the plain error standard. It argues that even if the trial court had not made the miscalculation, which the State considers "minor," it is improbable that it would have made any difference in that court's decision that Land's age at the time of the crime was not a mitigating circumstance.

In its sentencing order, the trial court did miscalculate Land's age at the time of Ms. Brown's murder. The trial court stated that Land was "five days short of his 24th birthday," when he was actually five days short of his 23d birthday. Although Land has attempted to magnify the error by arguing he was only 22 and the trial court determined he was almost 24, the truth is that the trial court miscalculated by only one year. Whether he was five days short of 23, or five days short of 24, Land was clearly an adult, not a minor, when he killed Ms. Brown. We conclude that the trial court's miscalculation of Land's age by one year did not rise to the level of plain error.

*Ex parte Land,* 678 So.2d at 242-243.

The trial court correctly stated Land's birth date of "5/23/69." (TR. 2182). The court incorrectly calculated Land's age finding that the day the victim disappeared Land was five days short of his 24th birthday (TR. 2182) when he was actually five days short of his **23rd** birthday. The state supreme court found no plain error based on the trial court's miscalculation, noting that Land was clearly an adult, not a minor. Implicit in this finding is that the trial court would have sentenced Land to death even if it had correctly determined his age at the time of the crime

to be just short of 23.   The trial court considered the fact that Land was a young adult.  He also

considered  Land's criminal history and military service.  (TR. 2175-77, 2183).  In addition, the

trial judge found inapplicable an allegedly mitigating circumstance that Land's capacity to

appreciate the criminality of his conduct or conform his conduct to the law was substantially

impaired.  The state supreme court's finding that the miscalculation did not rise to the level of

plain error – that is, that it did not adversely affect the substantial rights of Land –  is not

contrary to *Lockett* or *Eddings* as the trial court considered but rejected Land's relative youth as

a mitigating circumstance.  This claim, therefore, does not entitle Land to habeas relief.

III.(t).   <u>The claim that the trial court's admission of a previous, uncharged offense violated
Land's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United
States Constitution.</u>

Land argues, as he did before the Alabama Supreme Court, that the prosecutor's

reference to "facts about the prior burglary" violated his constitutional rights.  The Alabama

Supreme Court stated:

> Land also argues that the prosecutor introduced, and that the trial
> court improperly admitted, evidence of a prior burglary at Ms.
> Brown['s] home a few days before she was killed. Land argues
> that the admission of this evidence violated his rights guaranteed
> by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the
> United States Constitution and rights guaranteed by Alabama law.
> Land says that before his trial a local newspaper reported that Ms.
> Brown's home had been burglarized, and the phone line cut, a few
> days before her murder. Land says that the trial court granted his
> motion in limine to preclude the State from referring to this
> previous burglary, yet allowed the prosecutor to introduce facts
> about the burglary through the testimony of Ms. Brown's former
> landlord. Although Land's argument is not clearly articulated, he
> contends that it was reversible error for the trial court to overrule
> his objections and let the jury be told of a prior bad act that he says
> they would assume he committed.

In response, the State contends that there is no indication in the record that the prosecutor, or any witness called by the State, mentioned Land's involvement in a prior burglary, or mentioned even that a burglary had occurred. The State argues that the prosecutor merely described the sequence of events surrounding the murder, i.e., the *res gestae.*

As a general rule, when a person is being tried for the alleged commission of one crime, evidence that he or she committed another illegal act that is not now charged is generally inadmissible. *McLemore v. State,* 562 So.2d 639 (Ala. Cr. App.1989); *Gainer v. State,* 553 So.2d 673 (Ala. Cr. App.1989); C. Gamble, *McElroy's Alabama Evidence* § 69.01(1) (4th ed. 1991). An exception to this rule is that . . . evidence of the other crime is admissible if the other crime is part of the *res gestae,* or the transactions inseparable from the crime charged. *Gainer; McElroy's,* § 69.01(3).

Our review of the trial record indicates that there were no comments by the prosecution, and no testimony by a witness, informing the jury that a burglary had occurred at Ms. Brown's home a few days before her murder. The prosecutor did comment in his opening statement that the phone line at the house had been previously cut and then repaired before the night of Ms. Brown's abduction, and Ms. Brown's landlord was allowed to offer testimony to the same fact. However, the statements regarding the phone line did not directly violate the trial judge's order granting Land's motion in limine and directing the State not to mention the earlier burglary. Nor would a reasonable juror naturally assume from such limited statements that a prior burglary had occurred and that Land had committed it. The fact that the phone line had previously been cut and then repaired, shortly before Ms. Brown's abduction and murder, was sufficiently related to the murder to be considered part of the *res gestae.* We conclude that there was no violation of the general exclusionary rule described above and that the trial court did not err in overruling Land's objections.

*Ex parte Land,* 678 So.2d at 243.

The landlord merely testified that when he went to the victim's house on May 19, 1992

he saw that the telephone wire had been cut. He also testified that the wire had been cut on an

earlier occasion and repaired.  (TR. 738-39).  In his opening argument, the prosecutor related the

substance of the landlord's testimony but did not identify Land as a suspect in the first burglary.

No testimony or argument suggested Land's prior burglary of the victim's home, nor that

Land was a suspect in the first burglary.  The references were only to the fact that the telephone

wires had previously been cut, then repaired and cut again on May 19, 1992.  The testimony was

relevant as part of the facts surrounding the crime.  The Alabama Supreme Court's decision was

not contrary to nor was it an unreasonable application of Supreme Court law.  Further, it was not

based on an unreasonable determination of facts in light of the evidence.  The court, therefore,

will not grant Land habeas relief on this claim.

II.(u).  <u>The claim that the systematic underrepresentation of African Americans from the jury
         pool denied Land a jury selected from a fair cross section of the community in violation
         of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States
         Constitution.</u>

Land's claim that African Americans were systematically excluded from the jury pool

fails for the same reason that it did before the Alabama Supreme Court.  The Alabama Supreme

Court stated:

>  Land argues that African-Americans were systematically
>  underrepresented in the pool from which his jury was picked and
>  that the systematic underrepresentation prevented his having a jury
>  selected from a fair cross-section of the community and violated
>  his rights guaranteed by the Sixth, Eighth, and Fourteenth
>  Amendments to the United States Constitution and rights
>  guaranteed by Alabama law. Land says that in the Birmingham
>  Division of Jefferson County, where his trial was held, African-
>  Americans constitute 42.92% of the total population. He says that
>  only 9 persons on the 56-member jury venire (or 16.07%) were
>  African-Americans. Land argues that this 26.85%
>  underrepresentation of African-Americans on his jury venire
>  requires the reversal of his conviction and death sentence. Citing

*J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), Land notes that although he is white, he may raise an equal protection issue relating to exclusion of African-Americans  from his jury because, he says, the general rule is that a defendant claiming an equal protection violation resulting from the exclusion of a class of persons from a jury need not belong to the class of persons alleged to have been illegally excluded.

Although the State concedes that African-Americans constitute a distinctive group for equal protection purposes, it argues that, even assuming Land's census calculations are correct, he failed to establish that there had been a systematic exclusion of African-Americans from the venire. Citing *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the State argues that Land has failed to establish all the elements needed to prove a violation of the constitutional requirement that a jury be taken from a fair cross-section of the community.

In *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), the United States Supreme Court held that the systematic exclusion of women from the jury selection process deprived the defendant of his rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution to have his jury selected from a fair cross-section of the community. Then in *Duren, supra*, the Court stated:

> "In order to establish a prima facie violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process."

*Duren v. Missouri,* 439 U.S. at 364, 99 S.Ct. at 668-69. See *Ex parte Dobyne,* 672 So.2d 1354 (Ala.1995). In *Duren,* the Supreme Court held that the defendant had met the third prong of the test, the most difficult one: "His undisputed demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of a year manifestly indicates that the cause of the underrepresentation was systematic-that is, inherent in the

> particular jury selection process utilized." *Duren v. Missouri,* 439
> U.S. at 366, 99 S.Ct. at 669. Land, however, has offered no
> evidence toward meeting the third prong of the test established in
> *Duren.* Thus, we conclude that Land's argument on this issue is
> without merit.

*Ex parte Land,* 678 So.2d at 243-244.

In light of Land's failure to address the third prong of the test set out in *Duren* either in

state court or here, the court concludes that the decision of the Alabama Supreme Court was not

contrary to nor did it involve an unreasonable application of *Duren*.  Accordingly, Land's habeas

petition must fail on this claim.

III.(v).  <u>The trial court's failure to transcribe critical proceedings in this case violated Land's</u>
<u>right to full transcription, prevented him from obtaining a complete appeal and deprived</u>
<u>him of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the</u>
<u>United States Constitution.</u>

The Alabama Supreme Court described Land's argument on this claim and the State's

response:

> Finally, Land argues that the trial court's failure to transcribe
> certain portions of the trial proceedings requires a reversal of his
> conviction and sentence because, he says, it prevented him from
> obtaining a full review of critical portions of his trial. Land says
> that the trial record reveals over 20 instances in which no
> transcription was made during what he says were important
> portions of his trial. According to Land, these portions of the trial
> include selection of the jury venire; striking the jury; conferences
> regarding the admissibility of testimony or exhibits offered by the
> State; a conference that occurred just beforeLand waived his right
> to testify; a conference on jury instructions; and the polling of the
> jury at both phases of the trial.
>
> Land contends he was prejudiced by the lack of a complete
> transcription. He first argues that it prevented him from
> challenging the trial court's methods used for selecting a venire
> and for striking the jury. Land contends that numerous objections
> he made to the admission of prosecution testimony or exhibits

were not preserved. Finally, he argues that the failure to transcribe
a conference that occurred just before he waived his right to testify
prevented him from challenging that waiver as involuntary or
unknowing.

In response, the State argues that there are only two ways Land
could show that he was legally entitled to have transcriptions made
of the portions of the trial that were not transcribed: (1) by
showing that he filed, and that the court granted, a pretrial motion
for a transcription of the entire proceedings, or (2) by showing that
those portions of the trial not transcribed came within the
requirements of Rule 19.4(a), Ala.R.Crim.P.. The State says that
Land did not move to have all portions of the proceedings
transcribed, and it argues that none of the portions not transcribed
falls within the requirements of Rule 19.4(a). The State further
argues that Land's claim of prejudice is unpersuasive because, it
says, he has failed to show any untranscribed trial incident as to
which he could prove reversible error if he had a transcription of
the incident.

*Ex parte Land*, 678 So. 2d at 244.

The Alabama Supreme Court then addressed Land's claim:

We conclude that there is no merit to Land's claim of reversible error
based on the lack of a complete transcript of his entire trial
proceedings. In *Hammond v. State,* 665 So.2d 970, 972 (Ala. Crim.
App.1995), the Court of Criminal Appeals stated that with regard to
such a claim as Land now makes, the reviewing court "must
determine whether a substantial right of the appellant has been
adversely affected by [the] omission from the transcript." Further,
this Court has ruled that even where a transcript was lacking for a
portion of the trial that should have been transcribed and the
defendant's appellate counsel had not been the defendant's trial
counsel, the appellate court had to examine the existing record of the
trial in order to determine whether the failure to transcribe that
portion of the trial was only harmless error rather than reversible
error. *Ex parte Harris,* 632 So.2d 543 (Ala.1993) (holding that
although the failure to transcribe the voir dire examination of the jury
was error, it was only harmless error, even when the trial court had
granted the defendant's motion to have all proceedings in all phases
of the trial transcribed), *affirmed,* 513 U.S. 504, 115 S.Ct. 1031, 130
L.Ed.2d 1004 (1995).

The portions of the trial that Land says were not transcribed involve selection of the jury venire and striking the jury; bench conferences among the trial judge, the prosecution, and defense counsel; or the polling of the jury. Regarding transcription of a capital murder trial, such as Land's, Rule 19.4(a), Ala.R.Crim.P.,FN4 states:

> FN4. This rule creates duties for the court reporter in addition to those established by Ala.Code 1975, § 12-17-275.

> "In all capital cases (criminal trials in which the defendant is charged with a death penalty offense), the court reporter shall take full stenographic notes of *voir dire of the jury and of the arguments of counsel*, whether or not such is ordered by the judge or requested by the prosecution or defense. This duty may not be abrogated by the judge or waived by the defendant."

(Emphasis added.)

In *Ex parte Harris,* this Court noted that the phrase "arguments of counsel," as it is used in Rule 19.4(a), does *not* refer to "every incidental discussion between counsel and the trial judge that occurs at the bench," but, rather, refers only to counsel's opening and closing arguments. 632 So.2d at 545. Thus, it is clear that Rule 19.4(a) did not require the court reporter to transcribe the various bench conferences now placed in issue by Land. Although Land claims error in the lack of a transcript of the court's selection of the venire and of the actual striking of the jury, Rule 19.4(a) requires only transcription of the "voir dire of the venire," which was transcribed in full and which is part of the record in this case. Nor does Rule 19.4(a) require transcription of the polling of the jury. The transcript shows that both following the jury foreman's pronouncement of the jury's finding as to guilt and then later following the foreman's pronouncement of the jury's recommended sentence, the court reporter made a contemporaneous notation indicating that the judge polled the jury.

It is important to note that Land did not request that all proceedings of the trial be transcribed and, as explained above, Rule 19.4(a) did not require that they all be transcribed. Thus, Land cannot argue that the trial court breached a legal duty with regard to the transcription of his trial. Moreover, Land is raising this issue for the first time on appeal, and our review is subject to the plain error standard. After

> reviewing the record at the point of each transcript omission
> referenced by Land, we conclude that the lack of a complete
> transcription has not adversely affected his substantial rights. Thus,
> we find no plain error.

*Ex parte Land*, 678 So.2d at 244-245.

The United States Supreme Court has addressed the importance of a complete record in reviewing a capital case.  The Supreme Court stated "Since the State must administer its capital-sentencing procedures with an even hand, . . . it is important that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed."  *Gardner v. Florida,*  430 U.S. 349, 361, 97 S.Ct. 1197, 1206, 51 L.Ed.2d 393 (1977)  In *Gardner*, the Court remanded for further proceedings on the basis that the presentence investigation report contained a confidential portion which was not disclosed to defense counsel.   *See also Gregg v. Georgia,* 428 U.S. 153, 167, 198, 96 S.Ct. 2909, 2922, 2936, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (Georgia capital sentencing provision requiring transmittal on appeal of complete transcript and record is important "safeguard against arbitrariness and caprice"); *Dobbs v. Zant,* 506 U.S. 357, 358-59, 113 S.Ct. 835, 836, 122 L.Ed.2d 103 (1993)("We have emphasized before the importance of reviewing capital sentences on a complete record.")

The Eleventh Circuit has had several occasions to address whether the failure to transcribe certain portions of the trial rendered the record deficient. *See Songer v. Wainwright,* 733 F.2d 788, 792 (11th Cir. 1984)(Lack of charge conference transcript did not render record so deficient that it would be impossible for the reviewing court to perform the function required under *Gregg*); *Moore v. Balkcom,*  716 F.2d 1511, 1526 (11th Cir. 1983)("Moore has not shown

that the state of the record [based on failure to transcribe closing arguments at sentencing hearing] was inadequate to permit the Georgia Supreme Court to perform its required review function" ), *cert. denied,* 465 U.S. 1084, 104 S.Ct. 1456, 79 L.Ed.2d 773 (1984); *Corn v. Zant*, 708 F.2d 549 (11th Cir. 1983) ("Absent any showing of harm by a petitioner, it is settled that failure to transcribe counsel's arguments is not a constitutional violation requiring vacation of a death sentence"); *cert. denied,* 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984); *See also Stephens v. Zant*, 631 F.2d 397, 402 (5th Cir.1980), *modified on other grounds,* 648 F.2d 446 (5th Cir.1981), *aff'd on other grounds, Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (rejecting the claim of a death-row inmate that the absence of the transcript of both the closing arguments and arguments at petitioner's sentencing  violated *Gregg* or *Gardner*.)  None of these cases support Land's position here.

Because Land  has not alleged this claim with specificity nor offered evidence  that anything prejudicial occurred during the portions of the trial that were not transcribed or that his conviction and sentence were based on anything other than the evidence presented and transcribed, he has failed establish that the record was insufficient for the Alabama appellate courts to perform their required review functions.

The state supreme court's decision was not contrary to clearly established federal law. The court concludes, therefore, that Land is not entitled to habeas relief on this claim.

III.(w).  The trial court denied Land of his right to fully examine each venire member in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

This claim was adequately addressed in section III(r) above.  The court would add only that the trial court specifically stated to counsel:

> I do not, in declining the use of a questionnaire, mean to diminish
> one iota your opportunity to fully voir dire this venire.

(TR. 349).

Land failed to show any diminishment in his ability to fully examine each venire member, and,

therefore, he is not entitled to habeas relief on this claim.


IV.    Claim that juror misconduct during Land's trial deprived him of a fair trial, due process,
       and a reliable sentencing determination under the Fifth, Sixth, Eighth and Fourteenth
       Amendments to the United States Constitution.

This claim is procedurally barred from federal review because the Alabama Court of

Criminal Appeals found it precluded from Rule 32  review because it could have been but was

not raised at trial or on direct appeal.  *Land v. State*, CR-02-1563, memo. op. at 11.  Land has not

addressed this procedural default and has thus failed to establish cause and prejudice to overcome

the procedural default.

The Alabama Court of Criminal Appeals also agreed with the trial court that the juror

misconduct claim was precluded because it was raised beyond the two year statute of limitations

as provided in Rule 32.2(c), citing *Charest v. State*, 854 So.2d 1102 (Ala. Crim. App. 2002).

*Land v. State*, CR-02-1563, memo. op. at 35.  Land argues that the claim is not barred by the two

year statute of limitations because *Charest v. State* was overruled by *Ex parte Jenkins*, 2005 WL

796809 (Ala. 2005).  *Ex parte Jenkins, supra*, was decided April 8, 2005.  In *Hunt v. State*, 940

So.2d 1041, 1054, n.7 (Ala.Crim App. 2005), *cert. denied* (Ala. 2006), the Alabama Court of

Criminal Appeals applied the holding in *Jenkins* "because this appeal was pending at the time

that the decision in *Jenkins* was released.  *See Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708,

93 L.Ed.2d 649 (1987)."  Thus, the state appellate courts would not apply  *Jenkins* retroactively.

In Land's case, the petition for writ of certiorari on appeal from the denial of the Rule 32 petition was denied on September 24, 2004.  This federal habeas petition was filed on September 29, 2004.  The fact that *Charest* was overruled by *Jenkins* subsequent to Land filing his federal habeas petition would not allow this court to overlook the procedural default found in state court.

At any rate, the claim is also barred from federal review because it was  precluded from state review because it could have been but was not raised at trial or on direct appeal.[22]   Land has not established cause and prejudice to overcome his procedural default.

---

[22]    The Alabama Court of Criminal Appeals stated:
> This Court **notes** that although there may be jury misconduct claims that could not have been raised at trial or on appeal, the petitioner has failed to plead any facts demonstrating that his claims fit into such a category.  According to Rule 32.2, Ala.R. Crim.P., the petitioner has the "burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief."

*Land v. State*, CR-02-1563, memo. op. at 36 (emphasis added).

 Land has not addressed this procedural default.  Rule 32.3, Ala. R. Crim. Procedure, provides:
> The petitioner shall have the burden of pleading and providing by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.  The state shall have the burden on pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden on disproving its existence by a preponderance of the evidence.

The Eleventh Circuit Court of Appeals has held:
> Rules 32.3 and 32.6(b) have been firmly established and regularly followed by the Alabama courts. The Court of Criminal Appeals has consistently affirmed, as it did with Jenkins, lower court decisions that have summarily dismissed Rule 32 petitions that do not include specific facts which would entitle the petitioner to collateral relief. See, e.g., *Shaw v. State*, 949 So.2d 184, ---- (Ala. Crim. App. 2006); *Tubbs v. State*, 931 So.2d 66, 68 (Ala. Crim. App. 2005); *Boyd v. State*, 913 So.2d 1113, 1126-32 (Ala. Crim. App. 2003); *Chambers v. State*, 884 So.2d 15, 18-19 (Ala. Crim. App. 2003).

*Jenkins v. Bullard*,  210 Fed.Appx. 895, 900-901, 2006 WL 3635410 (11th Cir. 2006).

V.   <u>Request for evidentiary hearing</u>

Land seeks an evidentiary hearing in federal court on five claims: (1) Trial court's admission of DNA evidence; (2) trial court's failure to correct jury's misunderstandings about presumption of innocence based on a juror's note; (3) juror misconduct; (4) *Brady* violations; (5) prosecutorial misconduct based on prosecutor's comment on his failure to testify.

As observed above, The trial court conducted a Rule 32 evidentiary hearing on July 2, 2001.  28 U.S.C. § 2254(e)(2) provides:

> (2)    If the applicant has failed to develop the factual basis for a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
>     (A)    the claim relies on –
>
>         (i)    a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
>         (ii)    a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
>     (B)    the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Where a petitioner fails to develop the facts in support of his habeas claim in a state collateral evidentiary hearing the petitioner is entitled to a federal evidentiary hearing only if he

170

can show both cause for his failure to develop the facts in the state court proceedings and actual

prejudice resulting from that failure or if he can demonstrate that a fundamental miscarriage of

justice would result from failure to hold a federal evidentiary hearing. *Keeney v. Tamayo-Reyes*,

504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992).  In *Williams v. Taylor*, a529 U.S. at 433-34,

120 S.Ct. at 1489, the Court observed that § 2254(e)(2) as amended by the Anti-Terrorism and

Effective Death Penalty Act (herein AEDPA) "raised the bar *Keeney* imposed on prisoners who

were not diligent in state-court proceedings. . . so that prisoners who would have had to satisfy

*Keeney's* test for excusing the deficiency in the state-court record prior to the AEDPA are now

controlled by § 2254(e)(2)."

   The Supreme Court court recognized that before § 2254(e)(2) is even called into play, the

court must first make a determination of diligence:

> The question is not whether the facts could have been discovered
> but instead whether the prisoner was diligent in his efforts.  The
> purpose of the fault component of "failed" is to ensure the prisoner
> undertakes his own diligent search for evidence.  Diligence for
> purposes of the opening clause depends upon whether the prisoner
> made a reasonable attempt, in light of the information available at
> the time, to investigate and pursue claims in state court . . .Though
> lack of diligence will not bar an evidentiary hearing if efforts to
> discover the facts would have been in vain, see § 2254(e)(2)(A)(ii),
> and there is a convincing claim of innocence, see § 2254 (e)(2)(B),
> only a prisoner who has neglected his rights in state court need
> satisfy these conditions.
>
>                              . . . .
>
> Diligence will require in the usual case that the prisoner, at a
> minimum, seek an evidentiary hearing in state court in the manner
> prescribed by state law. . . .   For state courts to have their rightful
> opportunity to adjudicate federal rights, the prisoner must be
> diligent in developing the record and presenting, if possible, all
> claims of constitutional error.  If the prisoner fails to do so, himself

171

> or herself contributing to the absence of a full and fair adjudication
> in state court, § 2254(e)(2) prohibits an evidentiary hearing to
> develop the relevant claims in federal court unless the statute's
> other stringent requirements are met.  Federal courts sitting in
> habeas are not an alternative forum for trying facts and issues
> which a prisoner made insufficient effort to pursue in state
> proceedings.  Yet comity is not served by saying a prisoner "has
> failed to develop the factual basis of a claim" where he was unable
> to develop his claim in state court despite diligent effort.  In that
> circumstance, an evidentiary  hearing is not barred by § 2254(e)(2).

*Williams*, 529 U.S. at 435-37, 120 S.Ct. 1490-91.

Land had an opportunity in his Rule 32 evidentiary hearing to develop the factual basis for his *Brady* claims, but failed to do so except with respect to the interoffice communication. Land states that the other *Brady* claims were "record claims."  Land has failed to satisfy 28 U.S.C. § 2254(e)(2)(A)(ii) and (B).  Land cannot here rely on his counsel's failure, in the Rule 32 evidentiary hearing, to develop this factual basis.  "Attorney negligence . . . is chargeable to the client and precludes relief unless the conditions of § 2254(e)(2) are satisfied."  *Holland v. Jackson,*  542 U.S. at 653, 124 S.Ct. at 2738.  See also, *Hall v. Head*, 310 F.3d 683, 698 (11th Cir. 2002), *cert denied*, 540 U.S. 924, 124 S.Ct. 329, 157 L.Ed.2d 225 (2003).

The Rule 32 court concluded prior to the evidentiary hearing that claims related to the admission of DNA evidence and juror misconduct were precluded on grounds that the claims were not raised at trial or on appeal and that his prosecutorial misconduct claim was barred because it had been rejected on appeal.  Because they were precluded, these claims were not addressed at the Rule 32 hearing.

The Supreme Court has recently explained that while the AEDPA generally prohibits federal habeas courts from granting evidentiary hearings when applicants have failed to develop

the factual bases for their claims in state courts, the district court, however, has discretion to

order an evidentiary hearing where the § 2254(e)(2) prohibition is not at issue.  The Supreme

Court has explained what the district court should consider in deciding whether to grant an

evidentiary hearing:

> [A] federal court must consider whether such a hearing could
> enable an applicant to prove the petition's factual allegations,
> which, if true, would entitle the applicant to federal habeas relief.
> See, e.g., *Mayes v. Gibson*, 210 F.3d 1284, 1287 (C.A.10 2000).
> Because the deferential standards prescribed by § 2254 control
> whether to grant habeas relief, a federal court must take into
> account those standards in deciding whether an evidentiary hearing
> is appropriate. See id., at 1287-1288 ("Whether [an applicant's]
> allegations, if proven, would entitle him to habeas relief is a
> question governed by [AEDPA]").

> It follows that if the record refutes the applicant's factual
> allegations or otherwise precludes habeas relief, a district court is
> not required to hold an evidentiary hearing. The Ninth Circuit has
> recognized this point in other cases, holding that "an evidentiary
> hearing is not required on issues that can be resolved by reference
> to the state court record." *Totten v. Merkle*, 137 F.3d 1172, 1176
> (1998) (emphasis deleted) (affirming the denial of an evidentiary
> hearing where the applicant's factual allegations "fl[ew] in the face
> of logic in light of . . . [the applicant's] deliberate acts which are
> easily discernible from the record"). This approach is not unique to
> the Ninth Circuit. See *Anderson v. Attorney General of Kan.*, 425
> F.3d 853, 858-859 (C.A.10 2005) (holding that no evidentiary
> hearing is required if the applicant's allegations are contravened by
> the existing record); *cf. Clark v. Johnson*, 202 F.3d 760, 767
> (C.A.5 2000) (holding that no hearing is required when the
> applicant has failed to present clear and convincing evidence to
> rebut a state court's factual findings); *Campbell v. Vaughn*, 209
> F.3d 280, 290 (C.A.3 2000) (same).

> This principle accords with AEDPA's acknowledged purpose of
> "reduc[ing] delays in the execution of state and federal criminal
> sentences." *Woodford v. Garceau*, 538 U.S. 202, 206, 123 S.Ct.
> 1398, 155 L.Ed.2d 363 (2003) (*citing Williams v. Taylor, supra*, at
> 386, 120 S.Ct. 1495 (opinion of STEVENS, J.) ("Congress wished

173

> to curb delays, to prevent 'retrials' on federal habeas, and to give effect to state convictions to the extent possible under law")). If district courts were required to allow federal habeas applicants to develop even the most insubstantial factual allegations in evidentiary hearings, district courts would be forced to reopen factual disputes that were conclusively resolved in the state courts.

*Schriro v. Landrigan*, __ U.S. __, 127 S.Ct. 1933, 1939-40, 167 L.Ed.2d 836 (2007).

This court has concluded that the claims involving the admission of DNA evidence and juror misconduct are procedurally barred from federal review because the state courts found them to be precluded from state collateral review.  The court has also determined that in conjunction with these claims Land made no attempt to show cause and prejudice for the procedural default of the juror misconduct claim and has failed to establish cause for the procedural default of his DNA claim.

The claims involving the jury's alleged misunderstanding about the presumption of innocence and the prosecutor's alleged comments about Land's failure to testify do not require an evidentiary hearing because these issues are resolved on the merits by reference to the state court record, as described in Sections I.(a) and III.(j) above.

Based on the foregoing the petition for writ of habeas corpus is due to be denied.  A separate final judgment consistent with this memorandum of opinion will be entered simultaneously herewith.

DONE and ORDERED this 18th day of October 2007.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE